Christopher W. Arledge (Bar No. 200767)
  carledge@turnergreen.com
Peter Afrasiabi (Bar No. 193336)
  pafrasiabi@turnergreen.com
John Tehranian (Bar No. 211616)
  jtehranian@turnergreen.com
**TURNER GREEN LLP**
535 Anton Boulevard, Suite 850
Costa Mesa, California 92626
Telephone:   (714) 434-8750
Facsimile:   (714) 434-8756

Attorneys for Defendants Charles S. DeVore and
Justin Hart

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| DON HENLEY and MIKE CAMPBELL, <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES S. DEVORE and JUSTIN HART, <br><br> Defendants. | **Case No. SACV 09-0481 JVS** <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS UNDER RULE 12(B)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE** <br><br> Hearing Date:   June 29, 2009 <br> Hearing Time:   1:30 p.m. |

///

///

///

1

14765.1

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

# TABLE OF CONTENTS

I.   INTRODUCTION.................................................................................................1

II.  FACTUAL BACKGROUND.............................................................................1

III. ALLEGATIONS RELATED TO THE SECONDARY
     CLAIMS...........................................................................................................3

IV.  HENLEY CANNOT PLEAD A VIABLE LANHAM ACT CLAIM....................4

     A.   Henley does not plead a false endorsement claim because he does not
          allege that Defendants used his name, image or any other distinctive
          attribute........................................................................................................5

          1.   *Dastar* prohibits courts from creating "a species of mutant
               copyright law"....................................................................................6

          2.   Henley's false endorsement claim would create "a species of mutant
               copyright law" in contradiction to *Dastar*...........................................8

     B.   Henley's Lanham Act claim is defective because Defendants' parodies do
          not constitute the use of goods or services in commerce............................11

V.   HENLEY DOES NOT PLEAD A VIABLE UCL CLAIM..................................13

     A.   Henley's UCL claim has the same fundamental flaws as the Lanham Act
          claim...........................................................................................................14

     B.   Henley lacks standing to pursue the UCL claim..........................................14

          1.   Section 17203 helps explain the standing requirement...................15

          2.   Applying Section 17203 law to Section 17204's standing rule.........16

VI.  CONCLUSION..................................................................................................18

14765.1

i

# TABLE OF AUTHORITIES

**Cases**

*Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) ...................... 11

*Buckland v. Threshold Enterprises, Ltd.*, 155 Cal.App.4th 798, 817 (2007) ...................... 17

*Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022, 1062 (N.D.Cal. 2007) .................... 17

*Center for Biological Diversity, Inc. v. FPL Group, Inc.*, 2006 WL 2987634 (2006) ........ 16

*Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) ..................................... 14

*Compare Tax Cap Committee v. Save Our Everglades, Inc.*, 933 F.Supp. 1077, 1081 (S.D. Fla. 1996) ............................................................................... 12

*Daro v. Superior Court*, 1 Cal.App.4th 1079, 1097 (2007) .................................... 14

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ...................... 1, 6

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003) .......................... 15

*Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006) ................ 14

*Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 2004 WL 434004 (S.D.N.Y. 2004) .......................................................................... 12

*Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988 ................................. 9

*New.Net, Inc. v. Lavasoft*, 356 F.Supp.2d. 1090, 1117 (C.D. Cal. 2004) ...................... 12

*Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003) .......................... 11

*Sinatra v. Goodyear Tire and Rubber Co.*, 435 F.2d 711 (9th Cir. 1970) ...................... 6

*United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2nd Cir. 1997) ..................................................................... 12

*Waits v. Frito-Lay, Inc.* 978 F.2d 1093, 1098, 1106 (9th Cir. 1992) ......................... 5

*Wilcox v. Birtwhistle*, 21 Cal.4th 973, 979 (1999) .......................................... 16

**Statutes**

15 U.S.C. § 1125 ................................................................. 4, 11

17 U.S.C. § 115 ................................................................... 9

17 U.S.C. § 501(b) ................................................................ 9

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Cal. Bus. & Prof. Code § 17204 ......................................................................... 14, 15, 16, 17

California Business and Professions Code § 17200 ............................................................ 14

**Other Authorities**

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) ............................................................ 12

S. 1883, 101st Congress, 1st Sess., 135 Cong. Rec. 1207, 1217 (April 13, 1989) .............. 12

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1 **TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

2     PLEASE TAKE NOTICE that on June 29, 2009 at 1:30 p.m., or as soon thereafter as

3 the matter may be heard, in the in the Courtroom of the Honorable James V. Selna, United

4 States District Judge for the Central District of California, Southern Division, located at 411

5 W. Fourth Street, #1053, Santa Ana, CA 92701, Defendants Charles S. DeVore and Justin

6 Hart (collectively, "the Defendants") will and hereby do move the Court to dismiss pursuant

7 to Federal Rule of Civil Procedure 12(b)(6) the fourth cause of action for false endorsement

8 under the Lanham Act and the fifth cause of action for unfair competition under

9 California's Unfair Competition Law.  Henley does not allege the necessary elements of a

10 false endorsement claim, and this Court cannot extend the Lanham Act to cover Henley's

11 claim because of the Supreme Court's opinion in *Dastar Corp. v. Twentieth Century Fox*

12 *Film Corp.*, 539 U.S. 23 (2003).  In addition, Henley's UCL claim is defective both for the

13 same reasons the Lanham Act claim is defective and because Henley lacks standing to

14 pursue such a claim, having never been deprived of money or property by Defendants.

