CHARLES S. BARQUIST  (CA SBN 133785)
CBarquist@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street
Los Angeles, California 90013-1024
Telephone:  213.892.5200
Facsimile:  213.892.5454

JACQUELINE C. CHARLESWORTH  (*pro hac vice*)
JCharlesworth@mofo.com
KELVIN D. CHEN  (*pro hac vice*)
KChen@mofo.com
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York  10104
Telephone:  212.468.8000
Facsimile:  212.468.7900

PAUL GOLDSTEIN  (CA SBN 79613)
PGoldstein@mofo.com
559 Nathan Abbott Way
Stanford, California  94305-8610
Telephone:  650.723.0313
Facsimile:  650.327.0811

Attorneys for Plaintiffs
DON HENLEY AND MIKE CAMPBELL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DON HENLEY and MIKE CAMPBELL,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CHARLES S. DEVORE and JUSTIN HART,<br><br>                    Defendants. | Case No.      SACV09-0481 JVS  (RNBx)<br><br>Hon. James V. Selna<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Date:  June 29, 2009<br>Time: 1:30 p.m.<br>Courtroom:  10C |

ny-873973

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................2

ARGUMENT .................................................................................................................5

I.     APPLICABLE LEGAL STANDARD .................................................................5

II.    HENLEY'S LANHAM ACT CLAIM  IS AMPLY
       SUPPORTED BY THE FACTS AND THE LAW ...................................6

       A.    *Dastar* Does Not Eliminate "False Endorsement"
             Claims Under the Lanham Act ........................................................8

       B.    Henley Has More Than Adequately Alleged False
             Endorsement ...................................................................................10

       C.    False Endorsement Applies to "Noncommercial"
             and "Political" Speech ...................................................................16

III.   HENLEY'S UCL CLAIM IS SOUND ...................................................19

       A.    Henley Has Standing Under the UCL as Amended
             by Proposition 64 ...........................................................................20

       B.    Henley's UCL Claim is Not Preempted by
             Copyright Law .................................................................................24

IV.    CONCLUSION ...............................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aagard v. Palomar Builders, Inc.,*
   344 F. Supp. 2d 1211 (E.D. Cal. 2004) ........................................................19, 25

*ARC Ecology v. United States Dep't of the Air Force,*
   411 F.3d 1092 (9th Cir. 2005) ................................................................................6

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)................................................................................................6

*Bosley Med. Inst. v. Kremer,*
   403 F.3d 672 (9th Cir. 2005) ....................................................................... 17-18

*Browne v. McCain,*
   No. CV 08-05334-RGK (Ex), 2009 U.S. Dist.
   LEXIS 18876 (C.D. Cal. Feb. 20, 2009) ...................................... 7-8, 10, 12, 18

*Buckland v. Threshold Enters., Ltd.,*
   155 Cal. App. 4th 798, 66 Cal Rptr. 3d 543 (2007) ..........................................23

*Butler v. Adoption Media, LLC,*
   486 F. Supp. 2d 1022 (N.D. Cal. 2007).........................................................20, 23

*Butler v. Target Corp.,*
   323 F. Supp. 2d 1052 (C.D. Cal. 2004) ................................................. 10-13, 24

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)................................................................................................2

*Center for Biological Diversity, Inc. v. FPL Group, Inc.,*
   No. RG04-183113, 2006 WL 3542514 (Cal. Super. Ct. Oct. 12, 2006)............23

*Compco Corp. v. Day-Brite Lighting, Inc.,*
   376 U.S. 234 (1964)..................................................................................14; n.3

*Conversive, Inc. v. Conversagent, Inc.,*
   433 F. Supp. 2d 1079 (C.D. Cal. 2006) ..............................................................19

*Cortez v. Purolator Air Filtration Pdts. Co.,*
   23 Cal. 4th 163, 96 Cal. Rptr. 518 (2000) ....................................................22 n.5

ii

ny-873973

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
 539 U.S. 23 (2003)...................................................................7, 9

*Davis v. Blige*,
 505 F.3d 90 (2d Cir. 2007) ..........................................................21 n.4

*Downing v. Abercrombie & Fitch*,
 265 F.2d 994 (9th Cir. 2001) ...........................................................13

*Dr. Seuss Enters. v. Penguin Books USA, Inc.*,
 109 F.3d 1394 (9th Cir. 1997) .................................................... 12-13

*G&C Auto Body Inc. v. Geico Gen. Ins. Co.*,
 No. C06-04898 MJJ, 2007 U.S. Dist.
 LEXIS 91327 (N.D. Cal. Dec. 12, 2007) ..................................... 22-23

*Golden Door, Inc.  v. Odisho*,
 646 F.2d 347 (9th Cir. 1980) ...........................................................19

*Goldstein v. California*,
 412 U.S. 546 (1973).................................................................14 n.3

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134, 131 Cal. Rptr. 2d 29 (2003) .......................20, 24 n.6

*Laws v. Sony Music Entm't, Inc.*,
 448 F.3d 1134 (9th Cir. 2006) ......................................................25 n.7

*Lozano v. AT&T Wireless Servs., Inc.*,
 504 F.3d 718 (9th Cir. 2007) .......................................................22 n.5

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
 No. 00 Civ. 6068 (GBD), 2004 U.S. Dist.
 LEXIS 3644 (S.D.N.Y. Mar. 8, 2004)......................................... 16-17

*McGary v. City of Portland*,
 386 F.3d 1259 (9th Cir. 2004) ...........................................................5

*Microsoft v. Evans*,
 2007 U.S. Dist. LEXIS 77088 (E.D. Cal. Oct. 17, 2007)...................10

*Midler v. Ford Motor Co.*,
  849 F.2d 460 (9th Cir. 1988) ...........................................................21

iii

*New.Net, Inc. v. Lavasoft,*
 356 F. Supp. 2d 1090 (C.D. Cal. 2004) ............................................................18

*Overstock.com Inc. v. Gradient Analytics, Inc.,*
 151 Cal. App. 4th 688 (Cal. Ct. App. 2007).................................................. 21-22

*Rice v. Fox Broad. Co.,*
 330 F.3d 1170 (9th Cir. 2003) ..........................................................................18

*Sears, Roebuck & Co. v. Stiffel Co.,*
 376 U.S. 225 (1964).................................................................................14; n.3

*Sinatra v. Goodyear Tire & Rubber Co.,*
 435 F.2d 711 (9th Cir. 1970) ............................................................................14

*Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.,*
 7 F.3d 1434 (9th Cir. 1993) ..............................................................................24

*Tax Cap Comm. v. Save Our Everglades, Inc.,*
 933 F. Supp. 1077 (S.D. Fla. 1996) ..................................................................17

*In re Tobacco II Cases,*
 46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009) .....................................................22

*United We Stand America, Inc. v. United We Stand, America New York, Inc.,*
 128 F.3d 86 (2d Cir. 1997) .......................................................................... 17-19

*Waits v. Frito-Lay, Inc.,*
 978 F.2d 1093 (9th Cir. 1992) ...................................................8, 11, 14 n.3, 21

*Wendt v. Host Int'l, Inc.,*
 125 F.3d 806 (9th Cir. 1997) ...................................................................... 10-11

*White v. Samsung Elecs. Am., Inc.,*
 971 F.2d 1395 (9th Cir. 1992) ..................................................................... 9-12

