1   Christopher W. Arledge (Bar No. 200767)
        carledge@onellp.com
2   John Tehranian (Bar No. 211616)
        jtehranian@onellp.com
3   **ONE LLP**
    4000 MacArthur Boulevard
4   West Tower, Suite 1100
    Newport Beach, California 92660
5   Telephone:  (949) 502-2870
    Facsimile:   (949) 258-5081
6

7   Attorneys for Defendants Charles S. DeVore and
    Justin Hart
8

9                    **UNITED STATES DISTRICT COURT**

10               **CENTRAL DISTRICT OF CALIFORNIA**

11

12  DON HENLEY, MIKE CAMPBELL, and          Case No. SACV09-0481 JVS (RNBx)
    DANNY KORTCHMAR                          Hon. James V. Selna

13          Plaintiffs,
                                             **DEFENDANTS' MEMORANDUM IN**
14  v.                                       **OPPOSITION TO PLAINTIFF'S**
                                             **MOTION FOR PARTIAL SUMMARY**
15  CHARLES S. DEVORE and JUSTIN             **JUDGMENT**
    HART,
16                                           Date: June 1, 2010
            Defendants.                      Time: 10:00 a.m.
17                                           Courtroom: 10C

18
    ─────────────────────────────
19  AND RELATED COUNTERCLAIMS

20

21

22

23

24

25

26  ///

27  ///

28  ///

16639.1

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.     INTRODUCTION...................................................................1

II.    DEFENDANTS' VIDEOS ARE PROTECTED BY THE FAIR USE
DOCTRINE......................................................................1
    A.    The purpose of character of theuse.........................................2
        1.    Dr. Rose's opinion is irredeemably flawed and inadmissible.........3
        2.    Defendants' videos are not commercial speech.......................7
    B.    The second fair use factor is largely irrelevant................................9
    C.    The third fair use factor weighs in Defendants' favor.........................9
    D.    The fourth fair use factor weighs in Defendants' favor.......................10

III.   PLAINTIFFS LACK EVIDENCE OF WILLFUL INFRINGEMENT............12

IV.   HENLEY HAS NO EVIDENCE TO SUPPORT HIS LANHAM ACT
CLAIM.........................................................................12
    A.    Henley cannot prove the necessary elements of his claim....................12
    B.    Henley cannot prevail without proving actual malice, and he has no
evidence of actual malice...................................................16
    C.    The *Sleekcraft* factors are irrelevant in these circumstances – but also
harmful to Henley's argument if applied......................................17
        1.  Henley has no evidence to support his application of the *Sleekcraft*
factors.................................................................17
        2.  Henley's alleged evidence of actual confusion is weak and
disputed...............................................................19

V.    CONCLUSION ...............................................................24

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

*Cases*

*Aguilar v. International Longshoremen's Union Local No. 10,*
    966 F.2d 443 (9th Cir. 1992) .................................................. 4

*AMF Inc. v. Sleekcraft Boats,*
    599 F.2d 341 (9th Cir. 1979) ............................................... 17

*Browne v. McCain,*
    612 F.Supp.2d 1125 (C.D.Cal.2009) ................................... 7

*Burnett v. Twentieth Century Fox Film Corp.,*
    491 F.Supp.2d 962 (C.D.Cal.2007) .................................. 10

*Campbell v. Acuff-Rose Music,*
    510 U.S. 569 (1994) ............................................... 2, 3, 9, 10

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23 (2003) ... .............................................. 15

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,*
    109 F.3d 1394 (9th Cir. 1997) ............................................. 9

*Fisher v. Dees,*
    794 F.2d 432 (9th Cir. 1986) ........................................... 10

*Florida Bar v. Went For It, Inc.,*
    515 U.S. 618 (1995) .......................................................... 9

*Hangarter v. Provident Life & Accident Ins. Co.,*
    373 F.3d 998 (9th Cir. 2004) .......................................... 4

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) ...................................................... 7, 8

*Hoffman v. Capital Cities/ABC, Inc.,*
    255 F.3d 1180 (9th Cir. 2001) ....................................... 16

DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

*Keep Thomson Governor Comm. v. Citizens For Gallen Comm.*,
   457 F.Supp. 957 (D. N.H. 1978) ............................................................ 8

*Kournikova v. General Media Comm., Inc.*,
   2002 WL 3168027 (C.D.Cal.2002) ...................................................... 16

*MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.*,
   2004 WL 434404 (S.D.N.Y. 2004) ....................................................... 8

*Mattel, Inc. v. Walking Mountain Prod.*,
   353 F.3d 792 (9th Cir. 2004) ..................................................... 3, 4, 5, 6

*Nationwide Transport Finance v. Cass Information Systems, Inc.*,
   523 F.3d 1051 (9th Cir. 1999) ............................................................ 4

*Oliveira v. Frito-Lay, Inc.*,
   251 F.3d 56 (2d Cir. 2001) ........................................................... 13, 14

*Princeton University Press v. Michigan Document Services, Inc.*,
   99 F.3d 1381 (6th Cir. 1996) ........................................................... 12

*Solano v. Playgirl, Inc.*,
   292 F.3d 1078 (9th Cir. 2002) ......................................................... 17

*U.S. v. Scholl*,
   166 F.3d 964 (9th Cir. 1999) ............................................................ 4

*Waits v. Frito-Lay, Inc.*,
   978 F.2d 1093 (9th Cir. 1992) ......................................................... 13

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.       INTRODUCTION

Plaintiffs' motion asks this Court to rule that political speech by Chuck DeVore, a United States Senate candidate, which was delivered in the form of two music videos, willfully infringes their copyrights, and it asks this Court to rule that the same videos violate the Lanham Act by falsely implying that Don Henley endorses DeVore or DeVore's campaign. This Court must deny Plaintiffs' motion.

The fate of the copyright claims rests on a fair use analysis, and the key to that analysis is whether DeVore's videos were transformative. DeVore says they are, and he offers substantial evidence to show that his videos were parodic—that they commented, at least in part, on the original compositions. Plaintiffs offer nothing to the contrary other than the inadmissible opinion of a single expert witness. Plaintiffs cannot prevail on their copyright claims.

Henley's Lanham Act claim fails because he cannot prove the basic elements of his claim—that Defendants misappropriated a "distinctive attribute" or "distinguishing characteristic" of his—and because he has no evidence to prove that Defendants videos were made with actual malice, that is, with an intentional effort to confuse the public as to Henley's endorsement.

Because Plaintiffs' arguments are the inverse of the arguments Defendants presented in their pending summary judgment motion, Defendants hereby incorporate into this opposition the arguments in their earlier-filed Memorandum of Points and Authorities in Support of Summary Judgment ("Defendants' Memo").

