MORRISON & FOERSTER LLP
JACQUELINE C. CHARLESWORTH (*pro hac vice*)
JCharlesworth@mofo.com
CRAIG B. WHITNEY (CA SBN 217673)
CWhitney@mofo.com
TANIA MAGOON (*pro hac vice*)
TMagoon@mofo.com
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212.468.8000
Facsimile: 212.468.7900

PAUL GOLDSTEIN (CA SBN 79613)
PGoldstein@mofo.com
559 Nathan Abbott Way
Stanford, California  94305-8610
Telephone:  650.723.0313
Facsimile:  650.327.0811

Attorneys for Plaintiffs
DON HENLEY, MIKE CAMPBELL and DANNY
KORTCHMAR

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DON HENLEY, MIKE CAMPBELL and DANNY KORTCHMAR,<br><br>                      Plaintiffs,<br><br>        v.<br><br>CHARLES S. DEVORE and JUSTIN HART,<br><br>                      Defendants. | Case No. SACV09-0481 JVS (RNBx)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR  SUMMARY JUDGMENT**<br><br>Date:    June 1, 2010<br>Time:   10:00 A.M.<br>Ctrm:   Hon. James V. Selna |

# TABLE OF CONTENTS

**Page**

DEFENDANTS' UNSUBSTANTIATED "FACTS".............................................................1

ARGUMENT ...........................................................................................................2

I.    DEFENDANTS' TAKINGS CANNOT BE JUSTIFIED UNDER ANY
THEORY OF FAIR USE........................................................................................2

    A.    The Hope and Tax Videos Are Not Parodies .................................2

    B.    Defendants' Alternative Theories Are Unavailing.......................................6

        1.    The *Campbell* Footnote Merely Reiterates the Fair Use
Balancing Test...............................................................................6

        2.    Targeting an Author Does Not Qualify as Parody............................7

        3.    Defendants' Videos Are Not "Transformative" ................................10

    C.    Defendants Profited from Their "Political" Use of Plaintiffs' Works ........11

    D.    Defendants' Wholesale Copying Was Excessive and Inexcusable.............13

    E.    Defendants' Videos Usurp the Market for Plaintiffs' Works ....................15

II.    DEFENDANTS ACTED WILLFULLY .................................................................17

III.    PLAINTIFFS HAVE ESTABLISHED DIRECT, CONTRIBUTORY AND
VICARIOUS INFRINGEMENT ..........................................................................18

IV.    DEFFENDANTS CANNOT ESCAPE LIABILITY UNDER THE
LANHAM ACT .................................................................................................19

    A.    Defendants' Recycled Legal Arguments Should Be Rejected....................19

    B.    The Facts Clearly Demonstrate Defendants' Actual Malice......................23

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

i

ny-922507

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Blanch v. Koons*
467 F.3d 244 (2d Cir. 2006)...................................................................................10, 14

*Block v. City of Los Angeles*
253 F.3d 410 (9th Cir. 2001)..........................................................................................1

*Browne v. McCain*
612 F. Supp. 2d 1125 (C.D. Cal. 2009) ...............................................................12, 22

*Butler v. Target Corp.*
323 F. Supp. 2d 1052 (C.D. Cal. 2004) ...............................................................21, 22

*Campbell v. Acuff-Rose Music, Inc.*
510 U.S. 569 (1994)..........................................................................................*passim*

*Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*
150 F.3d 132 (2d Cir. 1998)...............................................................................16, 17

*Chicago Bd. of Educ. v. Substance, Inc.*
354 F.3d 624 (7th Cir. 2003)........................................................................................14

*Columbia Pictures Indus., Inc. v. Miramax Films Corp.*
11 F. Supp. 2d 1179 (C.D. Cal. 1998) ..........................................................1, 11, 15

*Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*
604 F.2d 200 (2d Cir. 1979)........................................................................................21

*Dastar Corp. v. Twentieth Century Fox Film Corp.*
539 U.S. 23 (2003)......................................................................................................22

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*
109 F.3d 1394 (9th Cir. 1997)............................................................................*passim*

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*
924 F. Supp. 1559 (S.D. Cal. 1996).....................................................................8, 12

*Dream Games of Arizona, Inc. v. PC Onsite*
561 F.3d 983 (9th Cir. 2009).......................................................................................18

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

ii

ny-922507

*Eastwood v. National Enquirer, Inc.*
123 F.3d 1249 (9th Cir. 1997)......................................................................25

*Elvis Presley Enters. v. Passport Video*
349 F.3d 622 (9th Cir. 2003).......................................................................12

*Fisher v. Dees*
794 F.2d 432 (9th Cir. 1986)............................................................. 2, 14-15 n.2

*Harper & Row Publishers, Inc. v. Nation Enters.*
471 U.S. 539 (1985) ...............................................................................12, 17

*Hoffman v. Capital Cities/ABC, Inc.*
255 F.3d 1180 (9th Cir. 2001).................................................................23, 24

*Hustler Magazine v. Falwell*
485 U.S. 46 (1988) .......................................................................................24

*Keep Thomson Governor Comm. v. Citizens for Gallen Comm.*
457 F. Supp. 957 (D.N.H. 1978) ..................................................................12

*Kournikova v. General Media Commc'ns, Inc.,*
No. CV 02-3747 GAF (AJWx), 2002 U.S. Dist. LEXIS 25810 (C.D. Cal.
Aug. 9, 2002).........................................................................................23, 24

*L.A. Times v. Free Republic*
No. CV 98-7840, 2000 U.S. Dist. LEXIS 5669 (C.D. Cal. Apr. 5, 2000) ..........11, 16

*Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*
983 F. Supp. 1167 (N.D. Ill. 1997) ..............................................................13

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*
No. 00 Civ. 6068 (GBD), 2004 U.S. Dist. LEXIS 3644 (S.D.N.Y.
Mar. 8, 2004)...............................................................................................11

*Mattel Inc. v. Walking Mountain Prods.*
353 F.3d 792 (9th Cir. 2003).........................................................................2

*Oliveira v. Frito-Lay, Inc.*
251 F.3d 56 (2d Cir. 2001).............................................................................22

*Peer Int'l Corp. v. Pausa Records, Inc.*
909 F.2d 1332 (9th Cir. 1990).......................................................................18

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

iii

ny-922507

*Rogers v. Koons*
    960 F.2d 301 (2d Cir. 1992)...........................................................................2

*Salinger v. Colting*
    No. 09-2878-cv, 2010 U.S. App. LEXIS 8956 (2d Cir. Apr. 30, 2010)...................3, 8

*Shakur v. Schriro*
    514 F.3d 878 (9th Cir. 2008)........................................................................1

*Solano v. Playgirl, Inc.*
    292 F.3d 1078 (9th Cir. 2002).....................................................................25

*Underwager v. Channel 9 Australia*
    69 F.3d 361 (9th Cir. 1995).........................................................................23

*Waits v. Frito-Lay*
    978 F.2d 1093 (9th Cir. 1992)..................................................................20, 23

*Walt Disney Prods. v. Air Pirates*
    581 F.2d 751 (9th Cir. 1978).......................................................................14

*White v. Samsung Elecs. Am., Inc.*
    971 F.2d 1395 (9th Cir. 1992).......................................................................20

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000)........................................................12, 13, 15, 17


**FEDERAL STATUTES**

15 U.S.C. § 1125(a)(1)(A) ......................................................................19, 20, 24

17 U.S.C. § 107(4) .................................................................................15


**OTHER AUTHORITIES**

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR
    COMPETITION § 27:13 (4th ed. 2010) ...........................................................21

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

iv

ny-922507

# DEFENDANTS' UNSUBSTANTIATED "FACTS"

Defendants' statement of uncontroverted facts offers a series of legal statements and conclusory opinions in lieu of the material facts required to support their motion. Defendants' central claim on summary judgment is that their taking of Plaintiffs' songs constitutes a fair use under copyright law.  Fair use is an affirmative defense as to which Defendants carry the evidentiary burden. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997); *see also Columbia Pictures Indus., Inc. v. Miramax Films Corp.*, 11 F. Supp. 2d 1179, 1187 (C.D. Cal. 1998).  Because Defendants fail to meet this burden, their motion should be denied.  *See Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (where moving party bears burden, it must provide "competent evidence" to prevail on summary judgment).