15     Pursuant to Local Rule 7-3, Counsel for Defendants provided notice of this motion to

16 Plaintiffs' counsel on May 11, 2009 and discussed the motion over the telephone with

17 Plaintiffs' counsel on May 12, 2009.

18     The Motion will be made for all of the reasons set forth in the accompanying

19 Memorandum of Points and Authorities, this Notice, the files and records on file with the

20 Court in this action, and any additional arguments that may be presented to and received by

21 the Court.

22 Dated:  May 21, 2009         **TURNER GREEN LLP**

23                 By:    /s/Christopher W. Arledge

24                      Christopher W. Arledge

25                      Attorneys for Defendants, Charles S. Devore and
Justin Hart

26

27

28

14765.1

2

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1 | **MEMORANDUM OF POINTS AND AUTHORITIES**

2 | **I.    INTRODUCTION**

3 |       This is a free speech case.  Defendants wish to use parody to reach voters with a

4 | political message.  Plaintiffs wish to use federal and state law to silence them.

5 |       Don Henley and his co-plaintiff are world-famous songwriters and performers.

6 | Chuck DeVore is a member of the California Assembly who is running for the U.S. Senate

7 | seat now held by Barbara Boxer; his co-defendant is a campaign advisor.  The primary

8 | issue is whether Defendants had the right to parody Plaintiffs' song, "Boys of Summer."

9 | Plaintiffs say no, arguing that Defendants infringed their copyright by creating an

10 | unauthorized derivative work.  Defendants counter that their work was parody and political

11 | speech, protected under the fair use doctrine and the First Amendment.

12 |       These are important issues, and Defendants' efforts here will promote the right to

13 | speak freely.  They are also issues for another day, however, because Defendants do not

14 | move to dismiss the copyright claims yet.  Right now, Defendants only ask this Court to

15 | strip away some clutter from the complaint.  Henley includes with the copyright claims

16 | certain secondary claims under the Lanham Act and California's Unfair Competition Law

17 | ("UCL").  Henley's secondary claims seek to extend copyright protection where the

18 | Copyright Act itself refuses to go, including to a second song that Henley did not write and

19 | in which he does not own the copyright.  But the Supreme Court has already squarely

20 | rejected any attempt to use other statutes to create quasi-copyright protections.  In addition,

21 | Henley's Lanham Act claim is defective because Defendants are not engaged in the use of

22 | "goods or services … in commerce," and he lacks standing to pursue the UCL claim

23 | because he has not been deprived of money or property by Defendants.

24 | **II.    FACTUAL BACKGROUND**

25 |       Carl von Clausewitz called war "the continuation of policy by other means."  For

26 | Don Henley, litigation is the continuation of policy disagreement by other means.  Henley

27 | does not like Chuck DeVore's politics—his complaint makes that clear—and he is angry

28 |

1

14765.1

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1  that DeVore has parodied his work in a political campaign. So Henley asks this Court to

2  silence a political opponent.

3       Chuck DeVore and Don Henley have long been involved in public policy, albeit on

4  opposite ends of the political spectrum. Chuck DeVore has been involved in conservative

5  politics his entire adult life, including as a Reagan White House appointee in the Pentagon,

6  as an aide to Congressman Chris Cox, and currently as a member of the State Assembly.

7  He is now a Republican candidate for the U.S. Senate seat currently held by Barbara Boxer.

8       Henley is also politically active, using a rock star's profile and wealth to promote his

9  liberal ideology. He gives substantial money to liberal causes and candidates (about

10  $750,000 so far), including to DeVore's soon-to-be opponent, Barbara Boxer; he plays at

11  fundraisers; and he speaks out on political topics, including in his music. Many of

12  Henley's songs convey a partisan, political message, including the two songs put at issue in

13  the complaint.

14       DeVore and Hart's first parody takes on Plaintiffs' "Boys of Summer," which is

15  essentially a political tract set to pop music. On the surface, the song is a wistful look at an

16  old romance, a fling between two kids, now grown, who have moved on with their lives.

17  But the song also has a clear political message. As Henley says, the second verse of the

18  song—the one with the famous line about seeing "a Dead Head sticker on a Cadillac"—

19  was about the essential failure of Sixties' politics: "I don't think we changed a damn thing,

20  frankly…. After all our marching and shouting and screaming didn't work, we withdrew

21  and became yuppies and got into the Me Decade."

22       DeVore and Hart's parody substitutes Barack Obama for the singer's love interest

23  and has Henley (and other outspoken liberal celebrities) dreaming wistfully of the time

24  before President Obama's election: "We will never forget those nights/ We wonder if it was

25  a dream/ Remember how you made us crazy?/ Remember how we made you beam." The

26  song asks whether the parties' naïve love affair can survive the circumstances since,

27  particularly President Obama's broken promises and failure to deliver on the promised

28  "hope."