*White v. Trans Union, LLC,*
 462 F. Supp. 2d 1079 (C.D. Cal. 2006) ....................................................... 22-23

iv

1

**STATUTES**

2

15 U.S.C.

3
    § 1051 et seq. ...............................................................................2, 12
    § 1125...............................................................................6, 8, 9, 16
4

5

6

17 U.S.C.

    § 101 et seq. ...............................................................................2, 12
7
    § 106...............................................................................................13
    § 115...............................................................................................15
8
    § 301...............................................................................12, 14 n.3, 24
9
    § 512................................................................................................4

10

Cal. Bus. & Prof. Code

    § 17200 ...................................................................................... 2, 19-20
11
    § 17203 ...................................................................................... 22-23
    § 17204 ...............................................................................................23
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ny-873973

## INTRODUCTION

This action arises from the deliberate plan of Charles DeVore and Justin Hart to exploit valuable copyrighted songs and to capitalize on the celebrity of a world-famous recording artist to promote a political campaign.  To generate publicity and support for DeVore's ambition to win the Republican nomination to the U.S. Senate in 2010, DeVore, with the assistance of Hart, copied "The Boys of Summer," a Grammy-winning, instantly recognizable rock song about a summer romance written by plaintiffs Don Henley and Mike Campbell, wrote new lyrics, and incorporated the song into a campaign ad, which the two posted on YouTube and elsewhere.  When Henley objected to this exploitation of his copyrighted work by sending a takedown notice to YouTube, as authorized by law, DeVore reposted the video to another site and publicly vowed to use still other Henley works as part of his ongoing publicity spree.  Indeed, DeVore and Hart made good on this threat when they fashioned a second video appropriating another widely-known song recorded by Henley, "All She Wants to Do Is Dance."

Evidently, DeVore and Hart believe that labeling their efforts as "parody" or "free speech" immunizes them from liability.  But the law does not permit someone to copy another's copyrighted musical work without permission, to add new lyrics, or to exploit the work over the Internet in a promotional video.  Nor does the law permit one to promote his own goods or services by trading without permission on the celebrity and goodwill of a popular artist.  These rules apply to politicians no less than to ordinary citizens.  Indeed, in the political arena, such compelled speech, forcing an artist to lend his or her creative work or identity to support a cause that he or she does not wish to endorse, would violate the very "free speech" values DeVore and Hart themselves purport to espouse.

This is not a case where a parodist has borrowed a few bars or phrases of a song in order to comment upon or criticize it.  The videos produced by DeVore and Hart nowhere aim at, or spoof or ridicule, the original songs.  Rather, made to

1

1    advance DeVore and Hart's interests and agenda, the videos address the actions of

2    third parties, President Barack Obama and Senator Barbara Boxer.  DeVore and

3    Hart took virtually the entire musical works, note for note, to provide soundtracks

4    for DeVore's campaign ads.  The videos are not parodies because – as the Supreme

5    Court put it in a case defining legal parody – they have "no critical bearing on the

6    substance or style" of the original songs, which songs were "merely use[d] to get

7    attention."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994).

8          Accordingly, Henley and Campbell have brought this action pursuant to the

9    Copyright Act, 17 U.S.C. § 101 *et seq.*, to halt further infringement of their

10   copyrighted musical work.  In addition, Henley seeks relief under the Lanham Act,

11   15 U.S.C. § 1051 *et seq.*, and California Business & Professions Code, § 17200 *et

12   seq.*, to redress the misappropriation and misuse of his identity and reputation as a

13   world-famous recording artist.

14                           **FACTUAL BACKGROUND**

15         As relevant here, plaintiffs allege the following facts in their Complaint:

16         Don Henley is a preeminent songwriter and recording artist.  He is a

17   founding member and lead singer of the Eagles, the band credited with recording

18   the largest-selling album ever in the United States.  (Compl. ¶ 18.)  Henley co-

19   wrote all of the Eagles' top ten hits and was the lead singer for many of them.  (*Id.*)

20   In addition to his extraordinary success as a member of the Eagles, Henley has had

21   a remarkable solo career.  His multi-platinum solo album *Building the Perfect

22   Beast*, released in 1984, included the hit song "The Boys of Summer," in which the

23   singer reminisces about his love for a woman during summer days gone by.  Henley

24   won a Grammy Award in 1985 for "The Boys of Summer."  (*Id.*¶ 19.)  This same

25   album also included Henley's recorded performance of another hit song, "All She

26   Wants to Do Is Dance," written by Henley's colleague, Danny Kortchmar.  (*Id.*

27   ¶ 37.)

28

                                          2

ny-873973

1      Plaintiff Mike Campbell, also a prominent songwriter, recording artist, and

2  producer, is a founding member of the Grammy-winning rock band Tom Petty and

3  the Heartbreakers.  (*Id.* ¶ 20.)  In addition to his work with Henley and Tom Petty,

4  Campbell has co-written songs that have been recorded by other popular artists,

5  including Stevie Nicks and John Prine.  (*Id.*)  He has co-produced a series of top-

6  selling albums for Tom Petty and has also acted as a producer for Stevie Nicks, Roy

7  Orbison, and Del Shannon.  (*Id.*)

8      Defendant Charles S. DeVore is a California State Assemblyman from

9  Irvine.  (*Id.* ¶ 15.)  DeVore is now campaigning for the Republican nomination for

10  the U.S. Senate seat currently held by Senator Boxer.  (*Id.*)  Defendant Justin Hart

11  is the Director of Internet Strategies and New Media for DeVore's campaign.  (*Id.*

12  ¶ 16.)

13      In or about April 2009, DeVore, with support from Hart, devised a campaign

14  strategy revolving around Henley and Campbell's "The Boys of Summer."  (*See id.*

15  ¶¶ 24-28.)  In open disregard of Henley and Campbell's intellectual property rights,

16  DeVore and Hart copied almost all of Henley and Campbell's copyrighted work,

17  note for note, without permission.  (*Id.* ¶¶ 1, 21, 25.)  Substituting lyrics to suit their

18  purpose and using a recorded performance of the work to simulate the original

19  Henley recording, they produced and distributed a campaign advertising video

20  featuring the song (the "Boys of Summer Video").  (*Id.* ¶ 1.)

21      Titled "A Special Message from Chuck DeVore," the video consists of a

22  spoken introduction by Hart addressing potential supporters of the DeVore

23  campaign, followed by DeVore and Hart's rendition of Henley and Campbell's

24  song.  (*Id.* ¶ 25.)  The unauthorized use of Henley and Campbell's copyrighted

25  work is synchronized with a series of photographic images of DeVore, Hart, and

26  President Obama, among others.  (*Id.*)  At the conclusion of the Boys of Summer

27  Video, with the Henley and Campbell song still playing, a DeVore campaign ad

28  slogan appears:  "Time for Chuck DeVore."  (*Id.* ¶ 27.)  Beneath the slogan, there is

a notice – "paid for by DeVore for California" – even though no payment has been made to, nor permission sought from, Henley and Campbell for the music in the video, to which they own the rights.  (*Id.*)

Because such an extensive, promotional use of a musical work requires the consent of the copyright owner, viewers accessing the Boys of Summer Video through YouTube or other means could easily conclude that DeVore and Hart used "The Boys of Summer" with permission, even though Henley and Campbell did not, and in fact would not, authorize the use of their song for this purpose.  (*Id.* ¶ 29.)  Viewers familiar with Henley and Campbell's well-known song might also conclude that Henley and Campbell are political supporters or sponsors of DeVore, which they are not.  (*Id.*)

DeVore and Hart's avowed aim in producing the video was to build support for DeVore's campaign for the Republican nomination for the Senate.  (*Id.* ¶¶ 1, 26-27.)  To this end, DeVore and Hart posted the infringing Boys of Summer Video on the popular online video site YouTube and elsewhere, publicized their efforts through multiple media outlets, and also encouraged others to make infringing videos of Henley and Campbell's work.  (*Id.* ¶¶ 25, 28, 34.)