## II.      DEFENDANTS' VIDEOS ARE PROTECTED BY THE FAIR USE DOCTRINE

Plaintiffs spill much ink on factual assertions that cannot possibly support a summary judgment order. Plaintiffs try to prove that Defendants did not intend to create parodies and invented parody as a *post hoc* justification. At best, that factual assertion is disputed (it really is just wrong), and therefore this Court could not find in Plaintiffs' favor on that issue at summary judgment. DeVore is clear that he at all times intended to create

16639.1                                                         1

1   parodies.  Declaration of Charles DeVore filed with Defendants' Motion for Summary

2   Judgment ("DeVore Decl."), ¶¶ 2-10.  And the very documents Plaintiffs attach to their

3   lawyers' declaration support his testimony.  *See, e.g.,* Exhibit 22 to the Declaration of

4   Jacqueline Charlesworth (DeVore referring to the Hope of November as a parody when he

5   first released the lyrics publicly, long before any dispute between the parties).  Thus, if

6   Plaintiffs think it important to their motion to prove that Defendants did not intend to create

7   parodies and are only now claiming otherwise—and they must believe that this assertion is

8   critical to their motion, otherwise why spend so much time on it?—then this is an issue of

9   disputed fact, and their summary judgment motion must be denied.

10          Likewise, Plaintiffs spend a lot of time trying to prove that Defendants wanted their

11  parodies to attract attention to the campaign.  Of course they did.  If the parodies generated

12  attention, more people would come to know and understand DeVore's political positions.

13  But this fact in no way changes the legal analysis of the real issue before the Court:

14  whether Defendants' use of Plaintiffs' copyrighted works was fair.  Many parodists

15  undoubtedly want the public to take note of their works, and the fair use doctrine does not

16  only protect transformational works that are kept under lock and key in the author's

17  basement.  There is certainly no indication in *Campbell* that 2 Live Crew tried to keep their

18  parody a secret; to the contrary, they released it publicly and no doubt hoped the entire

19  world would purchase it.  This means that much of Plaintiffs' brief is spent discussing

20  irrelevant factual material.  The real question for this Court is whether the fair use doctrine

21  covers Defendants' works.  It does, and the Court can make that determination on this

22  factual record.

23          **A.     The purpose of character of the use**

24          The heart of the fair use analysis—and, therefore, of the copyright claims—is the

25  first fair use factor.  Are Defendants' videos sufficiently transformative that the first fair

26  use factor weighs in Defendants' favor?  If they are—if, for example, the videos are

27  parodies—then there is a strong argument for application of the fair use doctrine.  In

28  Defendants' Memo, they show why the videos are parodies, why they would be sufficiently

16639.1                                              2

1 | transformative to satisfy the first fair use factor even if deemed to be satires rather than
2 | parodies, and why they are core political speech and therefore entitled to special protection
3 | under the First Amendment. *See* Defendants' Memo at 2-10.

4 |      Plaintiffs rest their argument to the contrary on two principal contentions. First, they
5 | use expert testimony from Dr. Mark Rose to argue that the works are not parodies. Second,
6 | they assert that Defendants' videos are merely commercial speech and are entitled to no
7 | special protection. Neither argument is persuasive.

8 |      **1.   Dr. Rose's opinion is irredeemably flawed and inadmissible**
9 |      There are three basic flaws in Dr. Rose's opinion, and all three render his opinion not
10 | only suspect, but inadmissible. First, Dr. Rose purports to opine on improper subject
11 | matter. Though he is an experienced and well-regarded literature professor, Dr. Rose does
12 | not rely on that expertise here. (Nor could he for the reasons explained below.) Dr. Rose
13 | was not asked to determine, for example, whether Defendants' works constitute parodies
14 | under the definition of parody used by experts in English literature. Such an opinion would
15 | almost certainly be inadmissible for other reasons, but it would at least rest on Dr. Rose's
16 | special knowledge and expertise. But, instead, Dr. Rose was asked to determine whether
17 | Defendants' works fit the legal definition of parody as set forth in the *Campbell v. Acuff-*
18 | *Rose Music* case. (Supp. Arledge Decl., Exh. A (Deposition of Dr. Mark Rose) at 11:10-25
19 | ("I have adopted … the definition used by the Supreme Court in Acuff-Rose.") and 21:14-
20 | 19 (In Dr. Rose's report and deposition testimony, he "used the Supreme Court's definition
21 | of parody from Acuff-Rose.").

22 |      Dr. Rose, then, was asked to opine on a purely legal question: whether Defendants'
23 | works satisfy the legal definition of parody articulated by the Supreme Court. But this is
24 | not his role. The Ninth Circuit has been absolutely clear that this question—whether a
25 | defendant's work is a parody—is a question of law for the court. *Mattel, Inc. v. Walking*
26 | *Mountain Prod.*, 353 F.3d 792, 801 (9th Cir. 2004) ("The issue of whether a work is a
27 | parody is a question of law…. [E]very court to address the issue whether a defendant's
28 | work qualifies as a parody has treated this question as one of law to be decided by the

16639.1

3

1   court."). Dr. Rose is not qualified to opine on the law even if such a legal opinion were

2   permissible. *See, e.g.,* Supp. Arledge Decl., Exh. A at 28:12 to 29:8 ("I'm not a lawyer and

3   I am not qualified to provide you a fair use analysis…. "I can't testify to that [what the

4   Supreme Court meant in footnote 14 of its *Campbell* opinion when it referred to looser

5   forms of parody], I'm not a lawyer.").

6       More importantly, an expert witness is not permitted to testify as to a legal

7   conclusion. *See Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523

8   F.3d 1051, 1058 (9th Cir. 2008) ("[A]n expert witness cannot give an opinion as to her *legal*

9   *conclusion,* i.e., an opinion on an ultimate issue of law. Similarly, instructing the jury as to

10   the applicable law is the distinct and exclusive province of the court.") (citing *Hangarter v.*

11   *Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1016 (9th Cir.2004); *U.S. v. Scholl*, 166

12   F.3d 964, 973 (9th Cir. 1999) ("It is well settled that the judge instructs the jury in the law.

13   Experts 'interpret and analyze factual evidence. They do not testify about the law because

14   the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to

15   inform the jury about the law that is relevant to their deliberations.'") (internal citation

16   omitted); *Aguilar v. International Longshoremen's Union Local No. 10*, 966 F.2d 443,

17   447 (9th Cir. 1992) ("Expert testimony is admissible if 'scientific, technical, or other

18   specialized knowledge will assist the trier of fact to understand the evidence or determine a

19   fact in issue....' Fed.R.Evid. 702. Here, the reasonableness and foreseeability of the casual

20   workers' reliance were matters of law for the court's determination. As such, they were

21   inappropriate subjects for expert testimony.") Simply put, it is this Court's job to

22   determine as a matter of law whether Defendants' works are parodies. Dr. Rose's opinion

23   on that legal conclusion is not relevant, valuable or admissible.

24       Second, and not surprisingly in light of the Ninth Circuit's conclusion that whether a

25   work constitutes parody is a question of law for the court, Dr. Rose's subjective opinion on

26   this question is irrelevant. In *Walking Mountain*, the plaintiff sought to admit survey

27   evidence to show that most members of the public do not perceive parodic character in the

28   defendant's works. The Ninth Circuit ruled that the survey evidence was inadmissible.