Moreover, such "facts" as do appear in Defendants' motion papers are largely unsubstantiated and, in some cases, simply manufactured.  Much of the specious evidence upon which Defendants seek to rely is derived from a sworn declaration submitted by Defendant DeVore, in which DeVore ruminates on Henley and Henley's "friends in the entertainment industry."  (Declaration of Charles S. DeVore ("DeVore Decl.") ¶ 3.)  DeVore asserts that Henley is "proudly a member" of "the liberal, entertainment elite"; that Henley is one of a "group of celebrities who are associated in the public eye with Ms. Boxer, Mr. Obama, and other prominent liberal politicians"; that Henley has "vocally supported" Barbara Boxer; and that he "fought . . . hard" to elect Barack Obama.  (DeVore Decl. ¶¶ 3, 6, 9, 10.)  DeVore offers no support for these statements, for they are false.  (*See* Supplemental Declaration of Don Henley ("Henley Supp. Decl.") ¶¶ 3, 4, 6.)  As set forth in objections to evidence filed by Plaintiffs concurrently herewith, DeVore's baseless conjecture about Henley – like much of the rest of his declaration – is inadmissible and may not be credited.  *See Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001); *Shakur*, 514 F.3d at 890 ("[C]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient.").

**ARGUMENT**

**I.    DEFENDANTS' TAKINGS CANNOT BE JUSTIFIED UNDER ANY THEORY OF FAIR USE**

**A.    The Hope and Tax Videos Are Not Parodies**

The hallmark of parody is the "joinder of reference and ridicule" to comment on an earlier work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 583 (1994). This defining principle of parody – that in making use of a prior work it do so for the purpose of commenting on or criticizing it – has been reiterated by courts before and since *Campbell*. *See, e.g.*, *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992); *Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir. 1986); *Dr. Seuss Enters.,* 109 F.3d at 1400-01; *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 802-03 (9th Cir. 2003).

Defendants concede, as they must, that in order to qualify as parodies, the Hope and Tax Videos must comment on or criticize Plaintiffs' original works, and do so in a manner such that the "parodic character can reasonably be perceived." (*See* Defs. Br. at 4); *see also Campbell*, 510 U.S. at 582. As demonstrated in Plaintiffs' opening brief, Defendants' claim of parody is negated by Defendants' videos themselves: they are campaign ads for DeVore, and contain no discernible commentary on Plaintiffs' songs. The videos, featuring lyrics critical of Barack Obama and Barbara Boxer – accompanied by images of Obama, Boxer, other political figures, and DeVore – conclude with written messages promoting DeVore's political ambitions. (Plaintiffs' Statement of Uncontroverted Facts and Conclusions of Law ("St.") ¶¶ 55, 61, 68, 101, 116, 118.) From a musical perspective, there is no send-up of Henley's music or musical style; the instrumental tracks used in the videos slavishly copy the original Henley recordings, which Hart does his best to mimic in his vocal performances of the substitute lyrics. (St. ¶¶ 59, 149.)

As was also shown in Plaintiffs' earlier brief, Defendants' attempt retrospectively to portray their campaign ads as parodies of Plaintiffs' songs is belied by earlier, more candid, descriptions of their undertaking. Before they were sued, Defendants repeatedly

characterized their videos as "parodies" not of Plaintiffs' works, but of, or as targeting, Obama, Boxer, and their policies.  (St. ¶ 74 (describing Hope lyrics as "Obama parody lyrics set to Don Henley's 'Boys of Summer'"), ¶ 97 (Hope Video a "music video parody of Barack Obama"), ¶ 98 (Hope Video a "parody using 'The Boys of Summer' to lampoon President Obama"), ¶ 66 (Hope Video an "exposition on the financial crisis and political realities of our day under President Barack Obama"), ¶ 138 (Tax lyrics as "parody lyrics . . . critical of the cap-and-trade bill . . . as well as my opponent in the U.S. Senate race, Sen. Barbara Boxer"), ¶¶ 119, 122 (Tax Video a "parody of Barbara Boxer"; Tax Video as a "satire on Barbara Boxer"), ¶ 128 (Tax Video "takes on Sen. Boxer's penchant for raising taxes" ).)  To add to this long list, upon receiving Henley's notice of infringement, DeVore promised to "look[] for every opportunity to turn any Don Henley work I can" – *not* into a parody of the Henley work – but "into a parody of any left tilting politician who deserves it."  (St. ¶ 98.)  The uncontroverted facts demonstrate that, until this lawsuit was brought, Defendants did not treat the Hope or Tax Videos as parodies of Plaintiffs' songs or of Henley, but understood them as what they are: promotional campaign videos directed against Obama and Boxer.[1]  When a defendant's claim of a critical purpose such as parody is belied by prior characterizations, this weighs against a finding of fair use.  *See Salinger v. Colting*, No. 09-2878-cv, 2010 U.S. App. LEXIS 8956, at *39-40 (2d Cir. Apr. 30, 2010) ("It is simply not credible for [defendant] to assert now that his primary purpose was to critique . . . while he and his agents' previous statements discuss no such critique, and in fact reference various other purposes behind the book.")

Despite all this, Defendants would now have us believe that they "carefully selected" Boys of Summer – a nostalgic song about a summer romance – for their parody, because of its "important political themes."  (Defs. Br. at 6.)  According to

---

[1] Even now, Defendants, echoed by their own literary expert, readily acknowledge the targets of their ads: "Our videos attack the policies of Barack Obama, Barbara Boxer, Al Gore and others." (DeVore Decl. ¶ 2; Defs. Br. at 4; St. ¶¶ 146-47 (citing to deposition of Dr. Martin Zeilinger).)

1    Defendants, these "themes" arise from a single line in the original song that mentions a
2    "Deadhead sticker on a Cadillac."  (Charlesworth Decl., Ex. 15 at 279 (Deposition of
3    Charles DeVore ("DeVore Dep.") at 215:8-20.)  Seizing on the Deadhead reference,
4    Defendants assert that DeVore's altered lyrics somehow comment on the Sixties' failure
5    to create "a better (more liberal) society."  (DeVore Decl. ¶ 5.)  Of course, DeVore's
6    lyrics do not comment on this at all, but rather conjecture disappointment by the current
7    electorate with Obama.  Even more revealing is that the entire rationale for Defendants'
8    explanation is an (inadmissible) Henley quote from a *Rolling Stone* article that DeVore
9    *denied having read* before he wrote his lyrics. (Defs. Br. at 6; Charlesworth Decl., Ex. 15
10   at 272-74 (DeVore Dep. at 208:5-210:3).)