14765.1

2

1       DeVore and Hart's second parody takes on "All She Wants To Do Is Dance," a song

2   Henley performed but did not write. "All She Wants To Do Is Dance," is about

3   Americans' indifference to what Henley perceives to be the misconduct of the Reagan

4   administration in Central America. In a not-so-subtle attack on the U.S. government's

5   policies—policies that DeVore helped to implement during the Reagan administration—the

6   song asserts that the American government was inserting itself into Central American

7   politics and enriching itself through immoral foreign policies that are causing or at least

8   contributing to violence in that region while the people there simply demanded that

9   America get out of their business.

10       DeVore and Hart's parody is a direct attack on liberal policies in America and Don

11   Henley's particular brand of politics. The song asserts that the American government,

12   through Barbara Boxer and her comrades in Washington—and with the support of

13   Hollywood's liberal elite (of which Henley is proudly a member)—are inserting themselves

14   into the American economy and enriching the government and certain special interests

15   through immoral tax policies that are causing a decrease in the American standard of living

16   while the American people simply demand that the liberals get out of their business.

17       DeVore and Hart's parodies, then, are directed at songs promoting liberal causes by a

18   well-known liberal activist who actively and openly supports DeVore's political opponents

19   and who has injected himself and his music into the political debate. The parodies turn

20   these political songs on their heads, promoting conservative political philosophies rather

21   than the liberal politics in the originals. In the process, the parodies mock the original

22   songs, Henley, and the liberal politicians and politics that he so vocally supports.

23   **III.   ALLEGATIONS RELATED TO THE SECONDARY CLAIMS**

24       Plaintiffs allege that Defendants copied almost all of Henley and Campbell's song

25   "Boys of Summer" note-for-note, altered the lyrics to suit their own purpose, recorded a

26   performance of the song with the new lyrics, and distributed a video of the performance on

27   YouTube and elsewhere. Complaint at ¶¶ 1-2. Plaintiffs allege that, days later, Defendants

28

1 │ "appropriated and exploited yet another famous song widely associated with Henley, 'All

2 │ She Wants to Do Is Dance.'" *Id.* at ¶ 4.

3 │      Henley asserts that in using the songs, Plaintiffs have appropriated Henley's

4 │ "goodwill, identity and persona," creating an unacceptable "false association" with them.

5 │ *Id.* at ¶ 5.  He alleges that Defendants "are attempting to capitalize on Henley and

6 │ Campbell's fame and popularity as hit songwriters and recording artists to advance their

7 │ personal and professional agenda [sic]." *Id.* at ¶ 38.  Plaintiffs "do[] not want endorse

8 │ DeVore's campaign and do[] not wish … to be associated with DeVore or the DeVore

9 │ campaign." *Id.* at ¶ 6.  They "do not want the public to believe that they might be

10 │ associated with or endorse the social or political views of DeVore." *Id.* at ¶ 39.

11 │      Henley asserts that both original songs are "famously associated with Henley and

12 │ immediately suggest[] Henley's identity and persona in the mind of the public." *Id.* at ¶¶

13 │ 69-70.  He argues that Defendants' use of the songs, one after another, "was likely to cause

14 │ confusion or mistake by the public regarding whether Henley has endorsed, is affiliated,

15 │ connected to, or associated with, or has approved of the message and content of"

16 │ Defendants' videos. *Id.* at ¶ 72.

## IV.  HENLEY CANNOT PLEAD A VIABLE LANHAM ACT CLAIM

18 │      Henley sues under the Lanham Act, which imposes liability on "[a]ny person who,

19 │ on or in connection with any goods or services … uses in commerce any word, term, name,

20 │ symbol, or device, or any combination thereof, or any false designation of origin, false or

21 │ misleading description of fact, or false or misleading representation of fact, which … is

22 │ likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection,

23 │ or association of such person with another person, or as to the origin, sponsorship, or

24 │ approval of his or her goods, services, or commercial activities by another person…." 15

25 │ U.S.C. § 1125.  Henley alleges that Defendants violated the Lanham Act by falsely

26 │ conveying that he had endorsed Defendants or their parodies.

27 │      Henley does not state a claim under the Lanham Act for two reasons.  First, all courts

28 │ that have recognized a false endorsement claim have required the plaintiff to plead and

14765.1

4

1  prove that the defendant used the plaintiff's name, image or some other distinctive

2  attribute.  Henley has pled none of those things.  Instead, Henley seeks to control

3  Defendants' very right to use two copyrighted songs, merely because those songs are

4  "associated" with him.  But any such theory under the Lanham Act would impermissibly

5  conflict with copyright law.   Second, Henley does not allege that Defendants used his

6  "mark" "in connection with any goods or services … in commerce."

7   **A.   Henley does not plead a false endorsement claim because he does not**

8   **allege that Defendants used his name, image or any other distinctive**

9   **attribute**

10   In the prototypical false endorsement case, the defendant uses the plaintiff's actual

11  name or likeness.  But the use of a name or likeness is not specifically required.  In the

12  Ninth Circuit, "courts have recognized false endorsement claims brought by plaintiffs,

13  including celebrities, for the unauthorized imitation of their *distinctive attributes*, where

14  those attributes amount to an unregistered commercial 'trademark.'"  *Waits v. Frito-Lay,*

15  *Inc.* 978 F.2d 1093, 1098, 1106 (9th Cir. 1992) (emphasis added).  Thus, for example, the

16  Ninth Circuit found liability for false endorsement where the defendant used "an

17  unauthorized imitation of an entertainer's distinctive voice."  *Id.* at 1107.