Henley, who carefully selects the causes he wishes to endorse and selectively licenses his copyrights, did not authorize DeVore or Hart to use his copyrighted song, does not endorse DeVore's campaign, and does not wish his name, work, or identity to be associated with DeVore or the DeVore campaign.  (*Id.* ¶ 6.)  Nor does Campbell wish his copyrighted work to be used by or associated with DeVore or DeVore's campaign.  (*Id.*)

When he became aware of the Boys of Summer Video, Henley arranged to send a notice pursuant to the Digital Millennium Copyright Act, 17 U.S.C. § 512, to YouTube requesting that the Boys of Summer Video be removed.  (*Id.* ¶ 30.)  The video was taken down.  (*Id.*)  But, dismissive of Henley's efforts to protect his intellectual property rights, DeVore publicly responded in an article on an Internet

4

1    site: "And, it goes without saying that I'll now be looking for every opportunity to

2    turn any Don Henley work I can into a parody of any left tilting politician who

3    deserves it . . . ." (*Id.* ¶ 33.)  Further, DeVore provided a link to a different website

4    where his infringing Boys of Summer Video could continue to be accessed,

5    http://www.chuck76.com/nov.  (*Id.* ¶ 34.)  A user who clicked on this link and

6    attempted to navigate from the Boys of Summer Video to www.chuck76.com was

7    automatically redirected to a DeVore fundraising page captioned "SUPPORT

8    Chuck DeVore for US Senate," at http://tweetforchuck.com/tweet2.  (*Id.* ¶ 35.)

9         True to the promise made in DeVore's Internet post, DeVore and Hart next

10    appropriated and exploited yet another song widely associated with Henley, "All

11    She Wants to Do Is Dance" (written by Danny Kortchmar and made famous by

12    Henley), which they fashioned into another promotional video, this one criticizing

13    Senator Boxer (the "Dance Video").  (*Id.* ¶¶ 4, 37.)  Again, DeVore and Hart copied

14    virtually the entire musical composition note for note, substituting lyrics to convey

15    their campaign pitch, and using a recorded performance of the work to simulate the

16    original Henley recording.  (*Id.* ¶ 4.)

17         As set forth in the Complaint, in making and distributing the videos, DeVore

18    and Hart have willfully and intentionally appropriated not just Henley's exclusive

19    rights in a copyrighted work, but also his goodwill, identity, and persona by using

20    well-known songs associated with him, one almost immediately after another, in

21    campaign fundraising commercials.  (*See id.* ¶ 5.)  Such close identification of

22    Henley with DeVore's fundraising efforts is an egregious, intentional, false

23    association that should be stopped.  (*Id.*)

24    **ARGUMENT**

25    **I.    APPLICABLE LEGAL STANDARD**

26         On a motion to dismiss, the plaintiff's allegations "are taken as true and

27    construed in the light most favorable to the plaintiff."  *McGary v. City of Portland*,

28    386 F.3d 1259, 1261 (9th Cir. 2004).  Dismissal of a claim is appropriate "only if it

5

1  appears beyond doubt that the claimant can prove no set of facts in support of the

2  claim which would entitle him to relief." *ARC Ecology v. United States Dep't of*

3  *the Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *see also Bell Atl. Corp. v.*

4  *Twombly*, 550 U.S. 544, 570 (2007).

5  **II.   HENLEY'S LANHAM ACT CLAIM IS AMPLY SUPPORTED BY THE FACTS AND THE LAW**

6

7  Henley's false endorsement claim under the Lanham Act, 15 U.S.C.

8  § 1125(a), arising from the misuse of Henley's goodwill and persona by DeVore

9  and Hart to promote DeVore's campaign, certainly cannot be dismissed as "clutter,"

10  as DeVore and Hart suggest.  (Defs.' Mem. at 1.)  As detailed above, in a blatant

11  quest to generate attention and raise funds for their campaign efforts, DeVore and

12  Hart focused on Henley as a world-famous recording artist and incorporated into

13  their campaign ads appealing, instantly recognizable songs that are uniquely

14  associated with Henley.  In each case, the lyrics to the original song were rewritten,

15  while the soundtrack was closely imitated to simulate Henley's well-known

16  performances and thus to suggest an association with Henley.

17  It is understood by the public that permission is required to use someone's

18  song or performance for promotional purposes.  Thus, a website visitor who

19  watched the Boys of Summer and Dance Videos and recognized Henley's creative

20  work could easily believe that Henley granted such permission and therefore

21  endorses the videos and the messages therein, which Henley does not.  (Compl.

22  ¶¶ 5, 29, 39.)

23  Indeed, such a mistaken impression of Henley's association with DeVore and

24  Hart is all the more likely because the Boys of Summer and Dance Videos are *not*

25  parodies, as DeVore and Hart assert.  The videos do not criticize or comment upon

26  the works they exploit.  DeVore and Hart use the Henley-identified songs not to

27  ridicule Henley's creative talents, but simply as vehicles to present campaign-

28  related subject matter.  The lack of commentary on, or critical distance from,

6

1   Henley's creative work not only negates DeVore and Hart's "parody" defense, but
2   strongly reinforces the suggestion of Henley's association with the videos.

3       DeVore and Hart's reliance on the Supreme Court's decision in *Dastar*
4   *Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), to seek dismissal
5   of  Henley's false endorsement claim is misplaced.  *Dastar* was a "reverse passing
6   off" case – brought under the "origin of goods" provision of the Lanham Act – in
7   which the plaintiff claimed that it should have been acknowledged as the source of
8   "goods" when defendant included portions of plaintiff's public domain television
9   series in defendant's own production.  *Id.* at 26-28.  Here, Henley does not seek
10  attribution as the originator of DeVore and Hart's campaign ads, but instead seeks
11  to enforce his right *not* to be falsely associated with them.  Far from eliminating this
12  type of false endorsement claim, *Dastar* expressly recognized continued liability for
13  falsely implying sponsorship or approval of a creative work under the separate
14  "false association" branch of the Lanham Act.  *Id.* at 36.  Post-*Dastar* decisions
15  have followed suit, including Judge Klausner's recent holding in *Browne v.*
16  *McCain*, No. CV 08-05334-RGK (Ex), 2009 U.S. Dist. LEXIS 18876, at *12 (C.D.
17  Cal. Feb. 20, 2009) (upholding singer Jackson Browne's Lanham Act false
18  endorsement claim as well as his copyright infringement claim based on use of his
19  song in campaign ad).