16639.1                4

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   "The issue of whether a work is a parody is a question of law, not a matter of public

2   majority opinion." *Walking Mountain*, 353 F.3d at 801.  The court found "no case law in

3   support of [Mattel's] contention that the parodic nature of a defendant's work should be

4   assessed using surveys and opinion testimony." *Id.*  Parody has "socially significant value

5   as free speech under the First Amendment." *Id.*  And the "[u]se of surveys in assessing

6   parody would allow majorities to determine the parodic nature of a work and possibly

7   silence artistic creativity.  Allowing majorities to determine whether a work is a parody

8   would be greatly at odds with the purpose of the fair use exception and the Copyright Act."

9   *Id.*

10          Under *Walking Mountain*, there is no basis for admitting Dr. Rose's opinion as to

11  whether Defendants' works are parodies.  Dr. Rose's declaration is, of course, opinion

12  testimony, and the Ninth Circuit in *Walking Mountain* expressly disallowed the use of

13  "surveys and opinion testimony" to determine whether a work is parodic.  *Id.*  No other

14  conclusion makes sense of *Walking Mountain*.  If it is inappropriate to allow a majority to

15  determine whether a work is entitled to protection—and if courts must therefore exclude

16  survey evidence—how much more problematic would it be to allow Dr. Rose to determine

17  the question by himself?  Dr. Rose is, by all accounts, a gifted academic and a very bright

18  man.  But none of this makes his subjective view of Plaintiffs' songs or Defendants'

19  parodies the standard by which to determine First Amendment rights.  Dr. Rose conducted

20  a "formal literary analysis" of Defendants' works.  Supp. Arledge Decl., Exh. A at 115:12

21  to 118:23.  This means that he simply read the works in question and offered his own

22  personal interpretation, limiting his review to the four corners of the document in the

23  process.  *Id.*; *see also id.* at 50:6-12; *id.* at 111:12-23 (He was "trying to analyze simply the

24  reading that comes from the words on the page of the poem here.").  Not only can Dr. Rose

25  not tell us whether untrained professionals would analyze the works the same way, he has

26  "no idea" even whether other professional literary scholars would.  *Id.* at 72:4-13.  It is

27

28

1   apparent from the opinions of Dr. Martin Zeilinger that many would not.[1]  *See* Declaration
2   of Dr. Martin Zeilinger.

3          In *Walking Mountain* the Ninth Circuit expressed concern about tyranny of the
4   majority, concluding that it is inappropriate to have a majority determine whether a work
5   merits protection.  Surely tyranny of the minority (here, a minority of one) is no better.  If
6   the opinions of a majority should not decide whether the First Amendment offers its
7   protection, should the subjective whim of a single individual?  Dr. Rose's interpretation
8   may be interesting, and it may have even some value for scholars who are interested in the
9   literary analysis of pop songs and political advertisements.  But it is irrelevant to the
10  question before this Court, and it must be excluded.

11         Finally, even apart from the clear inadmissibility of his opinion, Dr. Rose's
12  methodology was fatally flawed, because he ignored the Ninth Circuit's instructions on the
13  importance of looking at a work in context.  In *Walking Mountain*, the panel rejected
14  Mattel's argument that the court must "ignore context—both the social context of
15  Forsythe's work and the actual context in which Mattel's copyrighted works are placed in
16  Forsythe's photographs."  *Id.* at 802.  The court was of the opposite opinion: "in parody, as
17  in news reporting, context is everything."  *Id.* (internal citation omitted).

18         Dr. Rose ignored these instructions and analyzed Defendants' works *apart from* any
19  context.  According to Dr. Rose, his "formal literary analysis" did not require "a large
20  cultural context."  Supp. Arledge Decl., Exh. A at 115:12 to 118:23.  Instead, he focused
21  only on the words on the page.  *Id.*  This means that Dr. Rose cannot tell us how Chuck
22  DeVore's intended audience—or anybody else—would have understood the works.  *Id.* at
23  102:16 to 104:8 (Dr. Rose cannot tell us how Chuck DeVore's audience would have
24  responded to the songs or what they would have understood them to mean.  He cannot

─────────────────────

26  [1] Defendants do not believe that Dr. Zeilinger's opinion on this pure question of law is any
27  more admissible than is Dr. Rose's.  But if the Court disagrees and considers Dr. Rose's
    opinion, the Court should also take into account the opinions of Dr. Zeilinger, also a
28  literary scholar, who has concluded that Defendants' videos are parodic.

16639.1                                     6

1  testify as to "somebody else's opinion and reaction"; he can only give you his

2  understanding.).

3      In sum, Dr. Rose offered his subjective opinion as to a pure question of law.  His

4  opinion did not take into account the context in which Defendants' works were written, and

5  it does not even purport to speak to how any person other than Mark Rose would interpret

6  or understand Defendants' works.  Dr. Rose is also not an expert on the law, and

7  determining questions of law is a job for this Court, not an expert, in any event.  Dr. Rose's

8  entire testimony is inadmissible.

9      Without Dr. Rose's opinion, Plaintiffs have literally nothing admissible to support

10  their argument under the first fair use factor.  DeVore's thorough analysis of the question,

11  *see* Defendants' Memo at 2-10 and DeVore Decl., ¶¶ 5-10, is uncontradicted and more than

12  sufficient to establish that Defendants' videos were transformative parodies.

13          **2.    Defendants' videos are not commercial speech**

14      Plaintiffs also argue that Defendants' use of the songs was "commercial" and that the

15  commercial nature of the use weighs against a finding of fair use.  "Plaintiffs' valuable

16  songs were exploited to promote a product, the candidate Chuck DeVore...."  Plaintiffs'

17  Motion at 19.  Plaintiffs' support for this argument comes from *Harper & Row, Publishers,*

18  *Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) and *Browne v. McCain*, 612 F.Supp.2d

19  1125, 1130 (C.D. Cal. 2009).  The Court can dispense with the latter case quickly; its mere

20  citation only confirms the paucity of support for Plaintiffs' position.  Simply put, the

21  district court in *Browne* not only failed to address whether the use of copyrighted material

22  in a campaign advertisement is "commercial" speech, the court actually refused to analyze

23  fair use at all because it lacked a sufficient factual record at the motion to dismiss stage.

24  *Browne*, 612 F.Supp.2d at 1130.

25      By contrast, *Harper & Row* at least discusses fair use and commerciality, but the

26  case still is of little use to Plaintiffs.  There, the plaintiff tried to draw a distinction between

27  news reporting—which it argued should be entitled to fair use treatment—and the

28  commercial use of copyrighted material, which is less likely to be fair use.  The Supreme

16639.1                                    7

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

1  Court rejected the distinction in that case, finding that the defendant's entire goal was to
2  supplant for itself the economic value of plaintiff's work. "In evaluating character and
3  purpose we cannot ignore The Nation's stated purpose of scooping the forthcoming
4  hardcover and Time abstracts. The Nation's use had not merely the incidental effect but the
5  *intended purpose* of supplanting the copyright holder's commercially valuable right of first
6  publication." *Harper & Row*, 471 U.S. at 562 (emphasis in original).