11         Defendants' explication of Tax is equally implausible.  Defendants assert that, like
12   the dancing woman in the original song, Barbara Boxer has "no regard for the problems
13   she and her colleagues have caused; she just wants to tax."  (Defs. Br. at 7.)  It is unclear,
14   however, how the substitution of Boxer for the dancing woman comments on – rather
15   than simply takes from – the original song.  Perhaps for this reason, Defendants resort to
16   fiction.  Drawing on DeVore's declaration, Defendants assert that in Dance, "Plaintiffs
17   were criticizing the Reagan administration's Central America policies."  (Defs. Br. at 7
18   (citing DeVore Decl. ¶¶ 7-8).)  There is no reference to Central America or U.S. policy in
19   the song, and Kortchmar, the author of the song, has expressly rejected this
20   interpretation, as has Henley.  (Declaration of Danny Kortchmar ¶ 7; Supplemental
21   Declaration of Jacqueline Charlesworth ("Charlesworth Supp. Decl."), Ex. 2 at 12-13
22   (Deposition of Danny Kortchmar at 71:16-72:20); *see also* Declaration of Don Henley
23   ("Henley Decl.") ¶ 11; Henley Supp. Decl. ¶ 7; Charlesworth Supp. Decl., Ex. 1 at 3-4
24   (Deposition of Don Henley ("Henley Dep.") at 40:6-41:6).)  Nonetheless, in DeVore's
25   imaginary account, Kortchmar wrote the song about "what Plaintiffs perceive to be the
26   misconduct of the American government."  (DeVore Decl. ¶ 7.)  DeVore continues on,
27   claiming that images included in an unspecified "video" (not in evidence) make it "plain"
28   that Plaintiffs are criticizing Reagan's Central American policies because, in DeVore's

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

1  mind, soldiers in the "video" were dressed "like Nicaraguan Contras."  (*Id.*)  Against this

2  backdrop – and ignoring the fact that Kortchmar, not Henley, is the author of Dance –

3  DeVore posits that his video "turns this line of attack on its head and directly targets Don

4  Henley's particular brand of politics."  (*Id.* ¶ 9.)

5  That Defendants were not actually targeting Boys of Summer or Dance for parodic

6  commentary is obvious from the modifications made by DeVore to the original song

7  lyrics.  DeVore's substitutions are not directed at the underlying works, or at Henley (a

8  matter discussed in more detail below), but instead focus on Obama, Boxer, and Boxer's

9  policies.  For example, "Obama overload / Obama overreach" is substituted for "Nobody

10  on the road / Nobody on the beach"; "All she wants to do is tax" is substituted for "All

11  she wants to do is dance"; "They're pickin' up the taxpayers and puttin' 'em in a jam" is

12  substituted for "They're pickin' up the prisoners and puttin' 'em in a pen"; and "Cap and

13  trade program – from D.C. Inc." is substituted for "Molotov cocktail – the local drink."

14  (*See* Charlesworth Decl., Exs. 6-9.)

15  Defendants' use of Plaintiffs' works in this case closely resembles – and is legally

16  indistinguishable from – the use considered in *Dr. Seuss*.  In *Dr. Seuss*, the work at issue

17  was *The Cat NOT in the Hat!,* "a poetic account of the O.J. Simpson double murder trial"

18  that mimicked *The Cat and the Hat* and other well-known works by Dr. Seuss.  *Dr. Seuss*

19  *Enters.,* 109 F.3d at 1396-1403.  For example, for the Dr. Seuss line, "One fish / two fish

20  / red fish / blue fish," the defendants substituted "One Knife? / Two Knife? / Red Knife /

21  Dead Wife," referring to the Simpson trial.  *Id.* at 1401.  Because the new material was

22  directed at the Simpson story, rather than Dr. Seuss's works, defendants' book was held

23  to be unprotected satire, not parody.  *Id.* at 1396-1403.  The Ninth Circuit explained that

24  defendants' work "simply retell[s] the Simpson tale.  Although *The Cat NOT in the Hat!*

25  does broadly mimic Dr. Seuss' characteristic style, it does not hold *his style* up to

26  ridicule.  The stanzas [from defendants' work] have 'no critical bearing on the substance

27  or style of' *The Cat in the Hat*."  *Id.* at 1401 (emphasis in original).  In short, the Ninth

28  Circuit concurred with the district court's finding that defendants' parody defense was

1  "'pure shtick." *Id.* at 1403.

2  **B.      Defendants' Alternative Theories Are Unavailing**

3      Defendants cannot succeed in their argument that the videos target Plaintiffs'

4  works for criticism or commentary, as required under the law.  *Campbell*, 510 U.S. at

5  580; *Dr. Seuss*, 109 F.3d at 1400-01.  Because their videos fail the defining test of

6  parody, Defendants retreat to a series of fallback positions, none of which avails them.

7  **1.      The Campbell Footnote Merely Reiterates the Fair Use Balancing Test**

8      First, Defendants seek refuge in a footnote to the *Campbell* opinion, in which the

9  Court noted that, in some cases, "[a] parody that more loosely targets an original than

10  [did the 2 Live Crew parody of 'Pretty Woman'] may still be sufficiently aimed at an

11  original work to come within our analysis of parody." *Id.* at 580 n.14.  But this footnote

12  does not help them.  The *Campbell* Court did *not* say that a "looser" parody need not

13  target the original, or, as Defendants hopefully suggest, that "very little comment on the

14  original is required." (Defs. Br. at 3.)  Rather, in its very expression of the point, the

15  Court made clear that even a "looser" parody must still "target[]" and be "sufficiently

16  aimed at" the original from which it borrows.  *Campbell*‚ 510 U.S. 580 n.14; *id.* at 597

17  ("The parody must target the original, and not just its general style, the genre of art to

18  which it belongs, or society as a whole.") (Kennedy, J., concurring).

19      The correct reading of the *Campbell* footnote is *not* that the Court intended to

20  contradict its own holding concerning what is properly considered a parody, but simply

21  to note that it was not foreclosing the possibility that a "looser" parody, or even a satire –

22  like any other type of use – might be fair if it satisfies the factors of Section 107 of the

23  Copyright Act.  In such a case, however, where commentary on the original is slight (or

24  absent altogether), the intrinsic justification for borrowing under the first factor is

25  lacking, so the other criteria of fair use "loom larger," and become determinative.

26  *Campbell*, 510 U.S. at 580.  "Parody needs to mimic an original to make its point, and so

27  has some claim to use the creation of its victim's (or collective victims') imagination,

28  whereas satire can stand on its own two feet *and so requires justification for the very act*

*of borrowing*." *Id.* at 580-81 (emphasis added); *accord Dr. Seuss Enters.,* 109 F.3d at 1400. Thus – in a portion of the footnote that Defendants omit – the Court explained that, when the parody is "looser," it is all the more incumbent upon the defendant to establish little or no risk of market substitution, "*whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from an original*, or other factors." *Id.* at 580 n.14 (emphasis added). That is, defendants must justify their taking under the other parts of the test.

Here, even if Defendants could somehow demonstrate that their videos contain a trace amount of commentary on Plaintiffs' songs, such an insubstantial showing could never overcome the other factors of Section 107. Defendants could never satisfy the fair use criteria given the extensive takings of Plaintiffs' songs, the verbatim copying of the music and most of the lyrics, and the potentially limitless dissemination of the videos if made available on the Internet.

## 2. Targeting an Author Does Not Qualify as Parody

Next, Defendants try to expand the definition of parody, suggesting – without support – that it encompasses the targeting of an author, and not just the author's works. (Defs. Br. at 4 (misreading *Campbell*'s definition of "parody" to include "works that target . . . the . . . author"), 6 ("Defendants' parody video . . . aims its mocking gaze at Henley.").) In Defendants' words, Henley was "carefully selected" as an object for their parodies because of the "context" that "DeVore is a [Republican] candidate for the United States Senate" who seeks to "challenge[] the Hollywood and entertainment elite," and "[Henley] and his friends in the entertainment industry have spent huge sums of money and used the powerful platform that fame and celebrity have given them in order to help elect Democratic politicians, including President Obama and Senator Boxer." (*Id.* at 4-6.)

Setting aside, for the moment, that Henley is not the author of one of the songs (Dance), and that most statements about Henley in Defendants' papers are false,

1   *Campbell* nowhere suggests that a parody can be aimed solely at an author, rather than

2   the author's works.  Rather, *Campbell* and its progeny are unequivocal that to qualify as

3   a parody, the use of an author's works must "comment[] on that author's works."