18   Henley asserts that Defendants have misappropriated "his goodwill, identity and

19  persona."  Complaint at ¶ 5.  But he does not allege that Defendants have used his name,

20  image, voice, or any other "distinctive attribute."  To the contrary, Henley makes clear that

21  Defendant Hart used his own voice, and the words they delivered in connection with the

22  songs never claimed Henley's endorsement by name or implication.  Thus, Henley merely

23  asserts that Defendants violate the Lanham Act "by using well-known songs associated

24  with him, one almost immediately after another."  *Id.*

25   Henley, then, asks this Court to extend the false endorsement theory, finding Lanham

26  Act liability for the mere act of using without permission a copyrighted musical

27  composition that is somehow associated with someone else.

28

1     That is something this Court cannot do.  The Ninth Circuit decided in *Sinatra v.*

2  *Goodyear Tire and Rubber Co.*, 435 F.2d 711 (9th Cir. 1970), that a performer has no right

3  to stop someone else from using a song closely associated with that performer.  There,

4  Goodyear acquired a copyright license to the song "These Boots Are Made For Walking," a

5  song the public undoubtedly associated with Nancy Sinatra.  Goodyear changed some of

6  the lyrics, hired a singer to perform the revised song, and used it in a commercial.  Sinatra

7  sued for unfair competition, alleging that "the song ha[d] been so popularized by the

8  plaintiff that her name [wa]s identified with it; that she [wa]s best known for her

9  connection with the song; [and] that said song and the arrangement used by defendants had

10  acquired a 'secondary meaning....'"  *Id.* at 712.  The Ninth Circuit rejected her claim,

11  finding that it clashed impermissibly with copyright law.

12     Sinatra's argument was at least as good, and probably better, than Henley's.  Sinatra

13  could at least allege that Goodyear hired a singer to "imitate the voice and style of the

14  plaintiff."  If true that Goodyear sought to use a "distinctive attribute" of Sinatra's by

15  mimicking her voice, she might have had a claim under *Waits*.  But as to the argument that

16  she could preclude someone else from using her song because of its close association with

17  her, Sinatra made and lost Henley's identical argument almost four decades ago.

18     The progression of intellectual property law since *Sinatra* does not help Henley.

19  Indeed, the Supreme Court's opinion in *Dastar* seems to have foreclosed his argument for

20  good.

21     **1.**   ***Dastar* prohibits courts from creating "a species of mutant**

22          **copyright law"**

23     *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), concerned

24  certain rights in Dwight Eisenhower's written account of the war in Europe.  Fox acquired

25  the copyright in a television series based on Eisenhower's book; Fox did not acquire the

26  copyright in the underlying book.  In 1977, the copyright was set to expire on the television

27  series, and Fox failed to renew it.  Thus, the series entered the public domain.  In 1988, Fox

28

14765.1

6

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1   reacquired the television rights in Eisenhower's book.  Fox's licensees then restored the

2   original television series, repackaged it on videotape, and distributed the tapes.

3       In 1995, Dastar produced and distributed its own WWII video series.  Dastar took

4   tapes of the original Fox television series—which was, of course, in the public domain—

5   and borrowed heavily from it.  Dastar basically copied the series, shortened it, removed

6   references to and images of the book, and inserted some of its own touches, such as a new

7   opening sequence and closing.  Dastar gave the product a new title and sold the video as its

8   own product, with no reference to Fox or Fox's earlier series.

9       Fox sued for copyright infringement and "reverse passing off" under the Lanham

10  Act.  The Ninth Circuit found in Dastar's favor on the copyright claim, but held that Dastar

11  substantially copied Fox's series and marketed it without attribution to Fox, and that this

12  bodily appropriation of Fox's work was sufficient to establish a violation of the Lanham

13  Act.  The Supreme Court granted certiorari to decide the Lanham Act issue and reversed.

14      The Lanham Act prohibits conduct likely to cause confusion as to the "origin" of

15  "goods," and it therefore prohibits both "passing off" (passing off your goods as those of

16  another) and "reverse passing off" (passing off someone's else's "goods" as your own).

17  But the question before the Court was what "goods" Dastar was passing off—its goods or

18  Fox's?  Fox argued that Dastar's WWII videotapes were Fox's "goods" under the Lanham

19  Act, because Fox "originated the ideas or communications that [the] 'goods' embody or

20  contain."  *Id.* at 32.  The Court rejected that definition, finding that "[s]uch an extension [of

21  the phrase 'origin of goods'] would not only stretch the text, but it would be out of accord

22  with the history and purpose of the Lanham Act and inconsistent with precedent."  *Id.*

23      According to the Court, interpreting "origin of goods" to apply not only to the

24  producer of a physical item (like a video tape) but also to the "creator of the content that the

25  physical item conveys" would "conflict with the law of copyright, which addresses that

26  subject specifically."  *Id.* at 33.  As the Court has made clear on many occasions, "unless an

27  intellectual property right such as a patent or copyright protects an item, it will be subject to

28  copying."  *Id.*  Indeed, it is critical that copyright and patent protections not be extended

14765.1                                          7

1 | beyond the statutes that set forth those rights. "The rights of a patentee or copyright holder
2 | are part of a 'carefully crafted bargain,' under which, once the patent or copyright
3 | monopoly has expired, the public may use the invention or work at will and without
4 | attribution. Thus, in construing the Lanham Act, we have been 'careful to caution against
5 | misuse or overextension' of trademark and related protections into areas traditionally
6 | occupied by patent or copyright." *Id.* at 33-34 (internal citations omitted).