20      DeVore and Hart also suggest that, notwithstanding their deliberate targeting
21  of Henley and his creative works in order to generate publicity, and the simulation
22  of Henley-identified works in their campaign materials, Henley has not adequately
23  pled his false endorsement claim because he has not alleged the invocation of his
24  name, image, or voice or other sufficiently "distinctive attribute" that could give
25  rise to a Lanham Act claim.  (Defs.' Mem. at 5.)  At the same time, DeVore and
26  Hart admit that "use of a name or likeness is not specifically required" to assert a
27  false endorsement claim.  (*Id.*)

28

7

1   Whether the unauthorized use in promotional campaign videos of works
2   identified with Henley, including the use of simulations of well-known Henley
3   recordings, would cause viewers to assume that Henley endorsed those videos – as
4   Henley alleges it would – is a question of fact.  In any event, the law is not as
5   narrow as DeVore and Hart seek to portray it.  Congress drafted the Lanham Act
6   expansively to prohibit misleading the public through any "word, term, name,
7   symbol, or device, or . . . combination thereof."  15 U.S.C. § 1125(a)(1)(A).
8   Moreover, in a leading false endorsement case brought by the singer Tom Waits,
9   the Ninth Circuit explained that the term "device" is to be interpreted broadly and
10  includes, *inter alia*, "distinctive sounds" if such sounds might confuse consumers as
11  to a celebrity's sponsorship or approval of a product.  *Waits v. Frito-Lay, Inc.*,
12  978 F.2d 1093, 1107, 1110 (9th Cir. 1992).

13  Finally, DeVore and Hart attempt to carve a sweeping exception from the
14  Lanham Act that would exempt any type of politically motivated activity from its
15  reach on the ground that it is not "commercial."  But this Court and others have
16  flatly rejected such an approach in light of the history and purpose of the Lanham
17  Act, and the negative consequences that would flow from an inability to protect
18  against false endorsements in the political arena.  *See, e.g.*, *Browne*, 2009 U.S. Dist.
19  LEXIS 18876, at *12-13 (noting that courts have recognized that the Lanham Act
20  applies to noncommercial or political speech).

21          **A.      *Dastar* Does Not Eliminate "False Endorsement" Claims
              Under the Lanham Act**
22
        In pertinent part, the Lanham Act imposes liability on
23
        [a]ny person who, on or in connection with any goods or services . . .
24
        uses in commerce any word, term, name, symbol, or device, or any
25
        combination thereof, or any false designation of origin, false or
26
        misleading description of fact, or false or misleading representation of
27
        fact, which . . . is likely to cause confusion, or to cause mistake, or to
28

8

1         deceive as to the affiliation, connection or association of such person

2         with another person, or as to the origin, sponsorship, or approval of his

3         or her goods, services, or commercial activities by another person[.]

4   15 U.S.C. § 1125(a)(1)(A).  To prevail on his Lanham Act claim, Henley must

5   show that, in posting the videos at issue, DeVore and Hart "created a likelihood of

6   confusion" concerning Henley's association with the videos.  *White v. Samsung*

7   *Elecs. Am., Inc.*, 971 F.2d 1395, 1399-1400 (9th Cir. 1992).  Henley has alleged

8   such likelihood of confusion in his complaint.  (Compl. ¶¶ 29, 72.)

9        In invoking the Supreme Court's decision in *Dastar*, DeVore and Hart

10  misapprehend the nature of Henley's claim.  Two distinct types of claims arise

11  under the provision of the Lanham Act set forth above:  a claim that a defendant has

12  falsely represented the origin of its goods, and a claim that the defendant has falsely

13  suggested that the plaintiff endorses or is otherwise associated with the defendant's

14  goods.  *Dastar* addressed an "origin of goods" claim.  539 U.S. at 37.  The present

15  case, by contrast, concerns a "false endorsement" claim.  To read *Dastar* as do

16  DeVore and Hart would effectively eliminate the "false endorsement" cause of

17  action permitted under the Lanham Act.  *Dastar* cannot be so interpreted.

18        In *Dastar*, the defendant incorporated substantial portions of the plaintiffs'

19  public domain television series into a new video production and sold DVDs of the

20  production as its own.  *Id.* at 26-27.  Invoking a "reverse passing off" theory, the

21  plaintiffs claimed that, as the producers of the earlier television series, they should

22  have received credit as the source of the "goods."  *Id.* at 27, 31.  However,

23  construing "origin" as meaning the source of tangible goods such as DVDs, rather

24  than the "communicative works" that the goods embody, the Supreme Court ruled

25  that attribution of the plaintiffs' creative work was not required.  *Id.* at 37.  Notably,

26  in reaching this conclusion, the Supreme Court expressly distinguished, and

27  acknowledged the possibility of, a Lanham Act claim for falsely implying a

28

creator's "'sponsorship or approval'" of a communicative work – *i.e.*, the object of Henley's claim here.  *See id.* at 36 (citing 15 U.S.C. § 1125(a)(1)(A)).

Post-*Dastar* decisions confirm the continued force of false endorsement causes of action, including those involving copyrighted works.  For example, in a case currently pending in the Central District that bears a striking resemblance to this one, well-known singer-songwriter Jackson Browne sued former presidential candidate John McCain for the unauthorized use in a campaign commercial of Browne's song "Running on Empty."  *Browne*, 2009 U.S. Dist. LEXIS 11876, at *1-2.  Ruling on a motion to dismiss, the Court upheld not only Browne's copyright claim, but also Browne's Lanham Act false endorsement claim based on the assertion that viewers would be confused as to Browne's association with McCain. *Id.* at *11, *18; *see also Butler v. Target Corp.*, 323 F. Supp. 2d 1052, 1059 (C.D. Cal. 2004) (Lanham Act claim based on "distortion" of copyrighted song permitted because it "differs from a copyright claim as it refers to possible consumer confusion as to the plaintiffs' sponsorship or approval of the product"); *Microsoft v. Evans*, No. 1:06-cv-01745-AWI-SMS, 2007 U.S. Dist. LEXIS 77088, at *25 (E.D. Cal. Oct. 17, 2007) (damages can be recovered where "a single act" has violated both the Lanham Act and the Copyright Act "because two separate wrongs have been committed") (citing *Nintendo of Am., Inc. v. Dragon Pacific Int'l*, 40 F.3d 1007, 1010-11 (9th Cir. 1994), *cert. denied*, 515 U.S. 1107 (1995)).

## B.    Henley Has More Than Adequately Alleged False Endorsement

The essence of a false endorsement claim by a famous plaintiff is the defendant's invocation of some aspect of the celebrity's persona such that there is a likelihood that the public will be confused as to whether the celebrity endorses or is associated with defendant's product.  *White*, 971 F.2d at 1399-1400; *see Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th Cir. 1997).

10

1   　　　The defendant need not employ any particular characteristic of the plaintiff,

2   for it is well recognized that "[t]he identities of the most popular celebrities are not

3   only the most attractive for advertisers, but also the easiest to evoke without

4   resorting to obvious means such as name, likeness or voice." *White*, 971 F.2d at

5   1399.  Rather, as provided in the Lanham Act, it is sufficient if the device chosen

6   by the defendant to evoke the celebrity's image gives rise to a likelihood of

7   confusion as to the celebrity's association with the defendant's enterprise. *See, e.g.*,

8   *Butler v. Target*, 323 F. Supp. 2d at 1057-59 (distorted song lyrics); *Waits*, 978 F.2d

9   at 1107 (imitation of singer's voice); *White*, 971 F.2d at 1399-1401 (depiction of

10  plaintiff as robot).  As the Ninth Circuit has explained, the legislative history of the

11  amendments codifying false endorsement under the Lanham Act makes clear

12  that "Congress approved the broad judicial interpretation of" the terms symbol and

13  device in the Act and intended these terms to include "distinctive sounds." *Waits*,

14  978 F.2d at 1107 (citing S. REP. NO. 10[0]-515, at 44 (1988)).