7       In *Harper & Row*, then, a commercial enterprise—a for-profit magazine—
8  intentionally usurped the first publication of a copyrighted work. It is hard to argue with
9  the Supreme Court's conclusion that the use was a commercial use. It is even harder to
10 understand what the case has to do with Defendants. Defendants did not usurp a first
11 publication. Defendants did not and do not sell their videos. Defendants' videos do not
12 even solicit donations. The videos undoubtedly try to convince voters that Chuck
13 DeVore's political positions are right for America and that, therefore, DeVore is the best
14 candidate for the United States Senate. To this extent, the videos promote Chuck DeVore.
15 But by this definition, virtually all speeches by candidates or public officials promote the
16 speaker, and Plaintiffs offer no legal authority to support their contention that such core
17 political speech is somehow rendered mere commercial speech as a result.

18      There is, however, ample authority to the contrary. *See MasterCard Intern. Inc. v.*
19 *Nader 2000 Primary Committee, Inc.*, 2004 WL 434404, 12 (S.D.N.Y. 2004) (finding
20 Ralph Nader's use of Mastercard's copyrighted material from its "priceless" line of
21 advertisements to be noncommercial and parodic and therefore protected by the fair use
22 doctrine); *Keep Thomson Governor Comm. v. Citizens For Gallen Comm.*, 457 F.Supp.
23 957, 961 (D. N.H. 1978) (The court held that defendant's use of plaintiff's copyrighted
24 material was protected by the fair use doctrine. "The use by the defendant of a portion of
25 the plaintiff's political advertisement is clearly part of a political campaign message, non-
26 commercial in nature, and First Amendment issues of freedom of expression in a political
27 campaign are clearly implicated.").

28

1    Adopting Plaintiffs' argument would set a dangerous precedent. Commercial speech

2  enjoys less protection under the First Amendment than other types of "core" First

3  Amendment expression. *See, e.g., Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995)

4  ("We have always been careful to distinguish commercial speech from speech at the First

5  Amendment's core. " '[C]ommercial speech [enjoys] a limited measure of protection,

6  commensurate with its subordinate position in the scale of First Amendment values,' and is

7  subject to 'modes of regulation that might be impermissible in the realm of noncommercial

8  expression.' ") (internal citations omitted). This Court should not accept Plaintiffs'

9  argument that the assertion of public policy positions by a candidate for office can be

10  categorized as commercial speech—and, therefore, less deserving of First Amendment

11  protection—merely because the speaker's goal in discussing the public policy issues was to

12  further his campaign. Any such ruling would significantly and unjustifiably chip away at

13  the Constitution's most-basic free speech protections. Defendants' videos are core political

14  speech, deserving of the highest level of constitutional protection. This fact must weigh in

15  favor of a fair use finding.

16    **B.    The second fair use factor is largely irrelevant**

17    In the Supreme Court's words, the second fair use factor "is not much help in this

18  case, or ever likely to help much in separating the fair use sheep from the infringing goats

19  in a parody case, since parodies almost invariably copy publicly known, expressive works."

20  *Campbell*, 510 U.S. at 586; *Dr. Seuss*, 109 F.3d at 1402 ("[T]his factor typically has not

21  been terribly significant in the overall fair use balancing….").

22    **C.    The third fair use factor weighs in Defendants' favor**

23    Plaintiffs offer expert testimony to prove that Defendants closely tracked the

24  underlying musical compositions and simply changed lyrics. It is not clear why they

25  bothered. Defendants admit they used a karaoke track for the background music and

26  changed the lyrics to change the songs' meanings. DeVore Decl., ¶ 12. Plaintiffs needed

27  no expert to establish that fact, and that fact does not weigh against a finding of fair use.

28

1    "Like a speech, a song is difficult to parody effectively without exact or near-exact
2    copying. If the would-be parodist varies the music or meter of the original substantially, it
3    simply will not be recognizable to the general audience. This 'special need for accuracy,'
4    provides some license for 'closer' parody." *Fisher v. Dees*, 794 F.2d 432, 439 (9th Cir.
5    1986). Moreover, "there is no requirement that 'parodists take the *bare minimum* amount
6    of copyright material necessary to conjure up the original work." *Burnett v. Twentieth*
7    *Century Fox Film Corp.*, 491 F.Supp.2d 962, 970 (C.D. Cal. 2007).

8        Here, Defendants supplied new lyrics to the original musical compositions. DeVore
9    Decl., ¶ 12. To parody the original works properly—that is, to alter the songs' original
10   meanings and express DeVore's political message—Defendants needed to use the
11   underlying musical compositions. *Id.* Moreover, practically speaking it would not be
12   possible to use only a portion of the song. Using only the first 30 seconds, for example,
13   would have required Defendants either to switch in mid-song to a new musical composition
14   entirely—which would have been confusing and would have diluted the parodic impact of
15   the work—or they would have had to cut their parody short, which would not have allowed
16   them to convey all of the political and parodic points they wished to make. *Id.* Thus,
17   Defendants' use of the songs was not excessive.

18       Also important to the third fair use factor is the extent to which the parody can or
19   does serve as a market substitute for the original. *Campbell*, 510 U.S. at 587. As shown
20   below, Defendants' works do not constitute market substitutes for the originals, further
21   supporting Defendants' arguments under this third factor.

22   **D.    The fourth fair use factor weighs in Defendants' favor**

23       The fourth fair use factor asks whether the allegedly infringing work usurps demand
24   for the original. *Campbell*, 510 U.S. at 592. Here, Plaintiff offers expert testimony arguing
25   that Defendants' videos, "if allowed to continue, would harm the value of their copyrights
26   and curtail future licensing opportunities." Plaintiffs' Brief at 20-21. Plaintiffs assert that
27   their songs "have considerable value in the licensing marketplace." *Id.* at 21. They express
28   concern that Defendants' videos will harm that value.

10
**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

1    It is important to understand that Plaintiffs' offer no evidence that Defendants'

2    videos have usurped the market for the songs in question, and there is no reasonable basis

3    for concluding that they could.  Defendants' Memo at 13-14.  Thus, Plaintiffs' entire

4    argument hinges on damage to purely hypothetical licensing opportunities.  Plaintiffs argue

5    that Defendants' videos could "curtail future licensing opportunities."  But there is

6    something far more likely to curtail Plaintiffs' licensing opportunities, and Plaintiffs' don't

7    bother to mention it: *Henley refuses to license his songs*.  Henley does not and never has

8    licensed his songs for commercial purposes.  Supp. Arledge Decl., Exh. C at 91:1-9.

9    Neither does Campbell.  Supp. Arledge Decl., Exh. B at 47:3-5 ("I don't want the song

10   [Boys of Summer] used for anything….").  For them, it is a matter of principle.  Supp.