4   *Campbell*, 510 U.S. 580.  Indeed, courts have expressly rejected the notion that simply

5   targeting an author justifies the taking of that author's works.  *See Salinger v. Colting*,

6   2010 U.S. App. LEXIS 8956, at *11-12, *39-40 (2d Cir. Apr. 30, 2010) (agreeing with

7   district court's conclusion that defendants were unlikely to prevail on fair use defense, in

8   part because under *Campbell*, it is insufficient to target an author – "parody must critique

9   or comment on the work itself"); *see also Dr. Seuss Enters., L.P. v. Penguin Books USA,*

10  *Inc.*, 924 F. Supp. 1559, 1568 (S.D. Cal. 1996), *aff'd*, 109 F.3d 1394 (9th Cir. 1997)

11  (satirist who "wishes to parody the copyrighted work itself" may take protected

12  expression; "one intending to parody an author but not any particular work" may not).

13  Accordingly, absent discernible commentary on Plaintiffs' original works, Defendants'

14  videos – even if they did comment on Henley, which they do not – still would not qualify

15  as parodies.

16        Failing to appreciate the legal point, Defendants proceed to rely upon the bountiful

17  conjecture in DeVore's declaration to argue that the use of Henley's songs was

18  legitimate.  (*See* Defs. Br. at 5-7 (citing DeVore Decl.).)  In his declaration, DeVore

19  asserts that Henley is a "poster boy[]" for, and "proudly a member" of, the "liberal,

20  entertainment elite"; that he is one of "a group of celebrities associated in the public eye

21  with Ms. Boxer, Mr. Obama and other prominent liberal politicians"; that he has "vocally

22  supported" and is "publicly identified" with Boxer and the other politicians and policies

23  attacked in Defendants' videos; that Henley "fought . . . hard" to get Obama elected; that

24  he was reportedly "booed" in Orange County for making "liberal political statements";

25  and that he is supportive of efforts by Boxer and others to "insert[] themselves into the

26  American economy and enrich[] the government and certain special interests."  (DeVore

27  Decl. ¶¶ 2-3, 6, 9-10.)  Even if this litany of Henley's alleged "liberalism" were

28  somehow relevant to the question of parody (which it is not), it is contradicted by the

1   record in this case:  Henley testified that he does not consider himself a "liberal"; there is

2   not a shred of evidence of any "vocal support" by Henley for Obama or Boxer, or for any

3   particular policies of theirs; Henley has never campaigned for Obama or Boxer;

4   Defendants' assertions concerning the "booing" incident are inaccurate; and the only

5   public statement attributable to Henley concerning a politician in the record is a

6   statement that was supportive of Republican Senator John McCain.  (Henley Decl. ¶ 22;

7   Henley Supp. Decl. ¶¶ 3-6, 8-9; Charlesworth Supp. Decl., Ex. 1 at 5-7 (Henley Dep. at

8   59:2-24, 61:2-62:2).)

9       Notwithstanding all of Defendants' manufactured "evidence," the fact of the

10  matter is that the videos do *not* comment on Henley.  They do not mention Henley, they

11  do not describe Henley, they do not include any image of Henley.  Indeed, as DeVore

12  readily admits in his declaration: "[W]e did not use anything related to Henley's persona.

13  We did not use his voice, his picture, his image, his name, or anything else."  (DeVore

14  Decl. ¶ 14.)  If Defendants had actually intended to say something critical about Henley

15  (rather than merely associating themselves with his songs) one would expect that they

16  would have mentioned him at least once.

17      Lastly, Defendants make much of the fact that Henley is a registered Democrat

18  who (based upon an unauthenticated Internet printout) has given money to Democratic

19  politicians over the years (in addition to a number of Republicans, a fact overlooked by

20  Defendants).  (Henley Decl. ¶ 23; Henley Supp. Decl. ¶ 10.)  Even if the list of donations

21  were admissible, it is irrelevant to the question of whether Defendants' videos comment

22  on Plaintiffs' works – the more so given that the videos make no mention of Henley.

23  Although Henley's contributions are apparently of great interest to Defendants, there is

24  no evidence in the record to suggest that they are widely known to potential viewers of

25  Defendants' videos.  Moreover, Defendants' implication that one's political affiliation

26  and campaign contributions provide a justification for infringement is troubling.  Henley

27  should be able to exercise these basic rights of citizenship without fear that his

28  intellectual property will be taken from him.

1  **3.  Defendants' Videos Are Not "Transformative"**

2  Last but not least in their effort to overcome the problems with their parody

3  defense, Defendants belatedly concede that their videos may not be parodies after all, but

4  satires.  (Defs. Br. at 8.)  As explained above, because a satire does not comment on the

5  original, it requires independent justification "for the very act of borrowing."  *Campbell*,

6  510 U.S. at 580.  Defendants' proposed justification is that their taking of Plaintiffs'

7  songs is sufficiently "transformative" that it qualifies as fair use.  (Defs. Br. at 8.)  But

8  the lone case cited by Defendants in support of this proposition, the Second Circuit's

9  decision in *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), offers no support, and

10  *Campbell* and *Dr. Seuss* point in the opposite direction.

11  In *Blanch*, the artist Jeff Koons scanned a photo of a woman's legs and feet from a

12  fashion magazine, stripped out the background, changed the color, added a heel to one of

13  the feet, inverted the legs, and included the resulting image (among other fragmentary

14  images) in a collage-like painting, which was exhibited at art shows.  *Id.* at 247-48.  The

15  court determined that Koons had a "genuine creative rationale for [his] borrowing,"

16  because he had "used [the plaintiff's] work in a transformative manner to comment on

17  her image's social and aesthetic meaning rather than to exploit its creative virtues."  *Id.* at

18  255-57.  This is a far cry from the conduct at issue here.

19  Defendants assert in their brief that they, too, had a "clear creative rationale" in

20  taking Plaintiffs' works.  (Defs. Br. at 9.)  But, unlike in the case of Koons, there was in

21  fact no particular creative purpose in choosing Henley's songs – as Hart acknowledged,

22  other songs would have served Defendants' needs just as well.  (St. ¶ 107.)  The further

23  claim that Defendants targeted Henley based on the (misguided) view that he is

24  "associated in the public eye with Mrs. Boxer, Mr. Obama and other prominent liberal

25  politicians" is hardly an aesthetic decision about the songs themselves, and certainly not

26  a "creative rationale" for their use.  (Defs. Br. at 9.)  Nor, as Plaintiffs have amply

27  demonstrated, did Defendants take Plaintiffs' songs to cast a critical eye upon them.  In

28  such circumstances, where the infringer has merely avoided "'the drudgery in working

10

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

ny-922507

up something fresh,'" courts have held the use to be nontransformative.  *Dr. Seuss*, 109 F.3d at 1401 (quoting *Campbell*, 510 U.S. at 580); *see also Columbia Pictures Indus.,* 11 F. Supp. 2d at 1188 (incorporating elements of movie poster into new poster without commenting on original not a transformative use).

Second, unlike Koons's extensive, expressive alterations to the work he used, Defendants changed only a small portion of the lyrics to Plaintiffs' songs, which they otherwise took whole cloth.  Plaintiffs' music was copied essentially verbatim from beginning to end; no new or independent musical expression was added; and the music was not in any way transformed.  (St. ¶ 151; Declaration of Lawrence Ferrara ("Ferrara Decl.") ¶¶ 6(e), 9, Ex. 1 at 6-7, 13-14, 19-20.)  Some two-thirds of the Boys of Summer and three-quarters of the Dance lyrics were simply copied from the originals, and even in those lyrics that were altered, Plaintiffs' original syntax and rhyme were largely preserved.  (St. ¶ 152.)  Defendants' modest changes to Plaintiffs' works are completely overshadowed by the otherwise extensive, slavish copying of those works.  Such a low ratio of new expression to the amount appropriated is insufficient to support a finding that Defendants' use of Plaintiffs' songs was transformative.  As *Campbell* explained, when "'a substantial portion of the infringing work was copied verbatim' from the copyrighted work . . . it may reveal a dearth of transformative character or purpose . . . ." *Campbell*, 510 U.S. at 587-88 (quoting court of appeals); *see also L.A. Times v. Free Republic*, No. CV 98-7840, 2000 U.S. Dist. LEXIS 5669, at *24 (C.D. Cal. Apr. 5, 2000) ("There is little transformative about copying the entirety of large portions of a work verbatim.").