7 |     For this reason, the Court rejected Fox's Lanham Act claim. "[A]llowing a cause of
8 | action under § 43(a) for th[e] representation [that Dastar originated the creative work
9 | conveyed by the videos] would create a species of mutant copyright law that limits the
10 | public's 'federal right to 'copy and to use' expired copyrights.'" *Id.* at 34. And extending
11 | quasi-copyright or quasi-patent protection under the Lanham Act would "create[] a species
12 | of perpetual patent and copyright, which Congress may not do." *Id.* at 37.

13 |     Such a rule would also give rise to myriad practical difficulties, including the need to
14 | determine the proper "origin" of the work, which could be any number of producers,
15 | directors, performers, songwriters, etc. Parties and courts would be forced to engage in the
16 | monumental task of identifying all of the sources of the goods—or, worse, the single best
17 | "source"—making licensing impossible and litigation inevitable. "We do not think the
18 | Lanham Act requires this search for the source of the Nile and all its tributaries." *Id.* at 35-
19 | 36.

20 |     **2.**    **Henley's false endorsement claim would create "a species of mutant**
21 |            **copyright law" in contradiction to *Dastar***

22 |     *Dastar* reaffirms—to the extent there was any question—that the Ninth Circuit got it
23 | right in *Sinatra*, by clarifying that unfair competition law cannot be stretched in ways that
24 | undercut Congress' policy decisions in the Copyright Act. Where a performer brings a
25 | Lanham Act false endorsement or state-law right of publicity claim for the use a distinctive
26 | attribute, such as the performer's voice, *Dastar* has no application, because copyright law is
27 | not concerned with protecting an interest in such distinctive attributes. *See, e.g., Waits*, 978
28 | F.2d at 1100 ("[V]oice is not a subject matter of copyright: 'A voice is not copyrightable.

14765.1

8

1   The sounds are not "fixed."'") (quoting *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9[th]

2   Cir. 1988).  But where the plaintiff seeks to stretch the Lanham Act to protect interests

3   governed by the Copyright Act, the courts must stay out of Congress' way to avoid creating

4   "a species of mutant copyright law" that upsets Congress' careful balancing efforts.

5        Henley's proposed quasi-copyright protection *would* upset that balance, in at least

6   four ways.  First, under the Copyright Act, only the copyright owner or an exclusive

7   licensee can enforce a copyright.  *See* 17 U.S.C. § 501(b).  But here, as in *Dastar*, Henley

8   seeks protection over work for which he has no copyright.  In *Dastar*, Fox had failed to

9   renew the copyright on the series, leaving it without copyright protection.  Likewise,

10  Henley did not write and does not own the copyright to "All She Wants to Do Is Dance."

11  Like Fox, then, he is seeking quasi-copyright control absent a copyright, making his claim

12  little more than a transparent request that this Court expand the Copyright Act by judicial

13  fiat.

14       Second, also as in *Dastar*, Henley seeks a species of perpetual copyright protection

15  that Congress did not and could never authorize.  Henley claims the right to stop

16  Defendants from using his song because it is associated with him.  But the work could

17  conceivably be associated with Henley long after any copyright has expired; after all,

18  *Hamlet*, a public domain work free for anyone to use, is still associated with Shakespeare

19  after five centuries.

20       Third, Henley's argument undercuts a clear congressional policy choice regarding

21  the use of copyrighted music.  The Copyright Act contains a compulsory license provision

22  under which the copyright owner of a "nondramatic musical work" cannot prohibit others

23  from recording their own versions of the work.  *See* 17 U.S.C. § 115.  This means that

24  Congress has already decided that *even the copyright owner* cannot preclude someone else

25  from recording a version of a copyrighted work; there is, then, no justification for

26  overturning Congress' policy decision by granting veto power to anybody who is merely

27

28

14765.1
                                                9

1   "associated" with a song.[1]  To hold otherwise would subject any artist who has lawfully

2   recorded a cover song pursuant to § 115 to potential liability under the Lanham Act and the

3   UCL.  Ironically, Henley himself would face liability for the famous songs he has covered,

4   such as Leonard Cohen's "Everybody Knows."

5        Fourth, Henley's proposed extension of quasi-copyright protection would create all

6   of the practical difficulties the Supreme Court sought to avoid in *Dastar*.  Henley asserts

7   that someone associated with a copyrighted work can preclude others from using it if the

8   use is likely to cause confusion.  But a new rule requiring parties and courts to discern

9   which person or persons are sufficiently "associated" with a copyrighted work to merit

10  protection would be a Litigation Big Bang, creating an entirely new universe of claims

11  where none existed before.  In the process, the parade of horribles in *Dastar*—such as the

12  likelihood that persons in the chain of commerce will be subject to liability both if they

13  give credit and also if they withhold credit—will become a reality.