15  　　　Whether there exists a likelihood of confusion, in turn, is a fact-bound

16  inquiry to be conducted in accordance with the Ninth Circuit's well-established

17  eight-part test based on the *Sleekcraft* factors.  *Wendt*, 125 F.3d at 812 (test applies

18  in "celebrity endorsement" cases) (citing *Newton v. Thomason*, 22 F.3d 1455, 1462

19  (9th Cir. 1994) and *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)).

20  Following Ninth Circuit precedent, the ultimate question in this case is whether

21  "ordinary consumers" would be confused about Henley's association with DeVore

22  or his campaign.  *Waits,* 978 F.2d at 1111.

23  　　　Henley has clearly alleged that a likelihood of confusion exists as a result of

24  DeVore and Hart's promotional use of songs closely associated with him in their

25  campaign ads.  (Compl. ¶¶ 5, 29, 72.)  The close simulation – rhythmically,

26  sonically, stylistically – of Henley's familiar instrumental backing tracks for "The

27  Boys of Summer" and "All She Wants to Do Is Dance" could easily be mistaken

28  for the original renditions and thus give rise to the inference that Henley licensed,

1    and therefore approved, the content and message of the Boys of Summer and Dance

2    Videos.  (*See* Compl. ¶ 29); *cf. White*, 971 F.2d at 1399-1401 (noting likelihood of

3    consumer confusion due to assumption that game show hostess Vanna White must

4    have approved the ads in which she was represented as a robot); *Butler v. Target*,

5    323 F. Supp. 2d at 1059 ("distorted" use of elements of plaintiffs' song may give

6    rise to consumer confusion).  Further, DeVore and Hart's labeling their efforts a

7    "parody" does not bar a finding of perceived endorsement.  *See White*, 971 F.2d at

8    1400-01 (even if robot ad was intended as a "spoof," defendants may have "also

9    intended to confuse consumers regarding endorsement").

10          DeVore and Hart make much of the fact that Henley bases his false

11   endorsement claim on the use of creative works that are the subject of copyright

12   protection.  According to DeVore and Hart, this should preclude Henley's ability to

13   protect his image and reputation for fear of creating "a species of mutant copyright

14   law." (Defs.' Mem. 9.)[1]  That the two claims under 17 U.S.C. § 101 *et seq.* and

15   15 U.S.C. § 1051 *et seq.* can coexist is confirmed by the Copyright Act itself, which

16   provides:  "Nothing in this title annuls or limits any rights or remedies under any

17   other Federal statute."  17 U.S.C. § 301(d); *see also Butler v. Target*, 323 F. Supp.

18   2d at 1058 ("[T]he federal Copyright Act does not preempt the federal Lanham Act,

19   or vice versa.") (internal citation and quotation omitted).  Moreover, DeVore and

20   Hart's assertion is belied by this Court's ruling in the *Browne* case, in which a

21   copyright and Lanham Act claims are proceeding together.  *Browne,* 2009 U.S.

22   Dist. LEXIS 18876, at *18; s*ee also Dr. Seuss Enters. v. Penguin Books USA, Inc.*,

23   109 F.3d 1394, 1403, 1406 (9th Cir. 1997) (upholding injunction against claimed

24   _____

25   [1] DeVore and Hart compare Henley's false endorsement claim to a claim brought
     by Shakespeare based on a false association with Shakespeare's public domain
26   works.  (Defs.' Mem. at 9.)  In addition to the fact that the works at issue here are
     not in the public domain, it is difficult to imagine that consumers would think that
27   Shakespeare was endorsing products from the grave.

28

                                          12

1  CAT IN THE HAT "parody" after finding likelihood of success on both copyright and

2  Lanham Act claims).[2]

3       Henley's copyright and Lanham Act claims rest on different operative facts:

4  the first arises from the reproduction, distribution, derivative use, and public

5  performance of "The Boys of Summer" as a copyrighted musical work, activities

6  that violate Henley and Campbell's exclusive rights under the Copyright Act, *see*

7  17 U.S.C. § 106, whereas the Lanham Act claim stems from the factually distinct

8  conduct of repurposing Henley-identified works to promote DeVore's political

9  aspirations. *Cf. Downing v. Abercrombie & Fitch*, 265 F.2d 994, 1003-05 (9th Cir.

10  2001) (distinguishing claim based on publication of copyrightable photograph

11  depicting plaintiffs from claim based on misuse of plaintiffs' identities); *Butler v.*

12  *Target*, 323 F. Supp. 2d at 1057-58, 1059 (in contrast to licensed use of plaintiffs'

13  sound  recording, "distortion" of copyrighted work for promotional purposes

14  supports Lanham Act claim).  Significantly, the copyright claim would exist

15  regardless of whether the works used by DeVore and Hart had been exploited in a

16  misleading manner.  But here, as is alleged in the Complaint, DeVore and Hart

17  "willfully and intentionally appropriated not just Henley's exclusive right under the

18  Copyright Act, but also his goodwill, identity and persona."  (Compl. ¶ 5; *accord*

19  ¶ 33 ("'And, it goes without saying that I'll now be looking for every opportunity to

20  turn any Don Henley work I can into a parody of any left tilting politician who

21  deserves it . . . .'") (quoting DeVore).)

22       Moreover, the copyright and Lanham Act claims address entirely different

23  harms:  invasion of one's intellectual property interest, on the one hand, versus

24  _____

25  [2] Indeed, it would be improvident to embrace a rule that would encourage bad
actors to shield themselves from false endorsement claims by using copyrighted

26  properties to evoke a celebrity's image, as in many cases the injured party does not
control the copyright in the work with which he or she is associated, and thus would

27  be left without a remedy.

28

1  economic damage to one's public persona, on the other.  Henley's Lanham Act

2  claim seeks not to halt the reproduction, distribution, derivative use or public

3  performance of his copyrighted work (as Henley's copyright infringement claim

4  does), but rather to enjoin "further conduct [by DeVore and Hart] that falsely

5  suggests an association between Henley and Campbell and their creative works, on

6  the one hand, and DeVore, Hart and the DeVore campaign, on the other."  (Compl.

7  ¶ 42; *accord* Compl. Prayer for Relief (Fourth and Fifth Claims for Relief) ¶ 2).)

8  Such a false endorsement claim is plainly outside the province of copyright.

9          Rather than looking to the recent *Browne* decision or other leading precedent

10  under the Lanham Act, DeVore and Hart reach back to a dated common law case to

11  support their argument, *Sinatra v. Goodyear Tire & Rubber Co.*, 435 F.2d 711 (9th

12  Cir. 1970), *cert. denied*, 402 U.S. 906 (1971), in which plaintiff Nancy Sinatra, who

13  had recorded the song "These Boots Are Made for Walking," asserted an unfair

14  competition claim against Goodyear for the licensed use of a different recording of

15  that song for a commercial.  The court, relying heavily on the Supreme Court's now

16  inapposite preemption decisions in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S.

17  225 (1964), and *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234 (1964),[3]

18  held that Sinatra's claim was not viable.  *Sinatra*, 435 F.2d at 717.