11   Arledge Decl., Exh. C at 83:1 to 85:6 (Henley's explanation for passing on licensing

12   opportunities).  Thus, although it is entirely possible that there *could* be a market for these

13   songs, Plaintiffs have made a conscious decision not to *permit* a market for the songs.

14   Supp. Arledge Decl., Exh. B at 46:16 to 47:5 (Campbell explaining that he and Henley

15   have never tested the market for licensing Boys of Summer and that he doesn't want the

16   song used for anything).  (Defendant Kortchmar is the lone defendant who does not oppose

17   licensing his music, but he also says he would not license a song without Henley's

18   permission, *see* Defendants' Memo at 14 n.3, and Henley is opposed to all commercial

19   licensing opportunities.  Moreover, Kortchmar says that he has not been approached with a

20   commercial licensing opportunity in 25 years anyway, *see id.*, so any harm would be truly

21   hypothetical at best.)  Hence, Plaintiffs' fundamental problem: Defendants have not

22   affected demand for the songs themselves, and Defendants clearly cannot affect demand in

23   a market—the commercial licensing of the songs—that Plaintiffs insist does not and will

24   not exist.  Thus, Plaintiffs must resort to pure speculation by their expert witness, who tries

25   to construct a theory of harm apart from any empirical data or even a comparable

26   transaction with which to compare this case.  (*See* Defendants' Objections to Plaintiffs'

27   Evidence.)

28       The fourth fair use factor also weighs in Defendants' favor.

16639.1                                                    11

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1    The fair use factors overwhelmingly weigh in Defendants' favor, especially the first

2    factor. This Court should, therefore, grant summary judgment to Defendants' on all of

3    Plaintiffs' copyright claims.

4    **III.    PLAINTIFFS LACK EVIDENCE OF WILLFUL INFRINGEMENT**

5    Defendants believed and continue to believe that their videos were protected by the

6    fair use doctrine. The videos are parodic; they are core First Amendment expression; and

7    they do not harm the economic value of Plaintiffs' copyrighted works. Under these facts,

8    Plaintiffs cannot prove willful infringement. "In other contexts ['willfulness'] might simply

9    mean an intent to copy, without necessarily an intent to infringe. It seems clear that as here

10   used, "'[W]illfully' means with knowledge that the defendant's conduct constitutes

11   copyright infringement…. [Thus,] one who has been notified that his conduct constitutes

12   copyright infringement, but who reasonably and in good faith believes the contrary, is not

13   'willful' for these purposes." *Princeton University Press v. Michigan Document Services,*

14   *Inc.*, 99 F.3d 1381, 1392 (6th Cir. 1996) (quoting Melville B. Nimmer & David Nimmer, 3

15   *Nimmer on Copyright* § 14.04 [B] [3] (1996)). Thus, if Defendants reasonably believed

16   their videos were protected by the fair use doctrine—and they did—they cannot be deemed

17   to have acted willfully. "[T]he issue is whether the copyright law supported the plaintiffs'

18   position so clearly that the defendants must be deemed as a matter of law to have exhibited

19   a reckless disregard of the plaintiffs' property rights." *Princeton University Press*, 99 F.3d

20   at 1392. Here, Defendants' fair use arguments are strong enough that Defendants should

21   prevail; they must, then, be strong enough that Defendants could reasonably believe their

22   videos constituted fair use. Any decision to the contrary would unnecessarily deter would-

23   be parodists and would chill constitutionally permissible speech in this area.

24   **IV.    HENLEY HAS NO EVIDENCE TO SUPPORT HIS LANHAM ACT CLAIM**

25        **A.    Henley cannot prove the necessary elements of his claim**

26   Henley seems to believe that the only thing he must prove to prevail on his Lanham

27   Act false endorsement claim is likelihood of confusion. That is the entire focus of his

28   briefing. But likelihood of confusion is important only if Henley has first established the

16639.1                                         12

1   elements of his claim.  And as is set forth more completely in Defendants' Memo, Henley

2   has no evidence to support the most basic element of his claim: that Defendants used his

3   "mark."

4         To prevail, Henley must prove that Defendants misappropriated one of his

5   "distinctive attributes."  Henley tries to sidestep this issue; he notably fails to cite the clear

6   language from the seminal case articulating this requirement, and he simply asserts that

7   "there is no requirement that the name, likeness or any *particular* attribute of the celebrity

8   be used…."  Plaintiffs' Motion at 23 (emphasis added).  That is technically correct.  There

9   is no requirement that any *particular* attribute be used; but it is absolutely necessary to

10  show that *some* "distinctive attribute" be used.  It is the "distinctive attribute" that

11  constitutes the plaintiff's "mark" for purposes of the Lanham Act.  *See Waits v. Frito-Lay,*

12  *Inc.*, 978 F.2d 1093, 1106 (9th Cir. 1992) ("[C]ourts have recognized false endorsement

13  claims brought by plaintiffs, including celebrities, **for the unauthorized imitation of their**

14  ***distinctive attributes*, where those attributes amount to an unregistered commercial**

15  **"trademark."**) (emphasis added); *see also id.* at 1106 ("A false endorsement claim based

16  on the unauthorized use of a celebrity's identity is a type of false association claim, for **it**

17  **alleges the misuse of a trademark, *i.e.*, a symbol or device such as a visual likeness,**

18  **vocal imitation, or other uniquely *distinguishing characteristic*,** which is likely to

19  confuse consumers as to the plaintiff's sponsorship or approval of the product.") (emphasis

20  added); *see also id.* at 1110 (holding that "a celebrity whose endorsement of a product is

21  implied through **the imitation of a *distinctive* attribute of the celebrity's identity**" can

22  sue) (emphasis added).

23        At no point in this litigation has Henley identified the "distinctive attribute" that he

24  believes Defendants have misappropriated—not in his opposition to Defendants' motion to

25  dismiss, not in discovery, and not in his summary judgment motion.  That alone defeats

26  Henley's claim.

27        Henley seems to want to stretch the law to allow for recovery apart from the

28  misappropriation of a distinctive attribute.  That is, he wants this Court to conclude that the

16639.1
13
**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

1    mere use of a song associated with Henley without Henley's permission constitutes a

2    Lanham Act violation.  But no court has ever endorsed such an argument, and no court

3    should.

4        The Second Circuit squarely rejected it already, in *Oliveira v. Frito-Lay, Inc.*, 251

5    F.3d 56 (2d Cir. 2001).  There, as Defendants describe in their Memo, Astrud Oliveira

6    (known as Astrud Gilberto) sued Frito-Lay for using her famous 1964 recording of "The

7    Girl from Ipanema" in a television commercial.  Gilberto did not own the copyright in the

8    recording, and Frito-Lay had procured a license from the copyright owner.  Even so,

9    Gilberto argued that she was closely identified with the song—as, indeed, she was—and

10   therefore that use of the song without her permission would imply her endorsement, and

11   therefore constituted a false endorsement for purposes of the Lanham Act.