Defendants' use of Plaintiffs' works in this case mirrors that at issue in *Dr. Seuss.* The *Dr. Seuss* court determined that the defendants' use of Dr. Seuss's works to comment on an unrelated topic was not transformative.  *Dr. Seuss*, 103 F.3d at 1401. The same conclusion applies here.

## C.    Defendants Profited from Their "Political" Use of Plaintiffs' Works

Citing two district court cases, *MasterCard Int'l Inc. v. Nader 2000 Primary*

1   *Comm., Inc*., No. 00 Civ. 6068 (GBD), 2004 U.S. Dist. LEXIS 3644, at *12 (S.D.N.Y.

2   Mar. 8, 2004) and *Keep Thomson Governor Comm. v. Citizens for Gallen Comm.*, 457 F.

3   Supp. 957, 961 (D.N.H. 1978), Defendants argue that because their videos included

4   political content, their use of Plaintiffs' music was "consistent with [ ] fair use." (Defs.

5   Br. at 10 (characterizing videos as "pure political speech").  Neither of these cases

6   follows (or even considers) the guiding principle articulated by the Supreme Court in

7   *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), that the

8   nonprofit/profit distinction relevant to the first fair use factor turns not on how the use is

9   labeled (*e.g.*, "political"), but whether the defendant benefited from use of the

10  copyrighted material by exploiting it for free.  *See id.* at 562.

11       It is well established that First Amendment considerations in copyright cases are

12  accommodated by, and subsumed within, the fair use analysis of Section 107.  *See Elvis*

13  *Presley Enters. v. Passport Video*, 349 F.3d 622, 626 (9th Cir. 2003); *Dr. Seuss*, 924 F.

14  Supp. at 1575.  This includes the use of copyrighted materials by political campaigns.

15  *See, e.g.*, *Browne v. McCain*, 612 F. Supp. 2d 1125, 1130 n.2 (C.D. Cal. 2009)

16  ("[C]opyright claims based on use of a copyrighted work in a political campaign are not

17  barred, as a matter of law, under the fair use doctrine.").  Following *Harper & Row*, the

18  Ninth Circuit has explained – in a case involving free distribution of copyrighted material

19  by a church – that under Section 107, "[t]he crux of the profit/nonprofit distinction is not

20  whether the sole motive of the use is monetary gain but whether the user stands to profit

21  from exploitation of the copyrighted material without paying the customary price…. [In]

22  weighing whether the purpose was for 'profit,' 'monetary gain is not the sole criterion …

23  particularly in [a] … setting [where] profit is ill-measured in dollars.'"  *Worldwide*

24  *Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1117 (9th Cir. 2000)

25  (citing *Harper & Row*, 471 U.S. at 562, and quoting *Weissmann v. Freeman*, 868 F.2d

26  1313, 1324 (2d Cir. 1989) (academic use was unfair taking)); *see also Elvis Presley*

27  *Enters.*, 349 F.3d at 628 (finding commercial use where historical documentary sought to

28  "profit at least in part from the inherent entertainment value" of unlicensed Elvis Presley

1    materials); *Marobie-FL, Inc. v. Nat'l Ass'n of Fire Equip. Distribs.*, 983 F. Supp. 1167,

2    1175 (N.D. Ill. 1997) (nonprofit group's unauthorized use of clip art to "enhance" its

3    website considered commercial under Section 107).  Thus, in *Worldwide Church*, even if

4    the church did not use the materials to generate income, it "unquestionably profit[ed]"

5    from the free use of those materials, which attracted church members and donations, and

6    helped build the ministry.  *Worldwide Church*, 227 F.3d at 1118.

7         The same analysis applies here.  As demonstrated in Plaintiffs' opening brief,

8    Plaintiffs' songs were used to advance DeVore's career by garnering attention for his

9    campaign, encouraging donations, and, according to Defendants, generating "tens of

10   thousands, maybe hundreds of thousands, of dollars" in free advertising.  (St. ¶ 37.)

11   Defendants unquestionably benefited from the exploitation of Plaintiffs' copyrighted

12   works.  Their uses therefore fall on the profit-making, commercial side of the line.

13        Finally, as Defendants themselves acknowledge, "[t]he mere fact that a use is

14   educational and not for profit does not insulate it from a finding of infringement . . . ."

15   *Worldwide Church*, 227 F.3d at 1117 (quoting *Campbell*, 510 U.S. at 584); (*see also*

16   Defs. Br. at 9.)  Even if Defendants' use of Plaintiffs' works were found to have some

17   nonprofit elements, such a finding would not outweigh the otherwise inexcusable nature

18   of their takings.

19   **D.   Defendants' Wholesale Copying Was Excessive and Inexcusable**

20        The third factor of the fair use test, concerning the amount and substantiality of the

21   portion of the original work used in relation to the whole, "reinforce[s] the principle that

22   courts should not accord fair use protection to profiteers who do no more than add a few

23   silly words to someone else's song."  *Campbell*, 510 U.S. at 598 (Kennedy, J.

24   concurring).  Plaintiffs are unaware of any case in which a court has found takings of

25   songs as extensive as the ones here to be justified even for purposes of parody, let alone

26   satire.  Indeed, in *Campbell* – where the borrowing was considerably less than here, and

27   which involved a legitimate parody – the Supreme Court still questioned whether too

28   much musical expression had been appropriated.  *Campbell*, 510 U.S. at 589 (remanding

1   for evaluation of musical takings); (Ferrara Decl., Ex. 1 at 8, 19-21 (demonstrating, from

2   a musicological perspective, that "[f]ar less of the musical and lyrical composition in 2

3   LIVE CREW was copied from ORBISON as compared with the slavish copying in

4   HOPE and TAX[]").

5          Defendants' contention that they needed to use Plaintiffs' songs in their entirety

6   because "practically speaking it would not be possible to use only a portion of the song"

7   is not worthy of consideration.  (Defs. Br. at 12.)  Of course they could have taken less.

8   Even assuming a *bona fide* parodic purpose, Defendants were only permitted to take

9   what was required to "conjure up" the original work and make it the object of the parody.

10  *Dr. Seuss Enters*., 109 F.3d at 1400.  While, as Defendants note, this may be more than a

11  "bare minimum" in certain cases, it cannot be excessive in relation to what is reasonably

12  required to accomplish the parodic purpose.  (Defs. Br. at 11); *Campbell*, 510 U.S. at 586

13  (question is whether the portion used is "reasonable in relation to the purpose of the

14  copying"); *Blanch*, 467 F.3d at 257 (same); *Chicago Bd. of Educ. v. Substance, Inc*., 354

15  F.3d 624, 629 (7th Cir. 2003) (fair use copier can take "no more than is reasonably

16  necessary" to pursue aim that "law recognizes as proper").  Here, Defendants' takings

17  (assuming they could be justified at all) were grossly disproportionate to any conceivable

18  legitimate aim.  Boys of Summer and Dance are songs that are instantly recognizable

19  based on their opening notes, with melodies and music that repeat throughout the songs.

20  (St. ¶ 26 (audiences recognize songs immediately); ¶ 150 (Ferrara's expert finding that

21  far more musical expression taken than necessary to evoke the originals); Charlesworth

22  Decl., Exs. 1-2).  In the case of either song, a brief excerpt would have sufficed "to place

23  [it] firmly" in the minds of viewers of Defendant's videos for purposes of a parody.  *Cf.*

24  *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 757-58 (9th Cir. 1978) (rejecting claim

25  that extensive copying of cartoon characters was necessary to effectuate parody).[2]

26

27  [2] The "near-exact" copying language Defendants quote from *Fisher* addresses the
    closeness of copying, not the amount, as Defendants erroneously suggest.  (Defs. Br. at

28  11.)  *Fisher* in no way sanctions the copying of songs from beginning to end in the name

    (Footnote continues on next page.)