14       And in the circumstances here, those problems will be more acute.  Because of the

15  compulsory license provisions, it is commonplace for the same song to be recorded by

16  many acts.  "Boys of Summer" certainly has been.  For example, the pop-punk band The

17  Ataris famously covered the song in 2003 in a version that many hailed as better than the

18  original.  As a result, a new generation of fans likely "associates" the song "Boys of

19  Summer" with The Ataris, not Don Henley.  Thus, because of the compulsory license

20  provisions, there will be even more people than in the ordinary copyright context with an

21  argument that the song is "associated" with them.  Moreover, in light of the compulsory

22  license provision, there is no practical need for Henley's proposed rule in any event.  The

23  public has become accustomed to multiple artists recording the same song.  There is no

24  reason to believe that the public is confused as to the first performer's endorsement of the

25

26  [1] To be sure, the compulsory license rule does not allow *derivative* works of a nondramatic
    musical work.  But Henley's proposed rule—extending quasi-copyright protection through
27  the Lanham Act to persons with whom a song is "associated"—would have to apply also to
    re-makes with no significant differences.  It must if the rule is to make sense.  After all, the

28

1  second recording.  The fact that re-making songs is ubiquitous is a strong indication that the

2  public does not believe that a re-make must have been endorsed by an earlier performer.

3      This Court must reject Henley's invitation to create "a species of mutant copyright

4  law."  His Lanham Act claim must be dismissed.

5      **B.    Henley's Lanham Act claim is defective because Defendants' parodies do**

6           **not constitute the use of goods or services in commerce**

7      The Lanham Act imposes liability only where the defendant ***"in connection with***

8  ***any goods or services … uses in commerce*** … any false designation of origin, false or

9  misleading description of fact, or false or misleading representation of fact … likely to

10 deceive as to the affiliation, connection, or association of such person with another

11 person…."  15 U.S.C. § 1125 (emphasis added).  Henley's claim fails because Defendants's

12 parodies were not "goods or services" and Defendants were not engaged "in commerce."

13     Section 1125 of the Lanham Act applies to "commercial speech," which the Ninth

14 Circuit has defined as "speech which does no more than propose a commercial

15 transaction."  *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Bosley*

16 *Medical Institute, Inc. v. Kremer,* 403 F.3d 672, 676 (9th Cir. 2005) (same).

17     Henley tries to prove the Lanham Act's applicability with a conclusory allegation

18 that Defendants' "use of the[] two songs in connection with their videos was in commerce,

19 specifically for campaign, publicity and fundraising purposes, and to further DeVore and

20 Hart's interests."  Complaint at ¶ 71.  But Henley does not support that conclusory

21 allegation with any actual facts.  He does not allege that Defendants are offering the parody

22 videos for sale, or even that the parody videos themselves solicit donations.  Indeed, the

23 complaint alleges the opposite, making clear that at no point do Defendants solicit funds in

24 the video.  Henley alleges that Defendants never ask for money in the videos and, instead,

25 state that they are offering an "exposition on the financial crisis and political realities of our

26 day under President Barack Obama."  *Id.* at ¶ 26.

27

28 closer the re-made song is to the original, the more it will invoke the original and the

1    There is a debate in the federal courts as to whether the Lanham Act even

2   reaches political activities. *Compare Tax Cap Committee v. Save Our Everglades, Inc.,*

3   933 F.Supp. 1077, 1081 (S.D. Fla. 1996) (soliciting signatures on petitions is not a

4   "service" under the Lanham Act and therefore the Act does not apply) and *New.Net, Inc. v.*

5   *Lavasoft*, 356 F.Supp.2d. 1090, 1117 (C.D. Cal. 2004) (Lanham Act only covers

6   commercial speech and "the statements about Plaintiff are not commercial speech within

7   the meaning of the Lanham Act.... [U]nder the Lanham Act, [[t]he core notion of

8   commercial speech is 'speech which does no more than propose a commercial transaction.'

9   Because, as this Court has already ruled, Defendant's speech constitutes speech on an issue

10   of public importance, it cannot be said that the sole purpose of the speech is to propose a

11   commercial transaction.") *with United We Stand America, Inc. v. United We Stand,*

12   *America New York, Inc.*, 128 F.3d 86, 90 (2nd Cir. 1997) (endorsing candidates and position

13   papers constitutes "services" under the Lanham Act).

14    But this Court need not wade into that debate, for no court has ever concluded that

15   the Lanham Act applies to pure political speech unconnected to the sale of goods or

16   services, and in light of the Act's purpose, no court could. *Mastercard Int'l Inc. v. Nader*

17   *2000 Primary Comm., Inc.*, 2004 WL 434004, *8 (S.D.N.Y. 2004) (The Lanham Act

18   applies to "commercial speech," and it "uses the word commercial to describe advertising

19   or promotion for business purposes, whether conducted by for-profit or non-profit

20   organizations or individuals. Political advertising and promotion is political speech, and

21   therefore not encompassed by the term 'commercial.' This is true whether what is being

22   promoted is an individual candidacy for public office, or a particular issue or point of

23   view....'" (quoting 134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) (statement of

24   Wisconsin Rep. Kastenmeier); S. 1883, 101st Congress, 1st Sess., 135 Cong. Rec. 1207,

25   1217 (April 13, 1989) (Lanham Act "should not be read in any way to limit political

26

27

28   person "associated" with it.

14765.1

12

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1   speech, consumer or editorial comment, parodies, satires, or other constitutionally protected

2   material.").