19          But even if *Sinatra* were still good law, a critical distinction between *Sinatra*

20  and Henley's case – aside from the fact that *Sinatra* predates the Lanham Act cause

21  of action at issue here – is that, in *Sinatra* the defendants had properly licensed the

22  use of the song.  *Id.* at 716.  In the court's view, Sinatra had the opportunity to

23  control further exploitation of the song via her contractual relationships, but failed

24  _____

25  [3] In *Goldstein v. California*, 412 U.S. 546 (1973), the Supreme Court limited the
    reach of *Sears* and *Compco*, *id.* at 567-70, and Congress subsequently introduced a

26  new test for federal copyright preemption with the passage of the 1976 Copyright
    Act, *see* 17 U.S.C. § 301.  *See also Waits*, 978 F.2d at 1099, 1100 (observing

27  Supreme Court's retreat from "broad pre-emptive principle" of *Sears* and *Compco*).

28

to do so.  *Id*.  Of course, such is not the case here, where DeVore and Hart do not pretend to be relying on a license.

Finally, DeVore and Hart search for support in the Copyright Act's compulsory license provision that permits "cover" recordings of musical works to be made upon payment of a compulsory license fee, 17 U.S.C. § 115.  In fact, Section 115 only underlines the gravity of the misconduct at issue here.  First, contrary to DeVore and Hart's assertions, the Section 115 compulsory license is a narrow exception to the exclusive rights otherwise conferred by the Copyright Act on the copyright owner to control the use of his or her works.  It applies only to audio recordings of previously recorded works (not audiovisual recordings), and only when such cover recordings are to be distributed to the public for *private* use (not for public and commercial use).  17 U.S.C. § 115(a)(1).  Section 115's compulsory license does not encompass the creation of derivative works based upon the licensed work (such as by substituting lyrics or producing a synchronized audiovisual work, as here), and expressly provides that the licensee is precluded from altering the "fundamental character of the work" (as DeVore and Hart did here).  17 U.S.C. § 115(a)(2).  In sum, Section 115 definitively protects copyright owners *against* the very types of misuse of their works at issue in this case.

Although, as DeVore and Hart point out, cover recordings authorized under Section 115 are common, and it is possible that "the public does not believe that a re-make must have been endorsed by an earlier performer[,]" (Defs.' Mem. at 10-11), the recordings here are neither "covers" nor authorized.  DeVore and Hart did not simply re-record the same songs, but instead altered and integrated them into promotional videos.  Such video exploitations bear no relationship to what the public would perceive as ordinary, audio cover recordings intended for private consumption, which is all that Section 115 allows.  It is the fact that the exploitations are so clearly *not* cover recordings that gives rise to the inference that they were authorized by Henley.

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.   False Endorsement Applies to "Noncommercial" and "Political" Speech

In their attempt to distance their conduct from the reach of the Lanham Act, DeVore and Hart repeatedly misread and conflate different causes of action provided under the Act.  As shown above, Henley's false endorsement claim arises under 15 U.S.C. § 1125(a), which imposes liability on a defendant who "on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device" so as to falsely suggest a plaintiff's association with the defendant or the defendant's goods or services.  15 U.S.C. § 1125(a)(1)(A).  Unlike a case brought under a different provision of the Lanham Act, such as the Federal Trademark Dilution Act ("FDTA"), 15 U.S.C. § 1125(c) – which expressly exempts "noncommercial use of a mark," 15 U.S.C. § 1125(c)(3)(C) – there is no exception for "noncommercial speech" in the false endorsement context.  *See* 15 U.S.C. § 1125(a).  Thus, even if it is assumed that DeVore and Hart's videos could be characterized as "noncommercial" or "political" speech, this would not suffice to immunize DeVore and Hart from Henley's false endorsement claim.

Indeed, one of the cases relied upon by DeVore and Hart, *MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ. 6068 (GBD), 2004 U.S. Dist. LEXIS 3644 (S.D.N.Y. Mar. 8, 2004), drew such a distinction in the course of construing the FTDA's "noncommercial" exemption.  *See id.* at *25-26 & *26 n.2. As that court explained, unlike the FTDA, the different Lanham Act provision at issue in the *United We Stand America, Inc.* case (based on use of a trademark in connection with  "goods and services") "does not have a commercial activity requirement, nor does it exempt from liability noncommercial use of a mark."  *Id.* at *25.  Consequently, the *MasterCard* court declined to apply a "commercial activity" requirement in reviewing the plaintiff's claims under 15 U.S.C. § 1125(a). *Compare id.* at *5-14 (assessing question of consumer confusion for purposes of

16

15 U.S.C. § 1125(a) claim) *with id.* at *18-30 (analysis of FTDA claim).  DeVore and Hart simply overlook this critical point.  (*See* Defs.' Mem. at 12-13.)

Moreover, courts agree that the more general reference to use "in commerce" that appears in 15 U.S.C. § 1125(a) and elsewhere in the Lanham Act is jurisdictional, rather than substantive, in nature:  "The history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark."  *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 92 (2d Cir. 1997); *accord Bosley Med. Inst. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) ("'Use in commerce' is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause.") (internal citations omitted).

Similarly, DeVore and Hart's reliance on *Tax Cap Comm. v. Save Our Everglades, Inc.*, 933 F. Supp. 1077 (S.D. Fla. 1996), is misplaced.  In that case, in which the plaintiff alleged confusion arising from defendant's use of similarly designed petition forms for Florida ballot initiatives, the protected activity was confined to the solicitation of signatures on paper petitions.  Indeed, the court emphasized that the defendant "solicit[ed] no funds, no volunteers, and no supporters" and that defendant's acts were confined to the State of Florida.  *Id.* at 1081 (distinguishing contrary holding in *Brach Van Houten Holding, Inc. v. Save Brach's Coal. for Chicago*, 856 F. Supp. 472 (N.D. Ill. 1994), on ground that *Brach* defendant was "engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, etc.")  Here, DeVore and Hart produced promotional videos and posted them to the Internet as part of a full-fledged publicity campaign for DeVore, which was tied to the solicitation of supporters and donations.  (Compl. ¶¶ 5, 23, 35.)  Even if *Tax Cap* constituted authoritative precedent in this Circuit – which it does not – it is easily distinguishable based on the conduct alleged here.

17

1    Finally, DeVore and Hart's attempt to find support in *Bosley Medical*

2  *Institute* fails, for *Bosley* concerned whether the defendant was a competitor of the

3  plaintiff, as is required for standing to bring a false advertising – not a false

4  endorsement – claim under the Lanham Act.  403 F.3d at 677, 679.  Nor does this

5  case bear any resemblance to *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D.

6  Cal. 2004), also a false advertising case, which turned on whether the plaintiff

7  software company was a competitor of the defendant.  *Id.* at 1116-17.  *Rice v. Fox*

8  *Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003), yet another false advertising case, is

9  also irrelevant, because it concerned the question of whether the defendant was

10  actually engaged in advertising.  *Id.* at 1181.

11    In marked contrast to the inapposite authority cited by DeVore and Hart

12  stands this Court's recent ruling in the *Browne* case, in which the Court rejected the

13  very same "political speech" argument in response to Browne's claim of false

14  endorsement arising out of the infringing use of Browne's song in a commercial:

15    [C]ontrary to [defendant's] assertions, courts have recognized that the

16    Lanham Act applies to noncommercial (i.e. political) *and* commercial

17    speech. . . .  Indeed, the Act's purpose of reducing consumer confusion

18    supports application of the Act to political speech, where the

19    consequences of widespread confusion as to the source of such speech

20    could be dire.