12       Gilberto's claim, of course, was far stronger than Henley's.  The song in question

13   was, practically speaking, the only reason for her notoriety, which is why it was also the

14   source of her nickname, the Girl from Ipanema.  Moreover, Frito-Lay did not make or

15   procure a new recording of the song; it simply used Gilberto's signature recording, which

16   included, of course, her voice.

17       Even so, the Second Circuit rejected her claim and pointed out that no court had ever

18   accepted such an argument.  "[W]e conclude that, at least upon the showing made by

19   Gilberto, the law does not accord her trademark rights in the recording of her signature

20   performance.  ***Plaintiff has not cited a single precedent throughout the history of***

21   ***trademark supporting the notion that a performing artist acquires a trademark or service***

22   ***mark signifying herself in a recording of her own famous performance*****."**  *Id.* at 62

23   (emphasis added).  The song was undoubtedly identified with Gilberto, but many famous

24   artists throughout history have been identified with their famous recordings.  "Yet in no

25   instance was such a performer held to own a protected mark in that recording."  *Id.*  Simply

26   put, "[t]he use of her recorded song has not taken her persona, and the district court

27   properly concluded that she could sustain no claim of implied endorsement."  *Id.*

28

1    Finally, not only has no court ever adopted Henley's argument, no court should.
2    Indeed, a district court could do so only by ignoring the United States Supreme Court's
3    instructions in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). It
4    is critical to understand that accepting Henley's *Lanham Act* argument would
5    fundamentally change *copyright* law. Henley's position is that he has the right to preclude
6    the use of a musical composition—not his particular recording of the song, the composition
7    itself—if the public associates him with the song. If he is right, he can preclude the use of
8    a work even if it is in the public domain, and he can preclude the use of a copyrighted work
9    even if the copyright owner has granted a license.
10    This would be a disaster for copyright law, because it would effectively remove the
11    clarity the law seeks to establish. It would no longer be necessary merely to get a license
12    from the copyright owner, for example, which would make licensing transactions more
13    difficult, more costly, and therefore less likely. Practically, Henley's legal position takes
14    away rights that Congress currently gives to copyright owners alone and disburses them
15    more broadly, most particularly to artists. This might or might not be good policy, but it is
16    not the policy determination Congress has made. Henley would have this Court undercut
17    the balancing determinations that Congress has made in the Copyright Act when it sought
18    to balance the rights of the public, copyright owners, and artists. And that would violate
19    the principles the Supreme Court articulated in *Dastar*, where the Court warned against
20    "creat[ing] a species of mutant copyright law." *Id.* at 34. There, the Court was concerned
21    with creating a mutant species of copyright law that would "limit[] the public's 'federal
22    right to 'copy and to use' expired copyrights'" and would therefore create "a species of
23    perpetual … copyright." *Id.* at 34, 37. Henley's legal theory would allow for precisely that
24    result, by allowing an artist who is identified with a work to preclude its use even if the
25    work is in the public domain. It would also allow people in Henley's position to trample
26    on the rights of copyright owners by overruling their licensing decisions. And while this is
27    not the specific concern raised by the *Dastar* court, it is clearly related to the Court's
28    concern with upsetting Congress' balancing act under the Copyright Act.

16639.1

15

1    Henley's legal theory is inconsistent with *all* of the case law and would require this

2    Court to usurp Congress' policy making role and flatly ignore Supreme Court precedent.

3    The Court should decline Henley's invitation to take that path.

4    **B.    Henley cannot prevail without proving actual malice, and he has no**

5    **evidence of actual malice**

6    A public figure, like Henley, cannot prevail on a false endorsement claim that

7    involves noncommercial speech, like Defendants' videos, without proving actual malice.

8    Because Henley has no evidence of actual malice, his false endorsement claim fails.

9    Don Henley is undeniably a public figure. So the only issue here is whether

10   Defendants' videos are noncommercial speech. They clearly are. "'Commercial speech'

11   has special meaning in the First Amendment context. Although the boundary between

12   commercial and noncommercial speech has yet to be clearly delineated, the 'core notion of

13   commercial speech' is that it 'does no more than propose a commercial transaction.'"

14   *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001). Clearly,

15   Defendants' videos do more than simply propose a commercial transaction. They discuss

16   political issues in the midst of a political campaign; indeed, Henley himself found them

17   most informative in fleshing out DeVore's political message. Arledge Decl., Exh. 1 at

18   68:5-10 (Henley agreeing that the videos made the message of DeVore's political campaign

19   very clear); DeVore Decl., ¶¶ 2-10.

20   Because Henley is a public figure and Defendants' videos are noncommercial

21   speech, Henley bears the burden of proving actual malice by clear and convincing

22   evidence. *Hoffman*, 255 F.3d at 1184-85; *Kournikova v. General Media Comm., Inc.*, 2002

23   WL 31628027 *6 (C.D. Cal. 2002). This means Henley must prove by clear and

24   convincing evidence that Defendants **intended to confuse the public** into believing that

25   Henley actually sponsored or endorsed the videos. "Mere negligence is not enough to

26   demonstrate actual malice. '[S]ubjective or actual intent is required ... and there is no

27   actual malice where [defendants] unknowingly mislead the public." *Id.* at 1187 (internal

28   citations omitted); *see also Kournikova*, 2002 WL 31628027 at *9 ("The relevant inquiry

16639.1                                          16

1 | for Plaintiff's false endorsement claim is whether Plaintiff established, by clear and
2 | convincing evidence, that Defendant intended to confuse consumers into believing that
3 | Kournikova actually endorsed Penthouse (i.e., voluntarily posed for the photographs, or
4 | otherwise approved Penthouse's use of her identity)."); *see also Solano v. Playgirl, Inc.*,
5 | 292 F.3d 1078, 1084-85 (9th Cir. 2002).  Henley offers *no* evidence to carry his burden.
6 | The undisputed evidence comes from DeVore: he had no desire for the public to believe
7 | that Henley endorsed or sponsored him or his campaign.  DeVore Decl., ¶¶ 10-12, 15.
8 | Indeed, any such perceived endorsement would be harmful to him and he would seek to
9 | avoid it.  *Id.*  This undisputed evidence effectively ends Henley's claim.

**C.    The *Sleekcraft* factors are irrelevant in these circumstances – but also harmful to Henley's argument if applied**

    **1.    Henley has no evidence to support his application of the *Sleekcraft* factors**

Because Henley cannot make out the most-basic element of his claim—the existence of a "mark"—and because he has no evidence of actual malice, this Court must deny Henley's summary judgment motion, and it need not examine the *Sleekcraft* factors.

But even if Henley could overcome the fatal obstacles discussed above, he would still need to show a likelihood of confusion under *Sleekcraft*.  *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979) (1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines.).  Hence, it would ordinarily be more than a little odd that Henley chooses to gloss over the *Sleekcraft* factors quickly, with little analysis and even less factual support.  But, here, Henley really had very little choice.  It is not just that the factors do not help his case.  Worse, the very process of focusing on the specific factors only highlights Defendants' point about Henley's inability to make out the most basic element of his claim: a "mark."