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

ny-922507

**E.   Defendants' Videos Usurp the Market for Plaintiffs' Works**

Section 107 asks courts to consider the impact of the challenged use on "the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).   As the Ninth Circuit has emphasized, this factor "is not limited to market effect" but also includes also "the effect on the *value* of the copyrighted work.'"  *Worldwide Church*, 227 F.3d at 1119 (quoting 17 U.S.C. § 107(4)) (emphasis in original).  Nor is this factor limited to the past or current effect of the uses; rather, courts are to "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also '*whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market*' for the original."  *Campbell*, 510 at 590 (quoting *Nimmer* § 13.05[A][4], at 13.102.61) (emphasis added); (Defs. Br. at 12).  Harm may be established even if the defendant's use was not for financial gain, because "'even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have.'"  *Worldwide Church*, 227 F.3d at 1119 (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984)).

Because fair use is an affirmative defense, the burden is on the defendant to "bring forward favorable evidence" that potential markets for the works will not be adversely affected.  *Dr. Seuss*, 109 F.3d at 1403.  Mere "'uncontroverted submissions that there [i]s no likely effect on the market for the original'" will not suffice.  *Id.* (quoting *Campbell*, 510 U.S. at 590); *Columbia Pictures Indus.*, 11 F. Supp. 2d at 1189 (rejecting fair use where defendant failed to provide "affirmative evidence" concerning impact on "relevant markets").  Here, even if Defendants' works were found to have some slight parodic value, Defendants' burden would be a heavy one, for a work with "little parodic content and much copying" is presumed far more likely to cause market harm than one "whose

---

(Footnote continued from previous page.)

of fair use.  In fact, *Fisher* expressly relied upon the "brevity" of the defendant's use (29 seconds of a 40-minute album) in finding it fair.  *Fisher*, 794 F.2d at 434, 439.

1   borrowing is slight in relation to its parody." *Campbell*, 510 U.S. at 593 n.24.

2   Defendants' primary argument that their uses are not harmful is based on the

3   (unfounded) opinion of DeVore that Defendants' uses could not possibly harm the

4   market for Plaintiffs' original recordings.  (*See* Defs. Br. at 13; DeVore Decl. ¶ 13.)

5   This is exactly the kind of conclusory disclaimer rejected by the Supreme Court in

6   *Campbell* and the Ninth Circuit in *Dr. Seuss*.  In contrast to DeVore's lay speculation,

7   Plaintiffs submitted testimony from an experienced licensing consultant explaining

8   how Defendants' uses, if permitted to continue, would threaten the market for the

9   original recordings by alienating fans.  (St. ¶¶ 156-57; Declaration of Jon Albert ("Albert

10   Decl.") ¶ 11.)  The fact that Henley and Kortchmar testified at their depositions that they

11   were not then aware of lost sales based upon the brief availability of the Defendants'

12   campaign ads before they were taken down is hardly dispositive of the issue.  *See L.A.*

13   *Times*, 2000 U.S. Dist. LEXIS 5669, at *69-70 (evidence of lost revenue "not

14   determinative" of market harm as "'[a]ctual present harm need not be shown'") (quoting

15   *Sony*, 464 U.S. at 451).  The critical question is whether there *would* be harm if the

16   videos were allowed to become "widespread" on the Internet.  Defendants have offered

17   no evidence that this would not be the case.

18   Nor have Defendants submitted any proof that their uses are not damaging to the

19   highly valuable derivative licensing markets for Plaintiffs' works.  *See Castle Rock*

20   *Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) ("The fourth

21   factor must also 'take account . . . of harm to the market for derivative works . . . .'")

22   (quoting *Campbell*, 510 U.S. at 592).  Such markets include future uses of the songs for

23   television, movies and advertising.  Through their licensing expert, Plaintiffs established

24   that Defendants' use of the songs by the DeVore campaign, if permitted to continue,

25   would deter future advertisers and other licensees, who tend to avoid songs that are

26   already identified with a person or cause, as well as songs with politicized or

27

28

1  controversial associations.[3]  (St. ¶¶ 156-57; Albert Decl. ¶¶ 8-12.)  Defendants' campaign

2  ads, by their nature, therefore usurp – and substitute for – potential licensing

3  opportunities.  *See Castle Rock*, 150 F.3d at 145 (market harm occurs when a secondary

4  use "usurps or substitutes for the market of the original").  They thus diminish the value

5  of Plaintiffs' copyrights.

6         Finally, the fact that Boys of Summer and Dance are not currently licensed for

7  commercial uses (or that Henley so far has not chosen to license his works for such a

8  purpose) is irrelevant.  The licensing of popular songs for advertising purposes (as well

9  as for television and film) is a well-established derivative market that music copyright

10  owners in general "develop or license others to develop."  *See Campbell*, 510 U.S. at

11  592; *Castle Rock*, 150 F.3d at 145; St. ¶ 157.  It is therefore a market for Plaintiffs'

12  works that is entitled to protection.  As the Supreme Court has recognized, the freedom

13  of thought and expression protected by copyright law includes "the right to refrain from

14  speaking at all" – a principle especially pertinent here, where Plaintiffs' works are being

15  exploited to promote the political views of others.  *Harper & Row*, 471 U.S. at 559-60.

16  Thus, "[e]ven an author who ha[s] disavowed any intention to publish his work during

17  his lifetime [i]s entitled to protection of his copyright, first, because the relevant

18  consideration [i]s the 'potential market' and, second, because he has the right to change

19  his mind."  *Worldwide Church*, 227 F.3d at 1119 (citing *Salinger v. Random House, Inc.*,

20  811 F.2d 90, 99 (2d Cir. 1987)); *Castle Rock*, 150 F.3d at 145-46 ("although Castle Rock

21  has evidenced little if any interest in exploiting th[e] market for derivative works based

22  on *Seinfeld* . . . the copyright law must respect that creative and economic choice.")

23  ## II.  DEFENDANTS ACTED WILLFULLY

24       "To refute evidence of willful infringement, [the defendant] must not only

25  establish its good faith belief in the innocence of its conduct, it must also show that *it*

26

27  [3] This is not a question of the market's being suppressed by "biting criticism" of
Plaintiffs' works; Defendants' videos are devoid of any such commentary.  *See*

28  *Campbell*, 510 U.S. at 591-92.

ny-922507

*was reasonable in holding such a belief*." *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990) (emphasis added).  Defendants cannot establish that their conduct was reasonable here.

As Plaintiffs demonstrated in their opening brief, the record in this case is filled with evidence that Defendants appropriated Plaintiffs' songs with an understanding of copyright law and, more specifically, with the knowledge that the use of popular music requires a license.  According to DeVore, the use of music "is an endemic problem with campaigns," which has caused him on "more than one occasion" to ask Hart, "Hey, you know, you got the rights to this, right?"  (St. ¶ 44.)  Defendants paid the *Wall Street Journal* some $3,500 for a license to reprint an article for use in their campaign.  (St. ¶ 47.)  Hart is himself a copyright owner who has licensed his works and advised others how to avoid cease and desist letters for the use of online images.  (St. ¶ 46; Charlesworth Decl., Ex. 16 at 658 (Deposition of Justin Hart at 279:15-22).)  But despite the obvious signs that their use of Plaintiffs' music was not lawful –  the infringement notice from Henley, DeVore's familiarity with the *Dr. Seuss* case, and the warnings of friends – they chose to persist in their infringing conduct, declining to seek legal guidance on the question of fair use, and even welcoming the possibility of an injunction because of the potential for free publicity.  (St. ¶¶ 89-90, 93-95.)  Such behavior is willful within the meaning of the Copyright Act.