3          Henley's position seems to be that because all of DeVore's political activities can

4   indirectly help him raise money, and because Henley believes that political fundraising

5   should be covered under the Lanham Act, then the Lanham Act must apply to DeVore's

6   parodies.  This argument proves too much.  To be sure, all political candidates solicit

7   campaign donations, and DeVore is no exception.  But the fact that a politician on occasion

8   seeks campaign donations does not transform everything that politician does into an act

9   involving "goods or services ... in commerce" under the Lanham Act.  In other words, the

10  Lanham Act may prohibit John McCain from using a mark on his campaign mail outs that

11  implies association with the Democratic Party of California.  Under some courts' view

12  of Section 1125, such an act would violate the statute.  But no court has concluded that

13  because John McCain sometimes sends out mailers or holds fundraisers, that the Lanham

14  Act therefore governs the content of everything John McCain says, including for example

15  his acceptance speech at the Republican National Convention.  The mere fact that he

16  sometimes raises funds—and that any speech he gives in an indirect way can help his

17  fundraising efforts—does not give federal courts the right to judge the content of his

18  political speech and determine if it is confusing or unlawful.  Any rule to the contrary

19  would not only impermissibly stretch the text of the Lanham Act, it would also be a

20  violation of the separation of powers doctrine (in many cases) and would be impermissible

21  as a regulation of interstate commerce, which is the constitutional authority for the Lanham

22  Act.

23          Because the parodies in question are pure political speech, the Lanham Act simply

24  does not apply.  This Court must dismiss Henley's Lanham Act claim.

25  **V.     HENLEY DOES NOT PLEAD A VIABLE UCL CLAIM**

26          Henley cannot plead a viable UCL claim.  First, his UCL claims is defective for the

27  same reasons his Lanham Act claim is defective.  Second, Henley lacks standing to sue

28

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1  under the UCL because Defendants have not deprived him of money or property that could
2  be subject to a restitution order.

### A.  Henley's UCL claim has the same fundamental flaw as the Lanham Act claim

5  The Ninth Circuit has made clear there is no substantive difference between the
6  Lanham Act and UCL claims. *See, e.g., Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir.
7  1994) ("This Circuit has consistently held that state common law claims of unfair
8  competition and actions pursuant to California Business and Professions Code § 17200 are
9  'substantially congruent' to claims made under the Lanham Act."). Thus, if Henley's
10 Lanham Act claim is defective—and it is—then his UCL claim is defective for the same
11 reasons.

12 If anything, the UCL claim is at greater risk. Legion cases make clear that states
13 have no authority to intrude upon Congress' balancing efforts in the Copyright Act. *See,
14 e.g., Sinatra*, 435 F.2d at 711; *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134,
15 1144 (9th Cir. 2006) (Plaintiff, a professional singer, sued for right of publicity after
16 defendant, a music producer, used a recording she had made in another song. The Ninth
17 Circuit found that her claim was preempted by the Copyright Act because "the underlying
18 nature of Laws's state law claims is part and parcel of a copyright claim.").

### B.  Henley lacks standing to pursue the UCL claim

20 At one time, plaintiffs were not required to have standing in order to sue under the
21 UCL. "Under prior law, any person acting on behalf of the general public could sue for
22 relief under California's Unfair Competition Law." *Daro v. Superior Court*, 1 Cal.App.4th
23 1079, 1097 (2007). Not anymore. As a result of "Proposition 64, a private person has
24 standing to sue under the UCL only if that person has suffered injury *and* lost money or
25 property '*as a result of such unfair competition*.'" *Id.* (emphasis in original); *see* Cal. Bus.
26 & Prof. Code § 17204. This is a substantial change. In effect, Proposition 64 did not just
27 change the UCL to conform to traditional notions of standing; it went even further. Now,
28 not only must a plaintiff have suffered injury in fact—the traditional requirement for

1  standing—but the plaintiff must also have suffered the loss of money or property.  Henley

2  cannot satisfy the standing requirement of Section 17204.

3      **1.   Section 17203 helps explain the standing requirement**

4      Section 17203 of the UCL, which discusses the remedies available under the act,

5  provides insight into the meaning of Section 17204's standing requirement.  Under Section

6  17203, courts can both give injunctive relief and can "restore to any person in interest any

7  money or property, real or personal, which may have been acquired by means of such

8  unfair competition."  Of course, by stating that courts can "restore" money or property to a

9  plaintiff, Section 17203 clearly implies that the plaintiff must have previously had the

10  money or property; you cannot "restore" to someone an item he or she never had in the first

11  place.

12      This is certainly how the courts have interpreted this language.  In *Korea Supply Co.*

13  *v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (2003), the plaintiff, a company in the business

14  of representing manufacturers in military transactions with the government of South Korea,

15  sued the defendant for engaging in unfair competition (specifically, sexual favors and

16  bribes) in order to procure a bid that the plaintiff's client would have otherwise received.

17  The plaintiff asserted that as a result of the lost contract, it lost a commission of about $30

18  million.  The plaintiff sought to recover that lost commission under Section 17200 (among

19  other theories).  The California Supreme Court held that it could not: "[W]e address

20  whether disgorgement of profits allegedly obtained by means of an unfair business practice

21  is an authorized remedy of an unfair business practice under the UCL where the profits are

22  neither money taken from a plaintiff nor funds in which the plaintiff has an ownership

23  interest.  We conclude that disgorgement of such profits is not an authorized remedy in an

24  individual action under the UCL."  *Id.* at 1140.