21  2009 U.S. Dist. LEXIS 18876, at *12-13 (emphasis in original) (internal citations

22  omitted).  In reaching this conclusion, the Court acknowledged the Second Circuit's

23  influential holding in *United We Stand*, in which that Court held that the activities

24  of a political organization in support of a presidential candidate constituted

25  "services" within the meaning of the Lanham Act.  *Id.* at *11-15 (citing *United We*

26  *Stand America, Inc.*, 128 F.3d at 89-92).  As the Second Circuit explained, "[t]he

27  suggestion that the performance of such functions is not within the scope of

28  'services in commerce' seems to us to be not only wrong but extraordinarily

18

1    impractical for the functioning of our political system."  128 F.3d at 90 (internal

2    citations omitted).  That is to say, if it is permissible to take others' identities at will

3    to further the cause of one's choice, no one will know what is actually supported by

4    whom.  Indeed, this is Henley's very concern here.

5    **III.   HENLEY'S UCL CLAIM IS SOUND**

6        DeVore and Hart readily acknowledge that it is permissible to pursue a cause

7    of action under California's unfair competition law, Business & Professions Code

8    § 17200 ("UCL"), in tandem with a Lanham Act claim.  (Defs.' Mem. at 14); *see*

9    *also Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1980) (California

10   law extends "greater protection" than is available under the Lanham Act);

11   *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079, 1093-94 (C.D. Cal.

12   2006) (same).  And, as discussed below, a UCL claim can accompany a copyright

13   claim.  *See Aagard v. Palomar Builders, Inc.*, 344 F. Supp. 2d 1211, 1217 (E.D.

14   Cal. 2004).  In an effort to overcome Henley's UCL claim, however, DeVore and

15   Hart resort to the argument that Henley lacks standing to pursue it as a result of

16   Proposition 64.

17       Henley is not suing on behalf of the public, however, to prevent a generalized

18   harm.  Rather, he has brought his UCL claim as an individual to protect his identity

19   and property interests from further injury at the hands of DeVore and Hart.

20   Because the UCL authorizes injunctive relief to halt such harm to Henley and his

21   property, there is no question that Henley has standing to bring the state law claim.

22       In addition to their standing argument, DeVore and Hart suggest – but do not

23   quite assert – that Henley's claim could be preempted by the Copyright Act.

24   (Defs.' Mem. at 14.)  So that there is no doubt on this score, claims such as

25   Henley's, involving the misuse of a copyrighted work that also constitutes an unfair

26   business practice, have been held not to be preempted because they include

27   elements not encompassed by federal law.

28

19

## A.   Henley Has Standing Under the UCL as Amended by Proposition 64

The heart of Devore and Hart's challenge to Henley's UCL claim is their contention that Proposition 64, passed by California voters in 2004, deprives Henley of standing.  Although DeVore and Hart baldly assert that Henley has failed to plead a loss of money or property as required under the amended UCL, they utterly fail to explain why the diminution of Henley's property rights in his valuable creative works and public persona is not actionable.

In pertinent part, the UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]."  Cal. Bus. & Prof. Code § 17200; *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143, 131 Cal. Rptr. 2d 29, 37 (2003).  The UCL covers "a wide range of conduct," embracing "anything that can properly be called a business practice and that at the same time is forbidden by law."  *Korea Supply Co.*, 29 Cal. 4th at 1143, 131 Cal. Rptr. 2d at 37 (internal quotation omitted).  Pursuant to Proposition 64, members of the general public are no longer able to sue for violations of the UCL; rather, a plaintiff must have "'suffered injury in fact and [have] lost money or property as a result of . . . unfair competition.'"  *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1061 (N.D. Cal. 2007) (citing Cal. Bus. & Prof. Code § 17203, as amended by Prop. 64 § 2; *id.* § 17204, as amended by Prop. 64 § 3).

On the face of the complaint, Henley clearly meets the requirements for a cause of action under the UCL.  He alleges that he has "suffered substantial injury as a result of DeVore and Hart's wrongful acts," (Compl. ¶ 80), which include the unlawful appropriation of Henley's identity and persona, as well as the taking and misuse of Henley's copyrighted property, to create the false impression that Henley is associated with Devore's campaign.  (*E.g.*, Compl. ¶¶ 5, 42).  Such conduct is specifically alleged to have devalued Henley's property interests as a co-copyright owner of "The Boys of Summer" and the performing artist of "All She Wants to Do

20

1    is Dance" because Henley derives "substantial income and economic value from

2    licensed uses" of those works, and "[t]he association . . . with DeVore's campaign

3    and views will make these works less attractive to be licensed for other legitimate,

4    income-producing purposes, such as for film, television and commercials." (*Id.*

5    ¶ 41.)

6         In addition to Henley's property interests in his creative works,[4] the law

7    recognizes that Henley has a personal property right in his celebrity persona. *Waits*,

8    978 F.2d at 1100 (singer Tom Waits' state law claim for misuse of his identity in a

9    commercial was an invasion of his "personal property right"); *see also Midler v.*

10   *Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988) (common law rights in

11   celebrity's identity are "property rights"). Henley has plainly alleged harm to his

12   identity as a result of DeVore and Hart's unlawful acts, including injury to

13   "[himself], his reputation and goodwill." (*Id.* ¶ 80.)

14        In sum, Henley has alleged injury in fact, including the loss of property and

15   income, as a result of DeVore and Hart's tortious conduct. Henley seeks injunctive

16   relief to restore his property interests. (*Id.* ¶ 7.) These allegations more than suffice

17   to give him standing to sue under the UCL.

18        Contrary to what DeVore and Hart appear to contend, it is clear that standing

19   under the UCL does not require that the property in question be either tangible or

20   reduced to a "sum certain." For example, in *Overstock.com Inc. v. Gradient*

21   *Analytics, Inc.*, 151 Cal. App. 4th 688, 61 Cal. Rptr. 3d 29 (Cal. Ct. App. 2007), a

22   case involving defendant's manipulation of stock prices through false statements,

23   the court held that the plaintiff had standing to sue based on the "diminution in

24   value of [its] assets and decline in its market capitalization[.]" 151 Cal. App. 4th at

25   _____

26   [4] "Copyright, of course, is a federal grant of a property interest in the production,
     replication, publication, and distribution of certain classes of 'original works of

27   authorship fixed in any tangible medium of expression.'" *Davis v. Blige*, 505 F.3d
     90, 98 (2d Cir. 2007) (citing 17 U.S.C. § 102(a)).

28

716, 61 Cal. Rptr. 3d at 51.  Similarly, in *White v. Trans Union, LLC*, 462 F. Supp. 2d 1079 (C.D. Cal. 2006), the court upheld plaintiffs' UCL claim based on their allegation that they suffered loss of money or property due to defendants' faulty credit reporting practices.[5]  *Id.* at 1083-84.

Seeking to bolster their argument, DeVore and Hart further assert that, after Proposition 64, standing under the UCL is strictly limited to claims for which the remedy is "restoration of . . . money or property under Section 17203 [of the UCL]." (Defs.' Mem. 16.)  This is an erroneous view of the statute.  As the California Supreme Court recently confirmed in *In re Tobacco II Cases*, 46 Cal. 4th 298, 93 Cal. Rptr. 3d 559 (2009), Proposition 64 did *not* limit the remedies provision of the UCL , which provides that "[t]he court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, *or* as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. 17 U.S.C. § 17203 (emphasis added); *In re Tobacco Cases II,* 46 Cal. 4th at 319, 93 Cal. Rptr. 3d at 575 ("T]he primary form of relief available under the UCL to protect consumers from unfair business practices is an injunction, along with ancillary relief in the form of . . . restitution.").