16639.1

17

1    For example, the first *Sleekcraft* factor concerns the "strength of the mark." So what,

2    exactly, is Henley's "mark" for purposes of this case? In *Waits*, the seminal and

3    controlling case, the Ninth Circuit made clear that the "mark" for purposes of a Lanham

4    Act false endorsement claim is a "distinctive attribute" or "distinguishing characteristic" of

5    the plaintiff. *See, e.g., Waits*, 978 F.2d at 1106 ("[C]ourts have recognized false

6    endorsement claims ... **for the unauthorized imitation of their *distinctive attributes*,**

7    **where those attributes amount to an unregistered commercial "trademark.")**

8    (emphasis added).

9    Without an identifiable "mark," this Court cannot even apply, much less find in

10    Henley's favor on, the first, third or seventh *Sleekcraft* factors, all of which hinge on an

11    analysis of a "mark."

12    In addition, with one exception, Henley also offers no evidence to support his

13    position on the other *Sleekcraft* factors. Henley argues—without evidence—that the

14    second factor (proximity of the goods) weighs in his favor because Henley performs in

15    videos on YouTube and other internet sites, and thus "there is considerable overlap

16    between Henley's goods and Defendant's [sic] videos." But Henley's "goods" are the

17    professional recordings of a gifted, world-famous musician. Defendants' works are

18    political works by amateur musicians and are, in everybody's estimation, poorly done.

19    Defendants' Memo at 13-14. Henley himself has said that he is not in the least concerned

20    that somebody might mistake Defendants' recordings for the originals or even that they

21    might prefer Defendants' recordings. *Id.* The only "proximity" between these two sets of

22    works is that they both resided at one time on the internet. But make no mistake: they have

23    always lived in very different neighborhoods.

24    Henley's argument on the fifth factor—marketing channels used—is unpersuasive

25    and, again, unsupported by any evidence. Henley relies on the fact that Defendants' works

26    and Henley's works were on the internet. But Henley's works are clearly marketed more

27    broadly and differently than Defendants'. Henley is a world-famous musician and the

28    works were produced by an international record label. Henley sells his works in retail

16639.1              18

1   outlets, on internet download sites like iTunes, and he markets them in sold-out concerts all

2   over the world.  Henley undoubtedly has material on sites like YouTube, but that is because

3   his reach is so broad, his presence so ubiquitous.  Defendants, by contrast, placed their

4   videos only on free internet sites.  They do not sell the videos in stores, advertise them in

5   Rolling Stone, or promote them with a North American concert tour.

6       Finally, Henley offers no evidence to support his argument on the sixth factor, the

7   type of goods and the degree of care likely to be exercised by the purchaser.  There is, of

8   course, no such thing as a "purchaser" of Defendants' videos; the videos are not and never

9   have been for sale.  As for what kind of care a person would show in distinguishing

10  between Henley's products and Defendants' videos, it is hard to imagine that much care

11  would be required to separate a Grammy-winning, professional recording from—in

12  Plaintiffs' words—a "terrible" and "amateur" recording.  Defendants' Memo at 13.  But to

13  the extent this factor is important and to the extent it could weigh in Henley's favor, Henley

14  has provided no evidence from which this Court can draw a conclusion in his favor.[2]

15          **2.     Henley's alleged evidence of actual confusion is weak and disputed**

16      The only factor Henley spends any time discussing with what purports to be

17  evidence is the fourth factor—evidence of actual confusion.  But even here, Henley's

18  evidence is weak and contradicted.

19      Henley's only evidence of actual confusion comes from Hal Poret's expert

20  declaration.  Poret's testimony is badly flawed.  His alleged core finding is that "[c]lose to

21  half of the respondents (48%) who identified Henley indicated that they believed Henley

22  endorsed the video(s), or authorized or approved the use of his music in the video(s)."

23  Plaintiffs' Motion at 24.  This statement is patently and provably inaccurate, but the issue

24  requires some unpacking.  (The Declaration of Suzanne Shu, which is submitted with this

25  brief, tracks much of the analysis below.)

26

27

---

28  [2]  Henley rightly ignores the eighth factor as being inapplicable in this case.

16639.1                                         19

1    Poret gave his survey to 572 people.  He excluded from his results any answers by

2  respondents who did not identify Don Henley (or the Eagles, though that answer is

3  technically inaccurate) as the performers of the songs in question.  This led to the exclusion

4  of the vast majority (about 80%) of the total respondents.  Poret then focused his analysis

5  on the remaining 114 respondents.  He arrives at his 48% figure for this group by first

6  interpreting and then aggregating responses from three different questions or sets of

7  questions.  The first set, questions 1 through 4, are based around an open-ended question

8  designed to identify which respondents believe Henley endorsed or approved Defendants'

9  videos.  The second set, questions 5 through 8, are based around an open-ended question

10  designed to identify which respondents believe Henley permitted or authorized the videos.

11  And the final set, question 9, is a close-ended question designed to determine whether

12  respondents believe Henley gave permission or approval for the use of the music in

13  Defendants' videos.

14    It is important to understand that the three sets of questions are not entitled to equal

15  weight.  Poret conceded that if no respondents had identified Henley in response to the two

16  sets of open ended questions, the survey results would counsel strongly against a

17  conclusion that the respondents were confused as to Henley's endorsement, sponsorship or

18  approval.  In Poret's words: "[T]he open-ended questions are integral to my evaluation of

19  what's going on in the analysis … [b]ecause the best indication of what people truly believe

20  is what they give in response to these open-ended questions before anything specific is

21  suggested to them.  And there's a long, clear tradition of interpreting responses to surveys

22  like this.  And if nobody is mentioning an idea or a specific type of confusion on their own,

23  then you would not accept that there's a meaningful amount of confusion going on based

24  just on a question like Question 9."  Supp. Arledge Decl., Exh. D at 185:19 to 187:17.

25  Thus, based solely on Poret's own view, a trier of fact would be justified in rejecting

26  Poret's conclusion unless the open-ended questions support him.

27    They don't.

28

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

1    The answers to the first open-ended set was striking, but not in a way helpful to Poret

2 or Henley.  Only about 3% of the respondents said that they believed Henley endorsed or

3 approved Defendants' videos.  If this sounds like a very low percentage, it is.  Poret himself

4 says so.  Indeed, one of the ways he tested for "noise" in the survey was to measure how

5 many people in response to the first open-ended set of questions identified Barack Obama,

6 Al Gore, and others.  His theory was that "[a]s the videos are critical of these figures, one

7 would expect only a very low percentage of viewers to believe that any of these figures

8 endorsed or gave authorization for any aspect of the videos."  *See* Poret Report, Appendix

9 C.  Thus, if a small percentage of respondents named figures like Barack Obama and Al

10 Gore, the results would show "that the survey design and questions caused only a minimal

11 tendency for respondents to guess or to express beliefs that would be unlikely to be held by

12 real world viewers."  *Id.*  What Poret found is that about 3% of respondents named Barack

13 Obama as someone who endorsed or approved Defendants' videos.  And to Poret, this was

14 good news.  This three percent response rate was "a very low response rate," "within the

15 statistical error rate" of seven to eight percent, and therefore "basically equivalent to zero."