## III.   PLAINTIFFS HAVE ESTABLISHED DIRECT, CONTRIBUTORY AND VICARIOUS INFRINGEMENT

As set forth in Plaintiffs' opening brief, Plaintiffs have plainly established the elements of direct copyright infringement with respect to both Boys of Summer and Dance.  They have also established Defendants' contributory and vicarious infringement of both works.  The record shows that both DeVore and Hart knowingly and materially contributed to the unauthorized use of Plaintiffs' songs, and further, that they had the right and ability to control the unauthorized uses, from which they derived direct economic and financial benefit.  *See Dream Games of Arizona, Inc. v. PC Onsite*, 561

F.3d 983, 995 (9th Cir. 2009) (setting forth standards for contributory and vicarious infringement).

## IV.   DEFENDANTS CANNOT ESCAPE LIABILITY UNDER THE LANHAM ACT

DeVore's campaign ads present altered versions of well-known Henley songs, incorporating music that simulates the original Henley tracks, and mimicking Henley's vocal performances.  Henley's songs are not used as background music or in an incidental way; rather, they are the featured content of both videos.  The Henley-associated songs are used in an obviously promotional manner, including in conjunction with written campaign slogans, to broadcast Defendants' campaign messages.  The videos were posted on YouTube and other sites and, but for this lawsuit, would still be there – along with other videos featuring Henley songs, based on DeVore's promise that he would "rifle through Henley's catelouge [sic]" for other works to take.  (St. ¶ 100.) Plaintiffs have demonstrated that by using Henley's songs in this way, Defendants have caused confusion as to whether Henley is associated or affiliated with DeVore and/or his ads.  (St. ¶ 162.)  This violates the Lanham Act.

## A.   Defendants' Recycled Legal Arguments Should Be Rejected

The Lanham Act prohibits "[a]ny person" from using of "any word, term, name, symbol, or device, or any combination thereof" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A). Defendants seek to escape liability for their conduct by reprising an earlier argument from their unsuccessful motion to dismiss that this Court should set aside the broadly-worded standard set forth above and replace it with the undefined term "distinctive attribute" whenever a celebrity is involved.  (Defs. Br. at 16-17, 21 ("False endorsement claims must be tethered to the use of the plaintiff's personality—his or her distinctive characteristics . . . .").

1    This Court has previously declined Defendant's invitation to rewrite the Lanham

2  Act in this manner, and should do so again.  In denying Defendants' motion to dismiss,

3  the Court explained that "'Congress approved the broad judicial interpretation'" of the

4  Lanham Act, noting that a false endorsement claim may arise from "distinctive attributes

5  including uniforms, photographs, names, faces, and voices," as well as "'distinctive

6  sounds and physical appearance.'"  (July 8, 2009 Order Denying Defendants' Motion to

7  Dismiss ("Order") at 13 (quoting *Waits v. Frito-Lay*, 978 F.2d 1093, 1106-07 (9th Cir.

8  1992).)  Thus, the Court held, in the instant case, the use of two Henley songs, "one right

9  after the other," and the mimicking of Henley's original recordings, gives rise to an

10  actionable claim under the Lanham Act.  (*Id.* at 13-14)

11    Aside from the fact that "distinctive attribute" (like "distinguishing characteristic")

12  has no particular definition in the law (and in any event, is not limited to a personal

13  physical trait, as Defendants seem to suggest), Defendants' proposed judicial revision of

14  the Lanham Act conflicts with the very face of the statute, which, by its terms, forbids a

15  false association with "another person" based on "any word, term, name, symbol, or

16  device, or any combination thereof."  15 U.S.C. § 1125(a)(1)(A).  There is no suggestion

17  in the statutory language that the symbol or device be a "distinctive attribute" (however

18  that is defined); indeed, the statute does not make use of the term at all.  Nor does the one

19  case relied upon by Defendants, *Waits v. Frito-Lay*, support what they are saying.  *Waits*

20  held that the use of a "distinctive attribute" or "distinguishing characteristic" of a

21  celebrity in a confusing way *could* be the basis of a false endorsement claim – not that it

22  is the *only* basis for such a claim.  *See* 978 F.2d at 1107, 1110.

23    Courts have upheld Lanham Act claims by celebrities based on the evocation of

24  the celebrity through a variety of devices; whether or not these devices are referred to as

25  "distinctive attributes," there is no requirement that a physical trait of the celebrity be

26  used, or even closely imitated.  *Waits*, of course, did involve imitation of a singer's

27  voice.  But *White v. Samsung Electronics America, Inc.*, 971 F.2d 1395, 1399-1401 (9th

28  Cir. 1992), upheld a claim based on a robot posed next to a game board to evoke the

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

1  game show hostess Vanna White – clearly, the robot was not White.  In *Dallas Cowboy*

2  *Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979), the

3  court affirmed a finding that defendants' imitation of plaintiffs' cheerleading uniforms

4  gave rise to confusion as to whether plaintiffs had sponsored or otherwise approved

5  defendants' movie.  And, in a case closely on point, *Butler v. Target Corp.*, 323 F. Supp.

6  2d 1052, 1058-59 (C.D. Cal. 2004), the court held that the use of an altered title and

7  "distorted" lyrics from plaintiffs' well-known song as part of an advertising campaign

8  was actionable because it could cause consumer confusion as to the plaintiffs'

9  association with the defendant corporation.  In sum, even if a distinctive attribute must be

10  shown, the case law indicates that distinctive attributes include "distinctive sounds,"

11  "distorted song lyrics" and the simulation of a musical performance.  Defendants thus

12  used distinctive attributes of Henley's here.

13       Defendants further argue that Henley "has no choice" but to give up his false

14  endorsement claim, based on Henley's response to a request for admission concerning

15  the pleading of this claim.  (Defs. Br. at 17.)  Defendants' treatment of Henley's response

16  is misleading.  The request cited by Defendants' asked Plaintiffs to "[a]dmit that your

17  Lanham Act false endorsement claim is not based on an allegation that Defendants used

18  a 'distinctive attribute' of yours."  (Declaration of Christopher Arledge ("Arledge

19  Decl."), Ex. 2 at 4.)  Henley responded, subject to various objections, that his claim was

20  not "based on an *allegation* that Defendants' used a 'distinctive attribute' of Plaintiff

21  Henley."  (*Id.* at 4-5 (emphasis added).)  Henley did not include such an allegation in his

22  complaint because there is no such requirement to plead false endorsement; in fact, at the

23  time Henley furnished his response, this Court had already upheld the sufficiency of

24  Henley's pleading.  (Order at 13-14); *see also* 5 J. Thomas McCarthy, McCarthy on

25  Trademarks and Unfair Competition § 27:13 (4th ed. 2010) (setting forth elements

26  of claim under Section 43(a)(1)(A) of the Lanham Act).  More importantly, in a material

27  omission, Defendants fail to mention that in the two requests that followed, Henley was

28  asked to admit – and expressly *denied* – that Defendants did not use a "distinctive

1   attribute" of his in the Hope and Tax Videos.  (Arledge Decl., Ex. 2 at 5-6.)

2        Defendants next invoke a Second Circuit case, *Oliveira v. Frito-Lay, Inc.*, 251

3   F.3d 56 (2d Cir. 2001), in a further effort to defeat Henley's claim.  *Oliveira* concerned

4   the licensed use of the plaintiff Gilberto's *own* recording of the song "The Girl from

5   Ipanema" in a commercial.  *Id.* at 57-58.  There are several flaws in Defendants' *Oliveira*

6   argument.  First, in *Oliveira*, the district court had determined that "'no reasonable jury

7   could find for plaintiff on her claim of implied endorsement.'"  *Id.* at 60 (citing district

8   court).  Based on this, the Second Circuit concluded that "*at least upon the showing*

9   *made by Gilberto*," there was no basis to hold that she had a trademark interest in "her

10  own famous performance."  *Id.* at 62 (emphasis added).  Here, by contrast, there is a

11  clear record establishing that Defendants' uses cause substantial confusion concerning

12  Henley's association with DeVore.  (St. ¶ 162.)  Second, unlike Gilberto, Henley is *not*

13  claiming a trademark in an otherwise licensed use of his *own* performance, but rather,

14  that two songs widely associated with him were used in unauthorized, simulated

15  performances falsely to suggest an association between Henley and Defendants' videos.