25      The Court began its analysis by noting that a "UCL action is equitable in nature;

26  damages cannot be recovered."  *Id.* at 1144.  Instead, "prevailing plaintiffs are generally

27  limited to injunctive relief and restitution."  *Id.*  But the lost profits sought by the plaintiff

28  in *Korea Supply* would not qualify for restitution.  "The object of restitution is to restore

14765.1

15

1  the status quo by returning to the plaintiff funds in which he or she has an ownership

2  interest." *Id.* at 1149.  But the plaintiff was not seeking any such funds.  Clearly, the profit

3  that it hoped to achieve was not "money or property that was once in its possession." *Id.*

4  In addition, the plaintiff's expected commission was nothing more than "a contingent

5  interest" and did not qualify as property in which the plaintiff had an ownership interest.

6  Thus, the plaintiff was seeking "nonrestitutionary disgorgement of profits" and that is not

7  permissible under Section 17200. *Id.* at 1150.  Instead, "[c]ompensation for a lost business

8  opportunity is a measure of damages and not restitution to the alleged victims." *Id.* at

9  1151.

10         Thus, under Section 17203, for a plaintiff to recover money or property, the plaintiff

11  must have previously possessed or had an ownership interest in the money or property

12  wrongfully acquired by the defendant.  A claim for profit that the plaintiff would have

13  acquired but for the defendant's unlawful conduct is not enough.

14         **2.    Applying Section 17203 law to Section 17204's standing rule**

15         The California Supreme Court's interpretation of what it means to "restore … money

16  or property" under Section 17203 also illuminates the requirement that a party have "lost

17  money or property as a result of the unfair competition" under Section 17204.  Under basic

18  statutory interpretation principles, "words or phrases given a particular meaning in one part

19  of a statute must be given the same meaning in other parts of the statute." *Wilcox v.*

20  *Birtwhistle*, 21 Cal.4th 973, 979 (1999). *Korea Supply*'s analysis of Section 17203 does

21  not focus only on the meaning of "money or property" but also on what it means to

22  "restore" money or property.  Even so, the only reasonable reading of the statute is to give

23  the provisions a single, consistent meaning.  And, therefore, a plaintiff can have standing

24  under Section 17204 only if the plaintiff has suffered the same type of loss of money or

25  property that would make the plaintiff eligible for the restoration of its money or property

26  under Section 17203.

27         Superior Court Judge Sabraw explained the unavoidable logic of this interpretation

28  in *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2006) 2006 WL 2987634.  As

14765.1

16

she put it, the "'loss of money or property' needed for standing under § 17204 should be interpreted the same as the 'lost money or property' that the Court may order restored under § 17203" because such an interpretation "gives effect to the plain language of [the] statute, and makes the standing language in § 17204 consistent with the scope of relief language in section 17203." *Id.* at *5. Indeed, any other interpretation of the statutory language would be bizarre, "open[ing] the possibility that a plaintiff can have 'lost ... property as a result of ... unfair competition' under section 17204, but the Court might be unable, under section 17203, to restore to that plaintiff the 'property' that was lost. That would be a peculiar result." *Id.* at *6. Finally, "[i]nterpreting § 17204 to allow for standing based on loss of a property interest not concrete enough to suffice for a claim of restitution would mean permitting standing to be based on a non-concrete, abstract interest"— something Proposition 64 was designed to preclude. *Id.*

Two other courts—one state and one federal—have reached the same conclusion as did Judge Sabraw. *See Buckland v. Threshold Enterprises, Ltd.*, 155 Cal.App.4th 798, 817 (2007) ("Because remedies for individuals under the UCL are restricted to injunctive relief and restitution, the import of the requirement is to limit standing to individuals who suffer losses of money or property that are eligible for restitution."); *Butler v. Adoption Media, LLC*, 486 F.Supp.2d 1022, 1062 (N.D.Cal. 2007) ("Moreover, plaintiffs' expenditure of time and money preparing an application is not the kind of loss of money or property that is necessary for standing under the new version of the unfair competition law. Restitution, which is the only monetary recovery possible under § 17200, involves the payment or return of money or property that belongs to the plaintiff.").

The end result of Proposition 64 is that the UCL—once devoid of a standing requirement—now has a standing requirement more strenuous than the one governing ordinary civil litigation. Henley must plead not only traditional injury-in-fact, he must also plead that he has lost money or property that could be subject to a restitution order under the UCL. He has not pled any such thing. Nowhere in the complaint does Henley plead that in making the parodies the Defendants took money or property that had once been in

Henley's possession and to which he is entitled to restitution.  Without such an allegation, Henley lacks standing, and his UCL claim must be dismissed.

## VI.    CONCLUSION

Henley has not pled viable claims under the Lanham Act or the UCL.  And because the defects could not be corrected in a second complaint, this Court should dismiss the fourth and fifth causes of action without leave to amend.


Dated:  May 21, 2009        **TURNER GREEN LLP**



                                By:    /s/Christopher W. Arledge
                                       Christopher W. Arledge
                                       Attorneys for Defendants, Charles S. Devore and
                                       Justin Hart

14765.1

18

**MOTION TO DISMISS UNDER RULE 12(b)(6) OF THE FEDERAL RULES OF CIVIL PROCEDURE**