Because the statute permits parties to sue for both injunctive relief and restitution, the narrow reading of the UCL advanced by DeVore and Hart has been rejected by this Court and others.  For example, in *G&C Auto Body Inc. v. Geico Gen. Ins. Co.*, No. C06-04898 MJJ, 2007 U.S. Dist. LEXIS 91327 (N.D. Cal. Dec.

_____

[5] Similarly, other UCL cases have found standing based on intangible vested interests.  *E.g.*, *Cortez v. Purolator Air Filtration Pdts. Co.*, 23 Cal. 4th 163, 177-78, 96 Cal. Rptr. 518, 528-29 (2000) (standing based on vested interest in withheld overtime pay); *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 733-34 (9th Cir. 2007) (standing based on vested interest in free mobile phone minutes).

ny-873973

12, 2007), in which it was asserted that insurers' low reimbursement rates harmed auto repair shops, the court permitted plaintiffs to proceed on the basis of their claim for injunctive relief to halt the insurers' practices. *Id.* at *5, *14. The court found "no basis to presume that the People of California, when adopting Proposition 64, meant for the new Section 17204 standing requirements to track the requirements established for obtaining restitution under Section 17203." *Id.* at *13. Moreover, in the court's view, an interpretation of the UCL limiting standing to those who seek restitution would be untenable because it would mean that a plaintiff would "lack standing to seek . . . injunctive relief." *Id.* at *12. Likewise, in *White v. Trans Union, LLC*, a case challenging the defendant's credit reporting practices, this Court, too, held that the plaintiffs could proceed based on a claim for nonmonetary injunctive relief; they were not required to show that defendant "took money directly from them" or that "the losses in question were the product of the defendant's wrongful acquisition of the plaintiffs [sic] property." *Id.* at 1083-84.

The sole federal decision relied upon by DeVore and Hart in support of their strained reading of the UCL, *Butler v. Adoption Media LLC*, is easily distinguished from this case, because the *Butler* plaintiffs had not "previously identified any loss of money or property in connection with their [UCL] claims, and cannot now attempt to establish such a loss." 486 F. Supp. 2d at 1062. Similarly, in *Buckland v. Threshold Enters., Ltd.,* 155 Cal. App. 4th 798, 66 Cal Rptr. 3d 543 (2007), in which the plaintiff attempted to manufacture standing by purchasing  defendant's skin cream, the court's dismissal was based on plaintiff's failure to allege "lost money or property" as required under the statute.  486 F. Supp. 2d at 815-16, 818, 66 Cal. Rptr. 3d at 555-56, 558.  Finally, in *Center for Biological Diversity, Inc. v. FPL Group, Inc.*, No. RG04-183113, 2006 WL 3542514 (Cal. Super. Ct. Oct. 12, 2006), the court concluded that plaintiff lacked standing to bring a claim based on the killing of wildlife, an "abstract interest owned commonly by all members of the public" rather than "individually" by the plaintiff. *Id.* Clearly, none of these

23

1  holdings applies here, for Henley has alleged the loss of protectable, personal

2  property.  In any event, to the extent these cases suggest that standing under the

3  UCL is limited to those who assert claims for specific types of restitution, they are

4  in conflict with language of the statute as well as a recent decision of the California

5  Supreme Court.[6]

6                **B.    Henley's UCL Claim is Not Preempted by Copyright Law**

7          Finally, Henley's UCL claim is not preempted by copyright law, as DeVore

8  and Hart appear to suggest in passing.  (Defs.' Mem. at 14.)  That is because a state

9  law claim is not preempted when it requires proof of an "extra element" not

10 required by federal law.  *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*,

11 7 F.3d 1434, 1439-40 (9th Cir. 1993); *see also* 17 U.S.C. § 301(b) (preserving state

12 law claims involving rights not equivalent to those covered by the Copyright Act).

13 As discussed above, *supra* § II.B, such additional elements are plainly present here,

14 where Henley's UCL claim arises not only from the misappropriation of exclusive

15 rights under the Copyright Act, but from the alteration and misuse of works closely

16 associated with Henley improperly to suggest that Henley endorses DeVore.

17         Courts have declined to find preemption in circumstances such as these.  For

18 example, in *Butler v. Target*, plaintiffs alleged, *inter alia*, that the defendant

19 distorted the lyrics of plaintiffs' song and used the distorted lyrics in an advertising

20 campaign.  323 F. Supp. 2d at 1057.  This Court held this UCL claim was not

21 preempted because it alleged an "extra element":  that the altered lyrics led

22 consumers mistakenly to believe that plaintiffs endorsed defendant's products.  *Id.*

23 (noting that Section 301 of Copyright Act "'is not intended to preempt common law

24 _____

25 [6] In *Korea Supply Co.*, discussed at length by DeVore and Hart, the California
   Supreme Court held that "nonrestitutionary disgorgement of profits is not an

26 available remedy in an individual action under the UCL."  29 Cal. 4th at 1152, 131
   Cal. Rptr. 2d at 44.  But that case involved the type of restitution available under

27 the UCL, not standing.  In any event, Henley is not seeking disgorgement here.

28

                                            24

1  protection . . . even where the subject matter involved comes within the scope of the

2  copyright statute'") (quoting H.R. REP. NO. 94-1476, at 133 (1976)).  Likewise, in

3  *Aagard*, a case involving the misappropriation of copyrighted home design plans,

4  the court reasoned that the defendants' UCL counterclaim was not preempted

5  because the defendants alleged the plaintiff had capitalized on defendants'

6  reputation to promote her own interests.  344 F. Supp. 2d at 1217.

7  　　　Here, as in *Butler v. Target*, Henley has alleged that the alteration and misuse

8  of his works could lead consumers to believe that he endorses, is affiliated with, or

9  supports DeVore and his campaign.  (Compl. ¶¶ 29, 40, 78.)  And, like the

10  counterclaims in *Aagard*, Henley has alleged that DeVore and Hart have unlawfully

11  capitalized on his reputation, fame, and popularity.  (*Id.* at ¶¶ 38, 80.)  Such

12  allegations clearly constitute "extra elements" demonstrating that Henley's UCL

13  claim is not preempted and should go forward.[7]

14  ## IV.   CONCLUSION

15  　　　Accordingly, for all of the reasons set forth herein, Henley and Campbell

16  respectfully request that this Court deny DeVore and Hart's motion to dismiss.

17  Dated:    June 12, 2009            MORRISON & FOERSTER LLP
18                                     CHARLES S. BARQUIST
                                       JACQUELINE C. CHARLESWORTH
19                                     KELVIN D. CHEN
                                       PAUL GOLDSTEIN
20

21                                     By: _____/s/_____
                                           Charles S. Barquist
22
                                       Attorneys for Plaintiffs
23                                     DON HENLEY and MIKE CAMPBELL

24

25  _____

26  [7] *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134 (9th Cir. 2006), a right of
    publicity case cited by DeVore and Hart, is inapposite, for in that case – unlike here
27  – the defendant had obtained a license from the plaintiff's record label to use
    plaintiff's sound recording.  *Id.* at 1140-41.
28

ny-873973