16 Supp. Arledge Decl., Exh. D at 47:21 to 48:7 and 50:11 to 52:8.

17    Based on Poret's own testimony, then, the percentage of people who responded that

18 *Henley* endorsed or approved Defendants' videos in response to the first open-ended set of

19 questions (also about 3%) was "a very low response rate," "within the statistical error rate,"

20 and "basically equivalent to zero."  Clearly, a trier of fact could reasonably conclude that

21 the first set of open-ended questions does not support Poret's conclusion that people are

22 likely confused as to Henley's sponsorship or endorsement of the videos.

23    Thus, Poret's entire conclusion rests on the second open-ended set, questions 5

24 through 8.  Question 5 asks respondents whether they believe that "the politician who put

25 out the videos got permission or authorization for any particular aspect or aspects of either

26 or both of the videos."  Poret Report at 7.  Those respondents who said "yes"—a decided

27 minority—were asked in question in question 7b, "Who do you think gave permission or

28 authorization…?"  *Id.* at 8.  Poret concludes that 20 people identified Henley in response to

16639.1                                    21

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

1    this second open-ended set.  (Poret report at 18 and Appendix D).  Poret's conclusion is

2    provably false.

3           Below is a chart showing the answers to Question 7b given by the 20 respondents

4    who Poret claims "answered that Henley gave authorization for his music to be used in the

5    video(s)" (Poret Report at 18):

6

| Respondent | Code Number | Answer(s) to question 7b |
|---|---|---|
| 11 | 25 | don't know |
| 50 | 221 | 1. I would believe that it would have to be the songwriter and maybe the record company.<br>2. The news agency or photographer agency or photographer who owns the rights to the pictures. |
| 85 | 350 | Don Henley or his recording company |
| 96 | 417 | [No response] |
| 97 | 418 | the person who owns the song |
| 110 | 468 | whoever holds the copyright...writers I assume |
| 126 | 595 | The music artists |
| 162 | 885 | 1. him<br>2. the producer and writer |
| 196 | 1025 | The song writer/performer |
| 205 | 1063 | 1. Both parties (video clips/songs)<br>2. The recording company or current owner to the rights of those songs |
| 265 | 1342 | record company/whoever owns the rights |
| 285 | 1718 | [No Response] |
| 291 | 1741 | 1. whoever handles the royalties for the artist<br>2. don't know |
| 391 | 2290 | 1. I am not sure if Don Henly owns the rights or not to his song.<br>2. already answered<br>3. already answered |
| 417 | 2458 | 1. writer of the song or the person that holds the music rights to it<br>2. photographer/photographer's employer |
| 424 | 2487 | 1. Composer<br>2. Owner |
| 459 | 2673 | The person/people owning the music. |
| 488 | 2782 | Who every controls the rights for that particular song |
| 552 | 3235 | The artist who made the song or whoever has the rights to the music |
| 556 | 3254 | 1. obama<br>2. gore<br>3. The original groups that recorded the music. |

26          What is striking about the list is that only two of the respondents actually identified

27   Henley, despite the fact that all of these respondents identified Henley as the performer of

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1   the original songs.  Needless to say, the percentage of people who actually identified
2   Henley in response to question 7b (two) is, in Poret's own words, "very low," "within the
3   statistical error rate," and "basically equivalent to zero."  And even including the people
4   who gave responses such as "the songwriter" or "performer" still results in a small
5   percentage of the total respondents in this pool.  So how does Poret arrive at his conclusion
6   that all 20 of the people in the above chart identified Henley as someone who endorsed or
7   gave authorization for the videos?  By ignoring the actual results and "interpreting" the
8   responses in a way favorable to Henley.

9        For example, respondent No. 97 (who was assigned code number 418) is one of the
10   people Poret identifies as believing Henley endorsed or gave authorization for the videos.
11   That respondent did not identify Henley in response to the first open-ended set.  Supp.
12   Arledge Decl., Exh. D at 97:2-21.  In response to question 7b, the person also did not
13   identify Henley.  *Id.*  The respondent clearly know Henley's name, of course, because he or
14   she identified Henley as the artist "whose music was used in the videos" in response to
15   question 10.  *Id.* at 98:22 to 99:5.  But when asked to identify who they believe gave
16   permission or authorization for the videos, respondent No. 97 said, "The person who owns
17   the song."  *Id.* at 97:2-21.

18        These responses do not support Poret's contention that the person believed Henley
19   gave permission.  Indeed, a reasonable trier of fact could, and probably should, conclude
20   that the person is unsure whether Henley was involved or not.  If the respondent believed
21   Henley gave permission or authorization, he or she could have said so clearly; we know the
22   respondent knew Henley's name.  The response, then, betrays that the person is unsure who
23   granted permission.  In fact, Poret seems to admit as much: "We don't know who they
24   think is actually the one giving the authorization…."  *Id.* at 99:21-22.  But despite the fact
25   that this respondent did not identify Henley as a person who gave permission or
26   authorization for the videos, and despite the fact that Poret must concede that nobody
27   knows who the respondent believes gave permission or authorization, Poret still counts this

28

1 | particular respondent (No. 97 or code number 418) as a respondent who "believed Henley
2 | approved or authorized the use of his music in the videos." Poret Decl., ¶ 7.
3 |      This is a recurring pattern with Poret. Having not received actual responses helpful
4 | to his position, he simply asserted that the responses support him, as if turning bad
5 | responses into good responses is merely an act of will. *See also* Supp. Arledge Decl., Exh.
6 | D at 89:24 to 96:15 (Poret again concluding that the respondent answered that Henley
7 | approved or authorized the use of the music in Defendants' videos even though the
8 | respondent actually answered that he didn't know who gave permission or authorization).
9 | The trier of fact can—and, Defendants believe, absolutely will—reject Poret's conclusion.
10 | Poret's report cannot support Henley's summary judgment motion.
11 |      This Court need not reach the *Sleekcraft* factors because of the other, fatal flaws in
12 | Henley's false endorsement claim. But if the Court applies the *Sleekcraft* factors, it must
13 | conclude that those factors do not support Henley's argument. Henley is not entitled to
14 | summary judgment on his Lanham Act claim.

**V.   CONCLUSION**

     For the foregoing reasons, this Court must deny Plaintiffs' motion for partial summary judgment in its entirety.

Dated: May 3, 2010             **ONE LLP**

              By:         /s/ Christopher W. Arledge
                         Christopher W. Arledge
                         Attorneys for Defendants, Charles S. Devore and
                         Justin Hart

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**