16  This makes Henley's claim like Waits's, not Gilberto's.  Perhaps for this very reason, the

17  Second Circuit took pains to distinguish *Waits*, *White*, and similar cases from the reach

18  of it decision.  *See Oliveira*, 251 F.3d at 62.  Finally, *Oliveira* appears to depart from

19  case law in this circuit, including *Butler*, which distinguished *Oliveira* in upholding

20  plaintiffs' Lanham Act claim based on misuse of a song, 323 F. Supp. 2d at 1059; and

21  *Browne*, which upheld a false endorsement claim based upon the unauthorized use of the

22  plaintiff's own recording in a campaign ad, 612 F. Supp. 2d at 1128, 1133.

23       Lastly, Defendants resurrect their *Dastar* argument, which was fully aired and

24  disposed of in connection with Defendants' motion to dismiss.  (*See* Order at 9-11.)  This

25  Court correctly determined that Defendants' reliance on *Dastar Corp. v. Twentieth*

26  *Century Fox Film Corp.*, 539 U.S. 23 (2003), was misplaced because in *Dastar*, the

27  Supreme Court "makes it clear that its concern lies with extending protection for

28  uncopyrighted or expired works and not with a cause of action under false association or

ny-922507

1    endorsement claim."  (Order at 11.)

2         To the extent there is any new matter here, it appears to be Defendants'

3    speculation concerning a hypothetical false endorsement claim Henley might make based

4    on Kortchmar's licensing of the copyrighted musical composition Dance for the

5    television show *American Idol*.  To be clear, Henley has never made, and is not making,

6    any such claim, so the Court need not address this figment of Defendants' imagination.

7    But regardless, Defendants' suggestion that there is no conceivable circumstance where

8    the licensed use of a musical composition could or should ever be held to violate the

9    Lanham Act is directly contradicted by this Court's earlier ruling that Henley's false

10   endorsement claim is not preempted by the Copyright Act.  (*See* Defs. Br. at 20; Order at

11   14.)  It also runs straight into *Waits*, which stands for the proposition that even the

12   authorized use of song can violate the Lanham Act if the use is confusing.  *Waits*, 978

13   F.2d at 1097 (use held actionable even where song was specifically written for

14   commercial).

15   **B.    The Facts Clearly Demonstrate Defendants' Actual Malice**

16        Citing *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001), and

17   *Kournikova v. General Media Communications, Inc.*, No. CV 02-3747 GAF (AJWx),

18   2002 U.S. Dist. LEXIS 25810 (C.D. Cal. Aug. 9, 2002), Defendants assert that Henley

19   must demonstrate that "Defendants' videos were made with actual malice."  (Defs. Br. at

20   21.)  It is true that Henley is a public figure.  This case, however, which involves

21   freestanding video advertisements, stands in marked contrast to those relied upon by

22   Defendants, which involved editorial content in magazines.  Moreover, Defendants are

23   not media organizations, and the application of the actual malice standard to a nonmedia

24   defendant has not been established.  *See Underwager v. Channel 9 Australia*, 69 F.3d

25   361, 368 n.9 (9th Cir. 1995) (declining to address application of actual malice to a

26   nonmedia defendant); *cf. Hoffman*, 255 F.3d at 1186 (characterizing magazine defendant

27   as type of "media organization" that requires a showing of actual malice).

28        As Plaintiffs have demonstrated, Defendants' use of their songs is a commercial

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

1    one for purposes of the fair use test under copyright law.  While a somewhat different

2    standard applies under the First Amendment, the dividing line between commercial and

3    noncommercial speech is, nonetheless, not "clearly delineated." *Hoffman*, 255 F.3d at

4    1184-85.  Certainly, Defendants' uses, which are promotional in nature, do not constitute

5    the type of noncommercial, "editorial opinion" at issue in *Hoffman* or *Kournikova*.  *See*

6    *Hoffman*, 255 F.3d at 1184-85 (actual malice doesn't apply where celebrity is used to

7    "sell[] a product"); *Kournikova*, 2002 U.S. Dist. LEXIS 25810, at *24 (distinguishing

8    "simple advertisements").  And, under the First Amendment, "[f]alse or misleading

9    commercial speech is not protected." *Hoffman*, 255 F.3d at 1184.

10          Even assuming the Court were to apply the actual malice standard to Defendants'

11   advertising uses, it is plainly satisfied in this case.  Actual malice requires a showing, by

12   clear and convincing evidence, that the defendant made a false statement "with

13   knowledge that the statement was false or with reckless disregard as to whether or not it

14   was true." *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988).  Significantly,

15   Defendants' actual malice argument misstates the relevant inquiry in this case.  The

16   question is not properly characterized as whether Defendants "intended to confuse the

17   public into believing Henley actually sponsored or endorsed the videos." (Defs. Br. at

18   22.)  False speech under section 43(a) the Lanham Act is speech that causes confusion as

19   to the "affiliation, connection, or association of such person with another person" or as to

20   "the origin, sponsorship, or approval of his or her goods, services, or commercial

21   activities by another person."  15 U.S.C. § 1125(a)(1)(A).  Thus, the inquiry needs to

22   encompass whether Defendants acted with knowledge of, or reckless disregard for, the

23   fact that their use of Henley's music in the videos would falsely suggest *an affiliation,*

24   *connection or association with Henley.*

25          It is clear from the record that they did.  The videos themselves – in which

26   Defendants' grafted their campaign messages onto not just one, but two popular Henley

27   songs – demonstrate that Defendants directly and intentionally associated their videos

28   with Henley.  DeVore chose to use Henley's popular songs because they would allow

24

ny-922507

him to "reach people in three minutes" who would never read a position paper or listen to a speech. (St. ¶ 73.)  He admits to using Henley's work as a "vehicle" for his campaign messages; in posting the Hope lyrics to the Internet, he did so with "apologies to Don Henley" because he understood that he was "taking [Henley's work] and . . . using it for something else." (St. ¶¶ 75, 97.)  Tellingly, in reposting the Tax Video several months after this lawsuit was filed, Defendants felt obliged to include a written disclaimer that "Don Henley did not approve this message"; according to DeVore, this was to make it clear that the videos were "not approved by Mr. Henley." (St. ¶¶ 140-41.)  *Cf. Eastwood v. National Enquirer, Inc.,* 123 F.3d 1249, 1253, 1256 (9th Cir. 1997) (confirming jury's finding of actual malice based upon the totality of "circumstantial evidence" concerning editors' presentation of interview in magazine); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084-87, 1090 (9th Cir. 2002) (reversing grant of summary judgment to permit jury to consider issue of actual malice based upon "appropriate inferences" from the evidence).

In sum, Defendants' conduct in seeking falsely to associate DeVore's videos and campaign with Henley's songs and Henley himself was knowing, deliberate and reckless, and with a clear understanding that Henley had never approved the use of his songs in their videos, and was in no way affiliated with the DeVore campaign.

CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that this Court deny Defendants' motion for summary judgment on Plaintiffs' copyright and Lanham Act claims, and grant Plaintiffs' corresponding cross-motion on these issues.

Dated:    May 3, 2010

MORRISON & FOERSTER LLP
Jacqueline C. Charlesworth
Craig B. Whitney
Tania Magoon
Paul Goldstein


By:    /s/ Jacqueline C. Charlesworth
           Jacqueline C. Charlesworth

*Attorneys for Plaintiffs*

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(SACV09-0481 JVS (RNBx))

ny-922507